**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS
KANSAS CITY DIVISION**

| | |
|---|---|
| INSTITUTIONAL SHAREHOLDER SERVICES INC., *Plaintiff,* v. KRIS KOBACH, in his official capacity as the Kansas Attorney General, *Defendant.* | Case No. 2:26-cv-02254 Hon. Holly L. Teeter ORAL ARGUMENT REQUESTED |

**MOTION FOR PRELIMINARY INJUNCTION AND MEMORANDUM IN SUPPORT**

Plaintiff Institutional Shareholder Services Inc. ("ISS") moves for a preliminary injunction against Defendant Attorney General Kris Kobach preventing enforcement against ISS of a newly enacted—and blatantly unconstitutional—Kansas statute, Senate Bill ("S.B.") 375 (Ex. A). Because the law threatens ISS with ruinous fines for exercising its constitutional rights, ISS respectfully requests a decision in advance of the law's effective date of July 1, 2026.

ISS is a proxy advisor: an independent third-party firm that sophisticated institutional investors hire to provide research and recommendations to help them decide how to vote on board elections, shareholder proposals, and other ballot items for publicly traded companies. For each ballot issue, ISS analyzes relevant publicly available data, reviews voluminous proxy materials, and provides its institutional investor clients with detailed reports and recommendations according to criteria its clients select or design to fit their specific needs and priorities. ISS' objective is to help its clients make informed voting decisions in the client's best interest, as defined by the client.

S.B. 375 seeks to tilt the playing field in corporate elections away from shareholders and toward corporate boards. So long as ISS recommends following the board's preferred outcome,

1

the law has no effect. But if ISS recommends a client vote against the company board, the law compels ISS to issue disparaging and misleading statements about ISS' business. ISS must make these disparaging statements to its clients, to the companies that are the subject of ISS' advice, and to the broader public. The statute's theoretical exception to avoid making these statements would require ISS to undertake a "written financial analysis" meeting several statutory requirements—but ISS does not, and in many cases cannot, conduct such an analysis with the specificity demanded by the law. S.B. 375 declares any failure to comply a deceptive trade practice actionable by the Attorney General and punishable by up to a $10,000 fine per violation.

S.B. 375 is unconstitutional for at least three reasons. *First*, it violates the First Amendment. The law burdens proxy advisors only if they express a dissenting view from that held by company boards, as ISS sometimes does—and is thus textbook viewpoint discrimination. S.B. 375 compounds that free-speech violation by compelling ISS to recite a series of misleading warnings about its own services anytime ISS dissents. *Second*, S.B. 375 is unconstitutionally vague, leaving ISS guessing at how it must comply and inviting the Attorney General to arbitrarily enforce the law against those seen as politically disfavored speakers. And *third*, the law is impermissibly extraterritorial. It purports to regulate any advice from ISS, which is an out-of-state business, to any ISS client anywhere in the world. Kansas's attempt to regulate wholly out-of-state commerce violates the Commerce Clause, the Due Process Clause, and basic structural protections of the Constitution. For these reasons, ISS is likely to prevail on the merits.

The remaining preliminary-injunction factors all squarely favor ISS too. If not enjoined, ISS faces irreparable harm from losing its constitutional rights and staggering costs. The Attorney General has no legitimate interest in enforcing an unconstitutional statute against ISS. And there are already ample safeguards to protect institutional investors. ISS' motion should be granted.

## BACKGROUND

### A.    ISS And Proxy Advisory Services

Publicly traded companies hold meetings to conduct business that require shareholder approval.  Matters requiring shareholder votes at upcoming meetings are compiled into what is known as a "proxy statement"; at these meetings, shareholders' proxies—designees who vote the shares owned by particular shareholders—vote on the issues listed in the proxy statement.  Proxy statements include a variety of issues, including routine and high-profile matters like electing directors and executive compensation.  *See ISS v. SEC*, 718 F. Supp. 3d 7, 11 (D.D.C. 2024), *aff'd*, 142 F.4th 757 (D.C. Cir. 2025).  Federal law requires public companies to hold advisory shareholder "say on pay" votes on the compensation of top executives.  *See* Ex. 2 at 27-28; Ex. 32.

Shareholders satisfying certain requirements may also submit proposals, such as requesting that the company issue a report about potential supply-chain disruption or increase disclosures of policies and practices regarding artificial intelligence and related risks.  *E.g.*, Ex. 23 (ISS, A Look At AI-Related Shareholder Proposals At U.S. Companies (Dec. 2025), https://perma.cc/56ZH-8P4E).  Companies may seek to exclude shareholder proposals from proxy statements; where a shareholder proposal is included, it is typically nonbinding and companies can offer their "own point of view" urging shareholders to vote against it.  17 C.F.R. § 240.14a–8; *e.g.*, Ex. 1 at 44-48.  Many issues spur fierce competition for votes:  Proponents, other shareholders, and outside groups may lobby shareholders or institutional investors managing shares to vote in a certain way—referred to as "soliciting" proxy votes.  *See ISS*, 142 F.4th at 766-767; *e.g.*, Ex. 1 at 26, 31-32 (discussing "vote no" campaigns).

Institutional investors—sophisticated market participants that may manage billions or even trillions of dollars for thousands of investors across numerous companies—field thousands of

shareholder votes each year.  Historically, these investors often followed the so-called Wall Street Rule ("vote with management or sell") because it was too expensive and time-consuming to inform themselves about thousands of shareholder votes across all the companies in their portfolios.  *See* George W. Dent, Jr., *A Defense of Proxy Advisors*, 2014 Mich. St. L. Rev. 1287, 1288-89 (2014).

The entry of proxy advisors like ISS—which provide research and recommendations about proxy voting proposals—helped institutional investors break from this default and make informed decisions about how to vote in line with their own preferences.  *See ISS*, 142 F.4th at 761.  ISS is registered with the SEC under the Investment Advisers Act.  Ex. B, Declaration of Marc Goldstein ¶ 4.  But ISS is not akin to a personal investment adviser; "ISS does not manage investment accounts or make buy, sell or hold investment recommendations to clients."  Ex. 20 at 11.  Instead, ISS offers research and recommendations to its sophisticated institutional investor clients, based on each client's chosen framework, about upcoming shareholder elections.  Goldstein Decl. ¶¶ 14-34.  Clients, in turn, "must determine whether and how to incorporate [ISS'] research . . . into their investment decision-making process."  Ex. 20 at 5.  "ISS does not guarantee that its advice will produce any particular investment return or other results for clients."  *Id.* at 11.

To meet clients' diverse needs, ISS offers three types of voting policies that guide recommendations: (1) the Benchmark Policy, *see* Ex. 21, which is a market-specific proxy voting framework ISS has developed, and updated year after year, through a robust consultative process with investors, companies, and other industry experts; (2) Specialty Policies, which evaluate governance issues from thematic perspectives such as faith-based or sustainable investing; and (3) client-specific Custom Policies reflecting clients' specific approaches to voting.  Goldstein Decl. ¶¶ 21-31.  Some clients choose policies developed by third parties, *id.* ¶ 22; for example, ISS administers an "ESG skeptical" policy developed by Bowyer Research, *see* Exs. 31-32.

4

For a particular upcoming shareholder vote, ISS looks at each proposal on the ballot, pulls relevant publicly available information and data, and then analyzes the proposal and data through the prism of the applicable policy to come up with a voting recommendation. Goldstein Decl. ¶ 33. ISS routinely offers different recommendations about the same vote to different clients, depending on the client's chosen voting policy. *Id.* ¶ 20. Some clients choose a policy in which a recommendation takes into account environmental, social, and governance ("ESG") considerations; some clients make voting decisions that take into account religious or philosophical beliefs; other clients choose other policies with different considerations. Goldstein Decl. ¶ 18. ISS has no financial interest in the outcome of a shareholder vote. *Id.* ¶¶ 20, 33. And it is not unusual for ISS clients to "ignore its advice, especially the larger institutions and especially on higher profile issues." *Defense of Proxy Advisors* at 1326.

In 2025, ISS assisted approximately 1,400 clients in connection with voting analyses and recommendations for about 52,000 shareholder meetings in about 100 developed and emerging markets worldwide.[1] Goldstein Decl. ¶ 15. ISS currently provides research and voting services to only one client in Kansas, based on that client's billing address. *Id.*

**B.      Kansas S.B. 375**

S.B. 375 is one of several recently enacted state laws targeting proxy advisors' speech. Kansas's law—which is nearly identical to a model law drafted by an advocacy group calling itself "Consumers Defense," *see* Exs. 13-15—imposes onerous obligations on proxy advisors that make recommendations "against company management." S.B. 375 § 4. A "company" under S.B. 375 is broadly defined to mean "a publicly traded, for-profit corporation, limited liability company, partnership or other business entity." *Id.* § 3(d). The law defines a "proxy advisor" as anyone

---

[1] ISS also offers a suite of other services, including risk assessment tools, scoring, and thought leadership, which may be provided in connection with a proxy vote but that are otherwise freestanding services. Goldstein Decl. ¶¶ 35-40.

"who, for compensation, provides a proxy advisory service," meaning "[a]dvice or a recommendation on how to vote on a company proposal or proxy proposal"; "proxy statement research and analysis regarding a company proposal or proxy proposal"; or "[d]evelopment of proxy voting recommendations or policies." *Id.* § 3(g), h(1)(A)-(C). The law exempts certain "charitable organization[s]" and "bank[s]." *Id.* § 3(h)(2)(A)-(B).

Whenever "a proxy advisor makes a recommendation against company management" on a company or shareholder proposal, "or makes a default recommendation or policy involving votes against company management" on company or shareholder proposals, S.B. 375 requires the advisor to either produce a specifically defined "written financial analysis" or else issue a series of warnings. *Id.* § 4(a), (b). The law defines a "written financial analysis" as "a written document" that "(1) [a]nalyzes the expected short-term and long-term financial benefits and costs to the company regarding the implementation" of the proposal; "(2) concludes what vote or course of action is most likely to positively affect shareholder value; and (3) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation." *Id.* § 3(k). If a proxy advisor performs this "written financial analysis," the advisor must provide "a clear and conspicuous disclosure" to the client receiving the service "stat[ing] that the proxy advisor has made the recommendation or policy based on a written financial analysis" and that this "analysis is available upon request," *id.* § 4(b)(1)(C), (D); if requested, the advisor must "make such analysis available within a reasonable time," *id.* § 4(b)(2).[2]  And proxy advisors must provide a copy of the "written financial analysis" "to the board of directors of each company that is the subject of the service," "concurrently with providing" any "[a]dvice or a recommendation on how to vote" on a proposal or "[p]roxy statement

---

[2] ISS takes the position that § 4(a)(1), (b)(1), & (b)(2) refer only to the particular ISS client receiving the service. If the Attorney General's views differ, ISS reserves the right to address the constitutional problems that would result.

research and analysis." *Id.* §§ 3(h)(1)(A)-(B), 4(b)(3).

If the advisor does not produce this specific "written financial analysis" when advising against the company board's position, S.B. 375 requires the proxy advisor to do three things. *Id.* § 4(a). *First*, the advisor must "include a clear and conspicuous disclosure" to each client receiving the advice that "states that the proxy advisor has made the recommendation or policy without basing such recommendation on a written financial analysis regarding the impact of such recommended action on company investors" that "(i) [a]nalyzes the expected short-term and long-term financial benefits and costs to the company regarding the implementation of" the proposal; "(ii) concludes what vote or course of action is most likely to positively affect shareholder value"; and "(iii) explains the methods and processes used to prepare the analysis." *Id.* § 4(a)(1)(C).

*Second*, the proxy advisor must make the same disclosure "to the board of directors of each company that is the subject of the proxy advisory service" if the recommendation involves "a company proposal or proxy proposal" or "proxy statement research and analysis regarding a company proposal or proxy proposal." *Id.* §§ 3(h)(1)(A)-(B), 4(a)(2). The disclosure to company management must also "[i]dentif[y] the service" and "identif[y] the recommendation or policy" the proxy advisor provided its clients. *Id.* § 4(a)(1)(A)-(B), (2).

*Third*, the proxy advisor must "publicly and conspicuously disclose on the home or front page of" its website a "statement" that the advisor's services "include recommendations or policies against company management" that "are not made based on a written financial analysis regarding the impact of such recommended action on company investors." *Id.* § 4(a)(3). This disclosure must remain online "while any proxy advisory services are being provided." *Id.*

A proxy advisor that fails to comply with any aspect of S.B. 375 is deemed to have committed a "deceptive and unconscionable act or practice under the Kansas consumer protection

act." *Id.* § 5(a)(1); *see* Kan. Stat. § 50-623 *et seq*. The Attorney General may seek injunctive relief and civil penalties of up to $10,000 per violation. *See* Kan. Stat. §§ 50-632, 50-636.

The Legislature enacted S.B. 375 over the objections of an array of organizations, *see* Ex. 16 (United Church Funds); Ex. 17 (Green America); Ex. 18 (Taxpayers Protection Alliance), and over Governor Kelly's veto, *see* Ex. 12 at 3 (4/09/2026 Sen. Tr.).

## STANDING

As the object of S.B. 375, ISS' standing is self-evident. *See Diamond Alt. Energy, LLC v. EPA*, 606 U.S. 100, 114 (2025); *Susan B. Anthony List v. Driehaus*, 573 U.S. 149, 159 (2014). ISS would suffer economic, reputational, and constitutional harms if the Attorney General enforces S.B. 375, which would be redressed by enjoining enforcement. *See* Goldstein Decl. ¶¶ 41-55.

## ARGUMENT

A preliminary injunction is appropriate if the movant shows (1) a likelihood of success on the merits; (2) a likely threat of irreparable harm; (3) the movant's harm outweighs harm to the non-moving party; and (4) the injunction is in the public interest. *Does 1-11 v. Bd. of Regents of Univ. of Colo.*, 100 F.4th 1251, 1267 (10th Cir. 2024) (citation omitted). Every factor favors ISS.

## I. ISS Is Likely To Succeed On The Merits.

### A. S.B. 375 Violates ISS' First Amendment Rights.

When ISS provides advice on issues running the gamut from executive pay packages to disclosures of climate-related risks, ISS is speaking "on matters of public concern" "at the heart of the First Amendment," which protects the "unfettered interchange of ideas." *Lane v. Franks*, 573 U.S. 228, 235-236 (2014) (citation and quotation marks omitted). S.B. 375 is unconstitutional as applied to ISS for two independent reasons: (1) It discriminates based on the content and viewpoint of ISS' speech; and (2) it compels ISS' speech. Strict scrutiny applies to each of these faults. Even

if the Court applied a lower standard, S.B. 375 still could not survive.

### 1.  S.B. 375 Discriminates Based On Content And Viewpoint.

S.B. 375 is a content- and viewpoint-based speech regulation and is thus presumptively unconstitutional.  S.B. 375 is triggered *only* if ISS "makes a recommendation *against* company management" on a company or shareholder proposal.  S.B. 375 § 4(a), (b) (emphasis added).  A proxy advisor that "rubber-stamps" the views of the company board gets a free pass.  Ex. 6 at 17-18 (2/10/2026 Tr.).  The bill's sponsor put it bluntly: "proxy advisors often . . . recommend votes against what the management of the company has recommended.  And that's what this bill addresses."  Ex. 7 at 3-4 (2/18/2026 Tr.).  So when ISS recommends voting against an executive pay package, *e.g.*, Ex. 1 at 1, 18-39 (Benchmark Policy Recs., 11/06/2025 Tesla, Inc. meeting), recommends voting against directors given their management of climate-related issues, *e.g.*, Ex. 3 at 2-3, 18 (Climate Specialty Policy Recs., 5/31/2023 Exxon Mobil Corp. meeting), or recommends voting for a shareholder proposal requesting a report on reduced plastics demand that management disfavors, *e.g.*, Ex. 5 at 1-2 (Catholic Faith-Based Specialty Policy Recs., 5/25/2022 Exxon Mobil Corp. meeting), for example, S.B. 375 would require ISS to perform a complex "written financial analysis" to justify ISS' recommendation—or else slap a series of warnings on ISS' advice—*and* disseminate that speech widely to ISS' clients, the public, and company issuers. *See infra* pp. 12-15.  No matter what ISS chooses, S.B. 375 would impose difficult and expensive or cost-prohibitive requirements on ISS.  Goldstein Decl. ¶¶ 42-55.  But if ISS' recommendation is to vote in favor of whatever company management wants, ISS may make that recommendation unencumbered.  S.B. 375 thus on its face imposes burdens "on certain speakers based on the content of their expression"—speech that dissents from the views of powerful companies. *See Rosenberger v. Rector & Visitors of Univ. of Va.*, 515 U.S. 819, 828-829 (1995); *see also Animal*

9

*Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021).  But the First Amendment "secures, even and especially, the right to voice dissenting views."  *Chiles v. Salazar*, 146 S. Ct. 1010, 1024 (2026).  Little wonder that a member of the sponsoring committee candidly acknowledged S.B. 375 is not "viewpoint neutral."  Ex. 6 at 17-18, 20-21 (2/10/26 Tr.).

S.B. 375 is also impermissibly "aimed at particular speakers."  *Sorrell v. IMS Health Inc.*, 564 U.S. 552, 567 (2011).  S.B. 375 imposes unique requirements on a specific type of speech (proxy advisory services) and class of speakers (proxy advisors who give advice "for compensation") based on Kansas's desire to elevate the views of other speakers (company boards). S.B. 375 does not apply equally to all speakers who also advise investors about how to vote on proxy proposals:  It does not apply to company managers, shareholder proponents, those who solicit proxy votes, other shareholders, certain financial institutions, certain charities, or anyone who gives their advice away for free.  S.B. 375 § 3(g), (h)(2); *see* Ex. 7 at 7 (2/18/2026 Tr.).

Moreover, content and viewpoint discrimination inhere in S.B. 375's design and purpose, reflecting that the law was adopted "because of disagreement with the message the speech conveys."  *Reed v. Town of Gilbert*, 576 U.S. 155, 164 (2015) (citation and brackets omitted).  The author of the model law on which S.B. 375 is based aims to cleanse "the scourge of ESG in all its forms, in every state, and in every arena where it infects."  Ex. 14 (Consumers Defense, https://perma.cc/U97G-TW9M).  S.B. 375's findings—copied nearly verbatim from the model— make clear the law targets "recommended votes against company management" "related to environmental, social or governance (ESG) issues."  S.B. 375 § 1(e).  The Kansas Legislature may disfavor proxy advice that dissents from company managers based on ESG considerations.  But other States have taken the view that factors like "climate-related financial risk" can be material, *see* Cal. Gov't Code § 7510.5; *see also, e.g.*, Ex. 37 at 9, 60-63 (Maryland State Retirement &

Pension System Investment Policy Manual); Ex. 38 at 5-6, 12 (Office of the Illinois Treasurer 2026 Proxy Voting Policy Statement), as has the federal government, *see* 87 Fed. Reg. 73,822, 73,885 (Dec. 1, 2022) (Department of Labor rule recognizing "[r]isk and return factors may include" "climate change and other environmental, social, or governance factors"); 89 Fed. Reg. 21,668, 21,671-72 (Mar. 28, 2024) ("climate-related risks can affect a company's business").  On top of that, S.B. 375's sponsor said that the law targets "ideological" speech she disfavors, such as "set[ting] emission targets."  Ex. 7 at 4, 9 (2/18/2026 Tr.) (Sen. Kellie Warren).  And the law's carveout for banks providing proxy advice apparently came at bankers' request.  *See* Ex. 19 (Kansas Bankers Association Written Testimony).  The "legislative history" thus "confirms what the text of the law alone demonstrates:  the Act places pro-[management] viewpoints above anti-[management] viewpoints" based on the Legislature's disagreement with the underlying message.  *Animal Legal Def. Fund*, 9 F.4th at 1233.  Even a facially neutral law—which S.B. 375 is not—must satisfy strict scrutiny where, as here, it was adopted "because of disagreement with the message the speech conveys."  *See Reed*, 576 U.S. at 164 (citation and brackets omitted).

### 2.   S.B. 375 Is Independently Unconstitutional For Compelling ISS' Speech.

"[I]f there is any fixed star in our constitutional constellation, it is the principle that the government may not interfere with an uninhibited marketplace of ideas":  "[N]o government may affect a speaker's own message by forcing [it] to accommodate views [it] does not hold."  *303 Creative LLC v. Elenis*, 600 U.S. 570, 584-585, 599-600 (2023) (cleaned up).  S.B. 375 violates that core principle.  Whenever ISS provides advice "against" company management, the law would require ISS to either produce a complex "written financial analysis" or else issue self-denigrating warnings.  Either way, S.B. 375 would force ISS to speak in a way ISS would not otherwise.

S.B. 375's "written financial analysis" would make ISS "[a]nalyze[] the expected short-

11

term and long-term financial benefits and costs regarding the implementation" of a proposal and then force ISS to offer a "conclu[sion]" as to "what vote or course of action is most likely to positively affect shareholder value." S.B. 375 §§ 3(k), 4(b). But proxy ballot issues frequently involve qualitative issues that do not lend themselves to quantification, Goldstein Decl. ¶ 44; it is unclear how anyone could purport to quantify the "financial benefits and costs" of a vote for one director over another, *e.g.*, Ex. 1 at 1; Ex. 40, or a vote for or against a nonbinding shareholder proposal that the company can ignore even if it passes, *e.g.*, Ex. 2 at 35-36. Perhaps that is why no law requires company issuers, shareholder proponents, solicitors of proxy votes, or investors to quantify the "financial benefits and costs" of particular yes-or-no votes, even though all those entities would be better situated than ISS to try.[3]

Attempting to produce this "written financial analysis" would force ISS to create speech and take positions on controversial issues that ISS would not otherwise. ISS is not in the business of predicting stock returns; ISS' research reports and voting recommendations are informational and take into account the varied interests of ISS' diverse clientele, meaning that ISS frequently offers different clients different voting recommendations on the same issue based on each client's chosen criteria. Goldstein ¶ 45. Yet S.B. 375 would force ISS to "conclude[] *what* vote" "is most likely to positively affect shareholder value"—forcing ISS to undertake a fraught comparative analysis on controversial issues such as disclosures about climate change risk, even though ISS' clients have varied views on this and other topics. *See id.*; *Janus v. Am. Fed'n of State, Cnty., & Mun. Emps., Council 31*, 585 U.S. 878, 913-914 (2018) ("controversial subjects such as climate

---

[3] Costs to a company are generally not publicly disclosed. If a director fails to win reelection, ISS is not in a position to know the company's potential costs, which would likely depend on whether the company has a replacement who could be appointed quickly, needs to engage a search firm to find a new director, or plans to reduce its board size by one director. Goldstein Decl. ¶ 44. If a shareholder proposal requests a report on a particular topic and the company agrees to prepare it, ISS would not be in a position to know, for instance, how many company employees would be required, how many hours would be spent, or what those employees would be paid. *Id.* Companies generally do not disclose this sort of information in favor of their own proposals or in opposition to shareholder proposals. *Id.*

change" are "sensitive political topics" that "occup[y] the highest rung of the hierarchy of First Amendment values") (citations omitted).  But states may not "require businesses to . . . opine on highly controversial issues of public concern."  *NetChoice, LLC v. Bonta*, 113 F.4th 1101, 1120 (9th Cir. 2024).  Worse still, S.B. 375 would then force ISS to disseminate this speech not only to its clients who requested the research and advice, but also "to the board of directors of each company that is the subject" of the research and advice.  S.B. 375 § 4(b)(3).

Forcing ISS to choose sides between clients offends ISS' core values:  ISS believes its clients are best situated to determine their own needs, objectives, and risk tolerances, Goldstein Decl. ¶¶ 19, 45, consistent with ISS' Investment Advisers Act duty "to adopt [the client's] goals, objectives, or ends," 84 Fed. Reg. 33,669, 33,672-73 (July 12, 2019).  ISS honors its clients' choices; some may choose an "ESG skeptical" proxy voting policy, *see supra* p. 4, while other clients subscribe to ISS' Climate Specialty Policy because they believe "the environmental threats of climate change pose significant economic and business risks."  Ex. 22 at 10.  ISS does not countermand its clients' choices; ISS instead "seeks to help [its] clients reach their own stated objectives" by providing expert analysis on particular ballot items through the lens of the client's chosen framework.  *See Chiles*, 146 S. Ct. at 1017; *see also supra* pp. 4-5.  The SEC has long recognized that proxy advice is "by its nature judgmental" and a matter of "opinion[]" for which there "is not a 'correct' viewpoint."  57 Fed. Reg. 48,276, 48,278 (Oct. 22, 1992).  S.B. 375 is premised on there being a single right answer.  But "the First Amendment rests instead on a simple truth:  The people lose whenever the government transforms prevailing opinion into enforced conformity."  *Chiles*, 146 S. Ct. at 1029 (cleaned up).

If ISS does not engage in this prognosticating, S.B. 375 forces ISS to make misleading statements denigrating its services.  ISS must tell its clients in "a clear and conspicuous disclosure"

that ISS made its recommendation "without basing such recommendation on a written financial analysis regarding the impact of such recommended action on company investors," including that ISS did not "[a]nalyze[] the expected short-term and long-term financial benefits and costs to the company" of implementing the proposal; did not "conclude[] what vote or course of action is most likely to positively affect shareholder value"; and did not "explain[] the methods and processes used to prepare the analysis." S.B. 375 § 4(a)(1)(C). These statements are misleading.

For starters, ISS *does* consider "the impact of such recommended action on company investors" because ISS gives advice based on its clients' chosen criteria. Goldstein Decl. ¶ 47. ISS' detailed reports often contain dozens of pages of financial information and analyses, including tables and charts reflecting the company's historic performance; valuation and executive compensation; and other financial metrics, along with analyses thoroughly explaining ISS' "methods and processes." *E.g.*, Exs. 1-5. S.B. 375 would force ISS to falsely say the opposite. *See* Goldstein Decl. ¶ 47. And making ISS say it did not analyze "the expected short-term and long-term financial benefits and costs" or "conclude[]" which vote "is most likely to positively affect shareholder value" misleadingly suggests such an analysis is possible and that ISS' reports lack rigor. *See* Goldstein Decl. ¶ 47. That "plainly alters the content" of ISS' speech. *Nat'l Inst. of Fam. & Life Advocates (NIFLA) v. Becerra*, 585 U.S. 755, 766 (2018) (cleaned up).

S.B. 375 then forces ISS to "publicly" trumpet those false and misleading statements to the world in perpetuity, requiring ISS to "conspicuously" display them on ISS' website alongside a warning that ISS gives advice "against company management." S.B. 375 § 4(a)(3). Such laws requiring "the posting of a sign with the government's message" "compel[] speech." *Sanderson v. Hanaway*, 163 F.4th 1101, 1106 (8th Cir. 2026). And "requiring a company to publicly condemn itself" is "constitutionally offensive." *Nat'l Ass'n of Mfrs. v. SEC*, 800 F.3d 518, 530 (D.C. Cir.

14

2015) (citation omitted). S.B. 375 not only forces ISS to deliver these self-denigrating statements directly to the companies that are the subjects of ISS' advice, but also forces ISS to reveal confidential information to those companies about the proprietary investment management strategies of its clients that "[i]dentifies the service" and "identifies the recommendation or policy" ISS provided to each of its clients. S.B. 375 § 4(a)(1), (2); *see* Goldstein Decl. ¶ 49.

No matter what ISS does, S.B. 375 forces ISS "to create speech on weighty issues with which [ISS] disagrees" and then disseminate that speech to an audience ISS has not chosen. *303 Creative*, 600 U.S. at 599. That is textbook compelled speech.

### 3. The Attorney General Cannot Show S.B. 375 Satisfies Strict Scrutiny.

S.B. 375 is not "narrowly tailored to serve compelling state interests." *NIFLA*, 585 U.S. at 766. Start with Kansas's purported interests. S.B. 375 labels proxy advisors' noncompliance with the law a "deceptive and unconscionable act." S.B. 375 § 5(a)(1); *see also id.* § 1(g). To be clear, federal and state law already protect investors from deception. A "proxy advisory firm that deceives a client or fails to act in a client's interests" is subject to federal and state prohibitions on fraud, plus state tort liability. *ISS*, 718 F. Supp. 3d at 27; *see* 15 U.S.C. § 80b-6(2), (4); 57 Fed. Reg. at 48,278-79 (SEC's conclusion that existing rules "provide adequate protection against fraudulent and deceptive communications to shareholders"); Kan. Stat. § 50-626. What S.B. 375 does is deem certain speech deceptive and thus eliminate the need for the Attorney General to prove that a non-management-aligned recommendation actually deceived the recipient. The First Amendment forbids states from adopting such "broad prophylactic rules" on speech "lacking any nexus to the likelihood that the [speech] is fraudulent." *Illinois ex rel. Madigan v. Telemarketing Assocs., Inc.*, 538 U.S. 600, 619 (2003) (cleaned up); *see Chiles*, 146 S. Ct. at 1026 (government must show that regulated "speech bears a close causal connection to . . . a traditional crime").

15

Strict scrutiny requires Kansas to "specifically identify an 'actual problem' in need of solving." *Brown v. Ent. Merchs. Ass'n*, 564 U.S. 786, 799 (2011).  There is none.  The supposed objects of S.B. 375's protection—sophisticated institutional "investors purchasing proxy voting services," S.B. 375 § 2(h)—do not need it.  ISS' clients instruct ISS on the information they want to receive and vote "independently" of ISS' advice.  Ex. 25 at 8-9 (N.Y. State Common Retirement Fund); Ex. 26 at 2 (T. Rowe Price); *accord* Ex. 27 at 2-4 (Council of Institutional Investors).  It is not "fraud for [ISS] to be providing these customers the information that they have sought."  Hr'g Tr. 98-99, *ISS v. Paxton*, No. 1:25-cv-1160 (W.D. Tex. Aug. 29, 2025), ECF No. 44.

S.B. 375 also purports to increase transparency to investors.  *See* S.B. 375 § 2(h)-(i).  But the Legislature had zero evidence that ISS' clients are confused about what ISS does.  ISS offers detailed explanations about its methodologies under its Benchmark and Specialty Policies. Goldstein Decl. ¶¶ 26-31.  And ISS' clients have the opportunity to design Custom Policies and thus know exactly what they are asking ISS to consider.  *Id.* ¶¶ 22-25.  ISS' detailed reports often contain extensive financial information and analyses, but do "not purport to quantify or model the financial impact on company stock value of a particular vote recommendation."  *Id*. ¶ 44; *see supra* p. 12.  ISS is also clear that its clients "must determine whether and how to incorporate research or ratings into their investment decision-making process."  Ex. 20 at 5.

Besides lacking a compelling interest, the State cannot show the law is narrowly tailored. S.B. 375 is "wildly underinclusive."  *NIFLA*, 585 U.S. at 774.  Company managers are not all-knowing, yet proxy advisors that uncritically adopt management's views are unencumbered.  Nor does the law have anything to say about company issuers that encourage shareholders to cede voting rights to the company in perpetuity, *see* Ex. 34 at 2 (Exxon Mobil Corp., Letter to SEC (Sept. 15, 2025), https://perma.cc/7JB5-9S4G); groups that offer free "automate[d]" voting for

anti-"woke" views, *see* Ex. 35 (National Center for Public Policy Research, Conservative Group Launches Proxy Navigator Tool to Fight Woke Corporations (Mar. 7, 2024), https://perma.cc/MVB9-DNVV); or banks that offer AI-generated proxy voting advice, *see* Ex. 36 (Michael Gennaro, *JPMorgan Chase Says AI Can Replace Proxy Advisers, But Others Have Their Doubts*, Law.com (Jan. 20, 2026), https://tinyurl.com/bdz9upw8)—even if that advice is not based on *any* analysis.  S.B. 375's extensive list of carveouts confirms that the law seeks to "disfavor[ ] a particular speaker or viewpoint."  *NIFLA*, 585 U.S. at 774 (citation omitted).

S.B. 375 is also "seriously overinclusive" as a deception-prevention measure, which is independently fatal.  *See Brown*, 564 U.S. at 804-805.  The law applies regardless of what ISS clients have asked ISS to consider and regardless of any risk clients are confused about ISS' services.  There is no evidence ISS' clients are misled:  Proxy ballot issues are public; ISS' proxy research reports generally include, among other information, the company's or proponent's statements on the proposal, *e.g.*, Ex. 1 at 53-54; and companies have ample channels to express their views.  *E.g.*, Ex. 33 (*JPMorgan Pushes Back On ISS Recommendations On Severance, Independent Chair*, Reuters (May 14, 2024), https://tinyurl.com/58u7as2j); Ex. 24 at 8 (SEC Investor Advisory Committee) (companies engage in "counter-speech" by filing "proxy supplements challenging proxy advisor opinions"); Ex. 28 at 2 (Elliott Management Corp.) ("public companies already control their disclosures and have access to other avenues including the media").  A global "prophylactic rule of compelled speech" like S.B. 375 is by definition "not narrowly tailored."  *Riley v. Nat'l Fed'n of the Blind of N.C., Inc.*, 487 U.S. 781, 798 (1988).

Finally, it is independently fatal that the Legislature did not consider "more benign and narrowly tailored options."  *Id.* at 800.  For instance, the State can "vigorously enforce" its existing consumer protection laws, *id.*; "express [its] view" about good proxy advice "through its own

speech," *Sorrell*, 564 U.S. at 578-579; and dictate what state entities can consider in proxy voting.

S.B. 375's "entire statutory scheme is objectionable"; neither its viewpoint-discriminatory triggers nor its compelled-speech burdens "further a compelling state interest," so the entire law should be enjoined as to ISS. *See Hodes & Nauser v. Stanek*, 551 P.3d 62, 85-87 (Kan. 2024).

### 4.   The Attorney General Cannot Show An Exception To Strict Scrutiny Applies.

The State cannot show that strict scrutiny does not apply. *See Does 1-11*, 100 F.4th at 1268. ISS' speech is not commercial speech, which "is best understood as speech that merely advertises a product or service for business purposes." *Cardtoons, L.C. v. Major League Baseball Players Ass'n*, 95 F.3d 959, 970 (10th Cir. 1996). The "targeted speech" here—ISS research and advice to its existing clients about issues in upcoming shareholder elections—is not speech for the "sole purpose" of "soliciting those customers to purchase more or different . . . services." *U.S. W., Inc. v. FCC*, 182 F.3d 1224, 1232 & n.4 (10th Cir. 1999). ISS' speech is not an advertisement, and ISS is paid regardless of the contents of its ultimate recommendation. Goldstein Decl. ¶¶ 16, 20, 33. ISS' speech is not of a "mundane commercial nature"; it has "stir[red] the passions of many." *See Harris v. Quinn*, 573 U.S. 616, 648 (2014) (citation omitted); *e.g.*, *Defense of Proxy Advisors* at 1309 ("Corporate managers dislike the large proxy advisors . . . because of the voting advice they give."); Ex. 39 (Marco Quiroz-Gutierrez, *With $1 Trillion Pay Package On The Line, Elon Musk Blasts Influential Firms Telling Shareholders To Reject It: 'Those Guys Are Corporate Terrorists'*, Fortune Mag. (Oct. 23, 2025), https://tinyurl.com/3kd77puw); Ex. 29 at 5 (Better Markets) ("Silencing the proxy advisory firms has been on the wish-list of corporate management . . . for years"); Ex. 36 (noting one CEO's "personal" "years-long campaign against proxy advisers"). At the least, any commercial aspect "is inextricably intertwined with otherwise fully protected speech," meaning strict scrutiny applies. *Riley*, 487 U.S. at 796.

In any case, labeling ISS' speech commercial would not help the Attorney General.

Viewpoint discrimination is fatal; "[c]ommercial speech is no exception." *Sorrell*, 564 U.S. at 566; *cf. Chiles*, 146 S. Ct. at 1021 (observing that even restrictions on speech that traditionally do "not automatically trigger strict scrutiny" can do so "when governments have sought to regulate speech based on viewpoint"). And, in any case, S.B. 375 is unconstitutional under any standard.

The *Zauderer* standard does not apply: S.B. 375 "is not limited to purely factual and uncontroversial information about the terms under which services will be available" in the context of "commercial advertising." *NIFLA*, 585 U.S. at 768-769, 771 (quoting *Zauderer v. Off. of Disciplinary Couns. of Sup. Ct. of Ohio*, 471 U.S. 626, 651 (1985)) (ellipses omitted). ISS' private speech to its clients providing analysis and advice about how to vote in shareholder meetings is not "commercial advertising," and S.B. 375 purports to compel ISS to make controversial and misleading statements, *see supra* pp. 11-15. Even if *Zauderer* did apply, S.B. 375 is "unjustified [and] unduly burdensome." *NIFLA*, 585 U.S. at 768. The law "imposes a government-scripted, speaker-based disclosure requirement" "wholly disconnected from" any ostensible interest, and the "detail required" to comply "effectively rules out" speech. *Id.* at 777-778 (citation omitted); *see* Goldstein Decl. ¶¶ 52, 54-55 ("impossible" for ISS to comply).

Intermediate scrutiny under *Central Hudson* is similarly inapplicable. *See Chiles*, 146 S. Ct. at 1022 (acknowledging only "two kinds of content-based restrictions that can apply to professional speech without triggering strict scrutiny," without citing *Central Hudson Gas & Elec. Corp. v. Pub. Serv. Comm'n of N.Y.*, 447 U.S. 557 (1980)). But S.B. 375 fails even this test: ISS' speech concerns lawful activities, S.B. 375 is not tailored to any substantial interest, and Kansas failed to consider alternatives. *See NIFLA*, 585 U.S. at 773-774, 777; *supra* pp. 15-17.

**B.      S.B. 375 Violates ISS' Fourteenth Amendment Due Process Rights.**

A law is unconstitutionally vague if it (1) fails to give "fair notice of conduct that is

19

forbidden or required," or (2) "authorizes or encourages seriously discriminatory enforcement." *FCC v. Fox Television Stations, Inc.*, 567 U.S. 239, 253 (2012) (citation omitted).  S.B. 375 is unconstitutionally vague either way, especially given the "more stringent vagueness test" that applies here.  *Wyo. Gun Owners v. Gray*, 83 F.4th 1224, 1234 (10th Cir. 2023) (citation omitted).

### 1.  S.B. 375's Maze of Requirements Leaves ISS Guessing How to Comply.

S.B. 375 is void for vagueness because people of "common intelligence must necessarily guess at its meaning and differ as to its application."  *Fox*, 567 U.S. at 253 (citation omitted).  On the front end, the law's triggers are not "clearly defined," *Grayned v. City of Rockford*, 408 U.S. 104, 108 (1972), or articulated with a "reasonable degree of clarity," *Roberts v. U.S. Jaycees*, 468 U.S. 609, 629 (1984).  The law applies when "a proxy advisor makes a recommendation against company management."  S.B. 375 § 4(a), (b).  But what if company management takes no ultimate position on a proposal?  *E.g.*, Ex. 1 at 2, 43.  Or if ISS recommends abstaining—and does the answer depend on how a particular company's bylaws treat abstentions?  *Compare id.* at 18 (at Tesla, abstentions count as "against" votes), *with* Ex. 2 at 18 (at Exxon, abstentions not counted).  The law also applies to a "default recommendation or policy," but the law's definition of that phrase, *see* S.B. 375 § 3(f), makes it impossible to know whether this category covers the Benchmark and Specialty Policies, extends to Custom Policies, or encompasses even more.

Adding to the confusion, the law refers to "proxy advisory services" more generally.  As defined, proxy advisory services are broader than just making recommendations; they also include, for example, "proxy statement research and analysis" and "development of proxy voting recommendations or policies."  *Id.* § 3(h)(1)(B)-(C).  This further obscures the law's trigger:  Is it just the making of a recommendation, per § 4, or is it the provision of these broader proxy advisory services?  For that matter, what constitutes the "development of proxy voting recommendations,"

*id.* § 3(h)(1)(C), and when exactly do they mature into the provision of services, *see id.* § 4?

Once triggered, S.B. 375 leaves substantial uncertainty about how ISS should comply. Compliance obligations turn on whether ISS made its recommendation "based on a written financial analysis," *id.* § 4(a), (b), but the definition of that phrase relies on opaque terms like "expected short-term and long-term financial benefits and costs," *id.* § 3(k)(1). The law does not clarify the time horizons captured by "short term" (the next week? next month?) and "long term" (one year? thirty?). The law also refers to "the impact on . . . company investors" and "shareholder value," *id.* § 4(a)(1)(C), without clarifying whether those phrases mean the same thing. Nor is it clear whether those phrases refer to stock price or account for qualitative factors, such as risk tolerance and management or religious views, which may depend on the client's chosen policy.

Moreover, S.B. 375 does not say what ISS must do if it tries to produce a "written financial analysis" but the issue does not lend itself to the sort of quantification demanded by S.B. 375, such as, for example, a recommendation to vote against a director who sits on too many boards to give sufficient attention to each one. May ISS say that any short and long term benefits and costs are unclear, or that ISS cannot "conclude[ ]" which vote is "most likely to positively affect shareholder value"? Or must ISS disparage its advice to comply with S.B. 375?

The murkiness continues. The law refers to a "clear and conspicuous disclosure." *Id.* § 4(a)(1). May ISS add it to the last page of its reports? *E.g.*, Ex. 1 at 59. Or must ISS say it in another section, *e.g.*, *id.* at 18, or in a separate document altogether? How prominent must the website disclosure be? S.B. 375 § 4(a)(3). How much information does ISS need to give company boards to have "[i]dentifie[d] the service being provided" to each client and "identifie[d] the recommendation or policy at issue"? *Id.* § 4(a)(1), (2). What is a "reasonable time" within which to make a "written financial analysis" available to clients, *id.* § 4(b)(2), and does this production

21

requirement ever end?  ISS is left to "guess" at the answers to these and other basic questions, with significant consequences for guessing wrong.  *Fox*, 567 U.S. at 253 (citation omitted).

### 2.  S.B. 375 Guarantees Arbitrary Enforcement.

S.B. 375 is also void for vagueness because, for the same reasons ISS is left guessing at how to comply, the law "invites arbitrary enforcement." *Wyo. Gun Owners*, 83 F.4th at 1238.

S.B. 375's breadth exacerbates the problem, providing the Attorney General with "vast discretion" to enforce the law against speakers he disfavors. *See City of Chicago v. Morales*, 527 U.S. 41, 60-61 (1999).  Indeed, the Attorney General was recently honored for "fighting ESG policies" by an arm of the group that drafted the model law on which S.B. 375 is based.  Ex. 41. The Attorney General has also cosigned letters to ISS, institutional investors, and Congress criticizing ESG considerations and threatening legal action, Exs. 42-45, and he has filed federal lawsuits challenging the use of ESG.[4]  The Attorney General's "personal predilections," *Kolender v. Lawson*, 461 U.S. 352, 358 (1983) (citation omitted), make it unlikely that he would enforce S.B. 375 against self-styled anti-ESG proxy advisors, even if they do not comply with the law's punishing demands.  Due process is denied where the law "permits such selective law enforcement." *Smith v. Goguen*, 415 U.S. 566, 576 (1974).

### 3.  The Resulting Uncertainty Chills ISS' Protected Speech.

S.B. 375's vagueness has an "obvious chilling effect." *Fox*, 567 U.S. at 254-255 (citation omitted).  "First Amendment freedoms need breathing space to survive." *Keyishian v. Bd. of Regents of Univ. of State of N.Y.*, 385 U.S. 589, 604 (1967).  But the law's complicated scheme backed by ruinous fines is designed to dissuade advisors from breaking with management at all—

---

[4] *See* Am. Compl., *Utah v. Walsh*, No. 2:23-cv-00016 (N.D. Tex. Feb. 28, 2023), ECF No. 47 (suit over ESG factors in Department of Labor rule); Am. Compl., *Texas v. BlackRock, Inc.*, No. 6:24-cv-00437 (E.D. Tex. Jan. 5, 2026), ECF No. 145 (suit over investors' use of ESG).

by imposing a heavy price on the "right to voice dissenting views." *Chiles*, 146 S. Ct. at 1024.

## C.    S.B. 375 Exceeds The Constitution's Limits On Extraterritorial Regulation.

A state cannot regulate commerce wholly outside its borders.  Courts have located this principle primarily in the dormant Commerce Clause, which "precludes the application of a state statute to commerce that takes place wholly outside of the State's borders." *Edgar v. MITE Corp.*, 457 U.S. 624, 640-643 (1982) (plurality op.); *see ACLU v. Johnson*, 194 F.3d 1149, 1161 (10th Cir. 1999) (applying this rule to invalidate a state law "attempt[ing] to regulate interstate conduct occurring outside New Mexico's borders").  It also sounds in the Fourteenth Amendment's Due Process Clause, which requires "some minimal contact between the regulated subject matter or transaction before the state can" legislate as to that transaction.  *Gerling Glob. Reins. Corp. of Am. v. Gallagher*, 267 F.3d 1228, 1237-38 (11th Cir. 2001) (citing *Watson v. Emps. Liab. Assurance Corp.*, 348 U.S. 66, 70 (1954)); *accord Adventure Commc'ns, Inc. v. Ky. Registry of Election Fin.*, 191 F.3d 429, 436 (4th Cir. 1999).  These "territorial limits of state authority" inhere more broadly in the "Constitution's horizontal separation of powers," *Nat'l Pork Producers Council v. Ross*, 598 U.S. 356, 376 & n.1 (2023), which is reflected in the structure of the Constitution and myriad constitutional provisions, *see* U.S. Const., art. I, § 10, cl. 2-3; U.S. Const., art. IV, § 1; U.S. Const., amend. X; *see also Ross*, 598 U.S. at 408-410 (Kavanaugh, J., concurring in part and dissenting in part); *Mallory v. Norfolk S. Ry. Co.*, 600 U.S. 122, 154 (2023) (Alito, J., concurring).

Regardless of the constitutional rubric, S.B. 375 as applied to ISS' transactions with non-Kansas clients is impermissibly extraterritorial.  ISS is organized in Delaware and headquartered in Maryland; it has no offices in Kansas.  Goldstein Decl. ¶ 15.  ISS provides proxy advisory services to approximately 1,400 clients around the globe; it currently provides proxy research and voting services to just one client in Kansas.  *Id.*  S.B. 375 nevertheless purports to regulate ISS any

23

time ISS makes "recommendation[s] against company management" to its clients, whether or not that client is located in Kansas.  S.B. 375 § 4(a), (b); *see id.* § 3(d).  S.B. 375 thus purports to "*directly* regulate[] out-of-state transactions" with "*no* connection to the State."  *Ross*, 598 U.S. at 376 n.1 (citing *Edgar*, 457 U.S. at 641 (plurality op.)).  Whether considered through the lens of the dormant Commerce Clause, the Due Process Clause, or the broader structural protections of the Constitution, Kansas's attempt to regulate these transactions is impermissibly extraterritorial.  *See Edgar*, 457 U.S. at 641 (dormant Commerce Clause); *Allstate Ins. Co. v. Hague*, 449 U.S. 302, 310 (1981) (Due Process Clause); *Ross*, 598 U.S. at 376 & n.1 (horizontal separation of powers).

That is no less true when ISS speaks to a non-Kansas client about a company incorporated or headquartered in Kansas.  Even then, the activity S.B. 375 purports to regulate occurs "wholly outside of" Kansas, *Edgar*, 457 U.S. at 641 (plurality op.), and thus lacks a "jurisdictionally-significant relationship" with the State, *Gerling*, 267 F.3d at 1238.

## II.     The Remaining Factors Overwhelmingly Favor Preliminary Relief.

"[I]n First Amendment cases, the likelihood of success on the merits will often be the determinative factor."  *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013) (en banc) (citation omitted), *aff'd sub nom. Burwell v. Hobby Lobby Stores, Inc.*, 573 U.S. 682 (2014).  But the remaining preliminary-injunction factors also favor ISS.  "[T]he loss of First Amendment freedoms, for even minimal periods of time, unquestionably constitutes irreparable injury," *id.* (citation omitted), as do violations of the dormant Commerce Clause, *see Johnson*, 194 F.3d at 1163.  And these irreparable constitutional injuries are compounded by "the nonrecoverable compliance costs" ISS must shoulder, which are likewise "irreparable."  *Kansas v. Dep't of Educ.*, 739 F. Supp. 3d 902, 932 (D. Kan. 2024); *see* Goldstein Decl. ¶¶ 41-55.

Further, "it is always in the public interest to prevent the violation of a party's constitutional

24

rights." *See Hobby Lobby*, 723 F.3d at 1145 (citation omitted).  The Attorney General "does not have an interest in enforcing a law that is likely constitutionally infirm." *Chamber of Com. of U.S. v. Edmondson*, 594 F.3d 742, 771 (10th Cir. 2010).

The preliminary injunction should be issued without bond.  The Attorney General will suffer no damages from enjoining enforcement of an unconstitutional statute against ISS, while requiring the posting of a bond would impair ISS' ability to exercise its constitutional rights.  *See* Fed. R. Civ. P. 65(c); *Kansas*, 739 F. Supp. 3d at 936 ("no security is necessary" "due to the strength of Plaintiffs' case and the public interest" and given the "absence of proof showing a likelihood of harm to the enjoined party") (citation omitted).

## CONCLUSION

For the foregoing reasons, ISS respectfully requests an order enjoining Defendant and his successors, agents, employees, and all persons acting under his direction or control from taking any action to enforce S.B. 375 against ISS.

Respectfully submitted,

Dated:  May 7, 2026

/s/ *Brian C. Fries*

JESSICA L. ELLSWORTH*
   jessica.ellsworth@hoganlovells.com
DAVID M. FOSTER*
   david.foster@hoganlovells.com
MICHAEL J. WEST*
   michael.west@hoganlovells.com
DANA A. RAPHAEL*
   dana.raphael@hoganlovells.com
HOGAN LOVELLS US LLP
555 Thirteenth Street, N.W.
Washington, D.C. 20004
(202) 637-5600

\* admitted pro hac vice

BRIAN C. FRIES (Kan. Bar No. 15889)
   brian.fries@lathropgpm.com
CARRIE E. JOSSERAND (Kan. Bar No. 18893)
   carrie.josserand@lathropgpm.com
LATHROP GPM LLP
2345 Grand Boulevard, Suite 2200
Kansas City, MO 64108
(816) 292-2000

BRUCE D. OAKLEY*
   bruce.oakley@hoganlovells.com
HOGAN LOVELLS US LLP
609 Main Street, Suite 4200
Houston, TX 77002
(713) 632-1420

*Counsel for Plaintiff Institutional Shareholder Services Inc.*

25

**CERTIFICATE OF SERVICE**

I hereby certify that on May 7, 2026, I electronically filed the foregoing with the clerk of the court by using the CM/ECF system, which will send a notice of electronic filing to all counsel of record.

/s/ *Brian C. Fries*
Brian C. Fries