# Exhibit B

**IN THE UNITED STATES DISTRICT COURT**
**FOR THE DISTRICT OF KANSAS**
**KANSAS CITY DIVISION**

INSTITUTIONAL SHAREHOLDER
SERVICES INC.,

        *Plaintiff*,

   v.                        Case No. 2:26-cv-02254

KRIS KOBACH, in his official capacity as the
Kansas Attorney General,

        *Defendant*.

**DECLARATION OF MARC GOLDSTEIN**

I, Marc Goldstein, declare and state as follows:

1.     I am above the age of eighteen (18) years old.

2.     I make this declaration voluntarily and from my own knowledge, in support of the Motion for Preliminary Injunction filed by Institutional Shareholder Services Inc. ("ISS"). If called upon as a witness in this action, I could and would competently testify to the matters contained in this declaration based on my knowledge.

3.     I have been employed at ISS for over 25 years. During my tenure, I have held various roles within ISS' Research organization, which is the part of ISS' business that conducts proxy voting research and analysis and makes voting recommendations for institutional investor clients, as discussed below. My current title is Head of U.S. Research. In that role, I have particular responsibility for proxy research and advice relating to ISS' U.S. Benchmark Policy. Through this experience, I am knowledgeable about ISS' proxy research and business functions discussed below.

1

**I.      ISS' Role As A Proxy Advisory Service Provider**

4.      ISS offers a suite of corporate governance and sustainable investment services and data and analytics for institutional investors worldwide.  ISS is a registered investment adviser with the Securities and Exchange Commission under the Investment Advisers Act of 1940, as amended.

5.      As a proxy advisory service provider, ISS offers subscribing institutional investor clients objective, timely, and expert proxy research and vote recommendations based on the proxy voting policies selected and, in many cases, customized, by its institutional investor clients.  ISS provides proxy advisory services to institutional investors; ISS does not directly serve retail investors.

6.      Proxy voting is a means by which shareholders exercise their rights to vote at annual and/or special meetings of their portfolio companies.  At these meetings, shareholders can vote on various matters, including board elections, proposals submitted by the board or by shareholders, and any other decisions as to which a shareholder vote is required by the corporation's charter or bylaws, by listing rules, or by SEC regulations.  Most shareholders exercise their rights through the use of proxy voting instead of attending meetings in person.

7.      The overwhelming majority of voting items at U.S. companies are management proposals.

8.      Shareholder proposals offer a way for investors to express their views on significant or emerging issues facing the companies; they account for a fraction of the overall votable items at shareholders meetings.  U.S. shareholder proposals are typically non-binding and commonly address governance topics and/or requests for enhanced disclosures on a range of items.

9.     Institutional investors are sophisticated investors that often vote on behalf of their clients, who may themselves also be institutional investors, such as pension plans, investment management companies, funds, and asset managers.

10.     The decision as to whether or how to vote is the responsibility of ISS' institutional investor clients.  Institutional investors are not required to use the services of proxy advisory firms. Some choose not to do so, either because they perform the functions in-house or because they do not vote proxies on behalf of their clients.  Some investors use the services of multiple proxy advisory firms.

11.     Many institutional investors buy proxy research and review proxy advisors' analyses and recommendations but vote according to their own individually designed "custom" proxy voting guidelines, developed in consultation with their governance departments, boards of trustees, and portfolio managers.

12.     In our experience, institutional investors who do choose to subscribe to ISS' research and recommendations consider this information to varying degrees, alongside their own in-house research.  Investors may also directly engage with their portfolio companies on a variety of matters and take this engagement into account in deciding how to vote.  It is the institutional investors who are responsible for both their voting policy selections and voting decisions on behalf of their own clients or beneficiaries.

13.     ISS seeks to help institutional investors make informed proxy voting decisions that suit their particular investment needs and proxy voting preferences as articulated in and through the administration of either an ISS policy that the investor selects or the investor's own custom proxy voting policy or policies.  ISS' core advisory business is to provide proxy research, voting recommendations, and voting-related services.

14.    Institutional investors are sophisticated market participants that, in some cases, manage billions or even trillions of dollars for thousands of investors.  Institutional investors can, and some do, handle proxy voting in house.  But because institutional investors manage so many investments, for so many clients, who indirectly own shares in so many companies, it is often inefficient, costly, or impractical for institutional investors to perform research and analysis on each proposal presented at meetings of all their investment portfolio companies.  Compounding those challenges, U.S. shareholder meetings and votes also tend to be concentrated during the four-month period from March to June, which is known as "proxy season."  This problem is exacerbated by the similar concentration in this time frame of meetings in other major capital markets (such as Canada, Europe, Asia).  Most of ISS' clients invest globally, so they are faced with thousands, or even tens of thousands, of meetings to vote in this same four-month period each year.

15.    To help manage the voting responsibilities that come with their share ownership, and to help support their fiduciary duties, many institutional investors choose to contract with proxy advisory firms, like ISS.  In 2025 alone, ISS assisted approximately 1,400 clients in connection with voting analyses and recommendations for approximately 52,000 shareholder meetings in approximately 100 developed and emerging markets worldwide.  ISS currently provides proxy research and voting services to only one client in Kansas, based on that client's billing address.  ISS has no offices or employees with a home address in Kansas.

16.    ISS provides its services (which include but are not limited to voting-related research and advice) to its clients in exchange for fees.  Fees charged for ISS' products and services generally range from $5,000 to above $1 million depending on several factors, including the types of products purchased, the volume of products consumed, coverage universes, and delivery mechanisms.  Most services are offered on an annual subscription basis and are generally paid for

4

in advance.  ISS does not provide proxy voting services to any investor who has not contracted with ISS for this purpose.

17.    In providing proxy voting research and recommendations, ISS aggregates companies' publicly available data and information, analyzes company proxy materials, undertakes research and analysis on the agenda proposals put forth by management or shareholders, and provides voting recommendations in accordance with criteria chosen or designed by its investor clients.

18.    ISS' clients have different objectives and interests.  Some choose a policy in which a recommendation takes into account environmental, social, and governance ("ESG") considerations; some make investing and voting decisions that take into account religious or philosophical beliefs; others choose other policies with different considerations.  Some ISS clients themselves pursue divergent investment and proxy voting strategies, depending on the needs and investing objectives of their own clientele and portfolios.

19.    ISS' objective in providing research and recommendations is to help its clients make informed voting decisions in their own best interests as the clients define them.  As explained in more detail below, ISS does not unilaterally decide how much weight is given to any given factor in a proxy voting policy.  Rather, the relevant criteria and their weight are informed by the views of ISS' clients and what those clients value, as reflected in their policy choices.  ISS then evaluates proxy proposals by reference to those criteria and weighting—as well as incorporating traditional performance metrics—before making recommendations under the relevant proxy voting policy, which ISS' clients are free to follow or to reject as they see fit.[1]

---

[1] There are certain limited instances in which a client may determine that its fiduciary obligations create a potential conflict of interest with respect to certain voting decisions, such that the client may specifically contract with ISS for ISS to assume discretion with respect to voting particular fiduciary account shares pursuant to directions provided or policies established in advance by the client.

20.     ISS does not have a financial stake in the outcome of proxy votes. As a registered investment adviser, ISS is subject to the Investment Advisers Act's fiduciary duties of care and loyalty, which follow the contours of ISS' contractual relationships with its clients. ISS simply offers research and recommendations based on the client's voting policy or policies to help inform their evaluation of proposals as they consider how to vote their shares. Accordingly, ISS routinely offers different recommendations about the same vote depending on its clients' voting criteria.

### A.     ISS Offers Three Policy Frameworks: Custom, Benchmark, and Specialty Policies

21.     In order to meet the needs of its clientele, ISS offers three different types of voting policies, which are frameworks that guide ISS' proxy vote recommendations: (1) client-specific Custom Policies; (2) the ISS Benchmark Policy; and (3) various ISS Specialty Policies, which are also known as Thematic Policies.

#### (1)     Custom Policies

22.     ISS assists institutional investor clients in administering custom voting policies that clients develop, in consultation with their governance departments, boards of trustees, portfolio managers, or that in some cases third parties design.[2] A client's Custom Policy reflects the client's own specific approach to proxy voting and/or the mandates they have with the clients for whom they manage assets.

23.     Custom policies are proprietary to, and owned by, ISS' clients or the third parties that developed them. ISS is generally not permitted to divulge clients' proprietary mix of considerations or the recommendations ISS issues to them.

---

[2] Bowyer Research and The Catholic University of America are examples of third parties that have crafted custom voting policies to which some ISS clients subscribe. *See* Bowyer Research, *Summary of Bowyer Research Proxy Voting Guidelines for States*, https://perma.cc/KM5Z-G2ZZ; The Catholic University of America, *Catholic Shareholders Can Have Faith With New Proxy Guidelines* (Nov. 3, 2025), https://www.catholic.edu/info-for-the-media/media-releases/catholic-shareholders-can-have-faith-new-proxy-guidelines.

24.     Because Custom Policies are tailored to specific clients' needs and reflect their unique corporate governance and voting philosophies, the vote recommendations issued under these policies often differ from vote recommendations issued under the ISS Benchmark Policy and Specialty Policies.

25.     Custom Policies constitute a significant block of ISS' business.    In 2024, approximately 90% of the shares for which ISS processed voting instructions on behalf of its clients were tied to clients' Custom Policies.    In 2025, ISS issued Custom Policy vote recommendations under approximately 450 Custom Policies, including approximately 250 U.S. Custom Policies.

### (2)    The Benchmark Policy

26.     The Benchmark Policy offers a market-specific proxy voting framework that ISS has developed, and updated year after year, through a robust consultative process with investors, companies, other industry experts, and the public.    The U.S. Benchmark Policy is publicly available on ISS' website.[3]    ISS also currently offers nearly two dozen international Benchmark Policies tailored to markets in one or more countries, which are also available on ISS' website.[4]

27.     The Benchmark Policy is informed by ISS' Global Voting Principles, which provide for four key tenets on accountability, stewardship, independence, and transparency.    Those four tenets are outlined in further detail on ISS' website.[5]

---

[3]  ISS, U.S. Proxy Voting Guidelines, 2026 Benchmark Policy Recommendations (Dec. 9, 2025), https://perma.cc/6E8F-ZSQC ("2026 U.S. Benchmark Policy").

[4] ISS, *Current Voting Policies*, https://www.iss-stoxx.com/stewardship/voting-policy-gateway/proxy-voting-policies/. ISS currently provides Benchmark Proxy Voting Guidelines for China, Hong Kong, India, Japan, Korea, Singapore, Taiwan, Australia, New Zealand, other Asia-Pacific markets, continental Europe, the U.K. and Ireland, Russia and Kazakhstan, South-Eastern Europe and the Near East (EMEA Regional), Israel, the Middle East & North Africa, Sub-Saharan Africa, South Africa, Canada, Brazil, and Latin America.

[5] ISS, *Global Voting Principles*, https://perma.cc/5T85-KX34.

28.    The 2026 Benchmark Policy applicable to the U.S. outlines voting considerations and criteria for common shareholder meetings of companies that are publicly traded on U.S. exchanges, as well as certain non-listed companies (called Over-The-Counter, or OTC, companies, whose securities are not listed on a national securities exchange), if they are held in ISS' clients' portfolios. The Benchmark Policy explains in detail the framework through which ISS develops voting recommendations.

29.    For example, based on market input, the U.S. Benchmark Policy generally recommends voting against "overboarded directors," meaning directors who sit on too many company boards to give another board sufficient care and attention. 2026 U.S. Benchmark Policy at 13. The U.S. Benchmark Policy also generally recommends voting against directors and boards that adopt provisions "materially adverse to shareholder rights," such as "[s]upermajority vote requirements" for amending the company's bylaws or charter, or "classified board structure[s]" that divide a company's board into classes serving staggered terms, diminishing director accountability to shareholders. *Id.* at 16.

30.    ISS forms its Benchmark Policy through an annual review and development process that starts in the summer each year and generally ends in November when policy updates for the following year are released publicly.[6] ISS starts by collecting feedback from a diverse range of market participants through multiple channels: an annual policy survey of institutional investors and corporate issuers, as well as other market participants; roundtables with investor clients and corporate directors; and ongoing feedback during proxy season. ISS uses these inputs and ISS' expertise to develop its draft policy updates each year. ISS then publishes draft updates for an open review and public comment period. Anyone can comment or participate in the survey

---

[6] ISS, *Policy Development & Application*, https://perma.cc/75UM-3F6K.

process—including investors, companies, and the general public.  ISS reviews the comments before publishing its final updated policy at the end of each year, to apply to meetings held after February of the following year.

### (3)    Specialty Policies

31.    ISS also offers seven Specialty Voting Policies that evaluate governance issues from a variety of specific perspectives: (1) Global Board-Aligned; (2) Catholic Faith-Based; (3) Socially Responsible Investment; (4) Climate; (5) Sustainability; (6) Public Fund Guidelines; and (7) Taft-Hartley.  ISS also offers international versions of its seven Specialty Policies.  ISS publishes the Specialty Policies on its website.[7]  ISS crafted these policies to meet client demand for coverage tailored to these specific approaches and the factors that the clients demanding these policies view as material.

a.    *U.S. Global Board-Aligned Policy.*[8]  ISS developed this policy in response to market demand for voting recommendations that generally defer to board judgment on environmental and social issues.  The U.S. Global Board-Aligned Policy uses a "presumption on environmental and social topics that the board's recommendations should generally prevail."  2026 U.S. Global Board-Aligned Policy at 74.

b.    *U.S. Catholic Faith-Based Specialty Policy.*[9]  This policy generally takes as its "frame of reference policies and proposals promulgated by the Catholic Bishops' Pastoral on economics, the Socially Responsible Investment Guidelines adopted by the Bishops, and the policies developed by members of the Interfaith Center on Corporate Responsibility."  2026 U.S.

---

[7] ISS, *Current Voting Policies*, https://www.iss-stoxx.com/stewardship/voting-policy-gateway/proxy-voting-policies/ (under "Our Thematic Policies" dropdowns).

[8] ISS, U.S. Global Board-Aligned Proxy Voting Guidelines, 2026 Policy Recommendations (Jan. 16, 2026), https://perma.cc/3E9Q-YRAD ("2026 U.S. Global Board-Aligned Policy").

[9] ISS, U.S. Catholic Faith-Based Policy Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), https://perma.cc/Y6H4-G2GD ("2026 U.S. Catholic Faith-Based Specialty Policy").

Catholic Faith-Based Specialty Policy at 11. This policy is intended to recognize faith-based investors' "dual objectives: financial and social." *Id.*

   c. ***U.S. Socially Responsible Investment ("SRI") Specialty Policy.***[10] This policy is designed to provide analyses and recommendations that are consistent with the dual objectives of socially responsible shareholders. The SRI Specialty Policy generally takes as its "frame of reference policies that have been developed by groups such as the Interfaith Center on Corporate Responsibility, the General Board of Pension and Health Benefits of the United Methodist Church, Domini Social Investments, and other leading church shareholders and socially responsible mutual fund companies." 2026 U.S. SRI Specialty Policy at 11.

   d. ***U.S. Climate Specialty Policy.***[11] This policy is designed for investors that have determined that environmental threats of climate change pose significant economic and business risks to their investments.

   e. ***U.S. Sustainability Specialty Policy.***[12] The Sustainability Specialty Policy is designed to provide analyses and recommendations that consider recognized global governing bodies that promote sustainable business practices and advocate for stewardship of the environment, fair labor practices, nondiscrimination, and the protection of human rights.

   f. ***U.S. Public Fund Specialty Policy.***[13] The Public Fund Specialty Policy is designed to help public funds fulfill their obligations governing proxy voting.

---

[10] ISS, U.S. SRI Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 26, 2025), https://perma.cc/FQ4Q-K38S ("2026 U.S. SRI Specialty Policy").

[11] ISS, U.S. Climate Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), https://perma.cc/W75X-DQRY.

[12] ISS, U.S. Sustainability Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 31, 2025), https://perma.cc/B34N-PN38.

[13] ISS, U.S. Public Fund Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 26, 2025), https://perma.cc/2G6Z-QK2G.

g.      *U.S. Taft-Hartley Specialty Policy.*[14]  This policy is "designed for investors who take a worker-owner view of long-term corporate value."  2026 U.S. Taft-Hartley Specialty Policy at 8.  It "takes as one frame of reference the AFL-CIO Proxy Voting Guidelines."  *Id.*

**B.      ISS Applies Its Clients' Chosen Frameworks To Provide Advice On Specific Proxy Votes**

32.      Clients' Custom Policies and ISS' Benchmark and Specialty Policies set forth frameworks for addressing corporate governance issues.  When clients select these policies, they ask ISS to apply the policy they selected to upcoming shareholder meetings.  Some clients choose multiple different policies for different funds and/or different underlying clients.  For example, a client may use a Custom Policy in most cases, but use the Global Board-Aligned Specialty Policy for assets they manage on behalf of a state pension fund, and the Climate Specialty Policy for a fund intended to appeal to climate-conscious investors.

33.      ISS looks at each proposal on the ballot, pulls relevant publicly available information and data, and then analyzes the proposal and data through the prism of the applicable policy to come up with a voting recommendation.  ISS does not determine which issues appear on a proxy ballot or the ballots or agenda items on which it renders advice, nor does ISS engage in solicitation activities in support of (or against) any ballot item.  ISS has no financial interest in the outcome of any shareholder vote.

34.      As a courtesy, ISS allows company issuers to sign up online to obtain complimentary access to final, published proxy research reports under ISS' Benchmark Policy on

---

[14]  ISS, U.S. Taft-Hartley Proxy Voting Guidelines, 2026 Policy Recommendations (Dec. 26, 2025), https://perma.cc/UQJ3-6DEG ("2026 U.S. Taft-Hartley Specialty Policy").

their own company.[15]  ISS does not provide reports to company issuers that are generated under Custom Policies, which are proprietary to particular ISS clients, or under ISS' Specialty Policies.

## II.    Additional Services

35.    ISS also provides other services, which are sometimes performed in connection with an upcoming proxy vote and sometimes not.  ISS provides detailed information about its services and methodologies on its website.[16]

36.    ***Proxy Voting Supplementary Services***: ISS offers services that clients may choose to supplement proxy voting services.  These include:

a.    ***Special Situations Research***:  This service provides in-depth analyses regarding high-profile mergers and acquisitions, proxy contests, and other strategic corporate transactions that are put to a shareholder vote.[17]

b.    ***Vote Disclosure Service***:  ISS offers its Vote Disclosure Service to help certain clients comply with their own respective regulatory disclosure obligations.  Disclosure services are comprehensive and tailored to the individual client criteria, including the potential for daily updates of funds, meetings, and agenda information.

c.    ***Add-On Workflow Solutions***:  ISS offers several services to help investors increase efficiency in the proxy voting process.  For example, ISS helps investors disseminate information on proxy meetings to internal stakeholders and assists in internal collaboration by the client on its vote decisions.

---

[15] ISS, *Proxy Research FAQs*, https://perma.cc/7GND-XYAQ (select "How can a company obtain a copy of the ISS STOXX proxy research report?").

[16] ISS, *The Rigorous Methodologies Behind Our Solutions*, https://perma.cc/93H8-F5F6.

[17] ISS, *Voting Policy Gateway*, https://perma.cc/4EQ2-PZPQ.

37.    ***Ratings and rankings***:  ISS provides various rating and ranking services that are generated independently of shareholder meetings and proxy votes, but which ISS may include in proxy voting reports.  Among other things, these services include:

a.    ***ISS QualityScore***:  The environmental and social QualityScore offers "a measure of corporate disclosure practices and the degree of transparency provided by a covered company to shareholders and other stakeholders" in areas such as "Carbon and Climate, Natural Resources, Human Rights, or Labor, Health and Safety."[18]  The Governance QualityScore covers "four key areas: Board Structure, Compensation, Shareholder Rights, and Audit & Risk Oversight."[19]  ISS currently provides QualityScore coverage for approximately 8,000 companies, both U.S. and international, and QualityScores are generally updated at least annually.

b.    ***ISS Cyber Risk Score*** is a data-driven scoring and screening solution "designed to enable objective assessment of the cyber risk posture of any company"; the score "represents the relative likelihood that an organization will suffer a material cyber incident (e.g., breach) within the next 12 months."[20]

38.    ***Screenings and Controversies***:  ISS provides various research, analysis, and screening tools for clients to use in risk management.  These services include, among others:

a.    ***ISS Sector-Based Screening*** assists clients to "identify and make decisions regarding companies' involvement in certain industry sectors, particularly in the production and distribution of certain products and services which are viewed by some as controversial," as "[i]nvolvement in such sectors can constitute a material sustainability risk."[21]  "Issue areas covered

---

[18] ISS, Methodology and Research Process: E&S Disclosure QualityScore (Mar. 2026), https://perma.cc/BP59-9GBH.

[19] ISS, Methodology and Research Process: Governance QualityScore (Mar. 2026), https://perma.cc/23ZJ-624G.

[20] ISS, Methodology and Research Process: Cyber Risk Score (Mar. 2026), https://perma.cc/ELE9-WSUM.

[21] ISS, Methodology and Research Process: Sector-Based Screening (Mar. 2026), https://perma.cc/JEX4-4NHG.

by Sector-Based Screening include:  Abortifacients, Alcohol, Animal Welfare (Fur/Exotic Leather and Live Export), Cannabis, Civilian Firearms and Ammunition, Contraceptives, Euthanasia, For Profit Correctional Facilities, Gambling, GMO, Hazardous Substances, Military Equipment and Services, Palm Oil, Pork, Pornography, Tobacco, and Violent Video Games." *Id*.

b.    ***ISS Global Sanctions Screening*** "helps institutional investors to identify entities that are subject to different national, multilateral and US state-level sanctions, and to keep track of countries that have ratified international treaties and conventions or are subject to UN and EU sanctions."[22]

c.    ***ISS Modern Slavery Solution*** "provides a holistic assessment of companies' modern slavery risk exposure, risk mitigation, and involvement in modern slavery controversies," considering "both company-specific and industry-based risk profiles and the quality of a company's disclosures on upholding labor standards for its employees and workers in its supply chain."[23]

d.    ***Climate Analytics***:  ISS provides numerous tools designed to help clients assess climate-related risks and opportunities.  For example, ISS' Physical Risk Solution "assesses company exposure to physical risks by simulating the impact of hazards such as tropical cyclones or wildfires on company operations and financials," which "takes into account the operational and market risks that can have financial implications for companies."[24]

39.    ***Sustainability Data and Analysis***:  ISS also provides general environmental, social, and governance data and ratings, research, other market information on corporate governance and voting practices and trends, portfolio screening and other assessment tools and

---

[22] ISS, Methodology and Research Process: Global Sanctions Screening (Mar. 2026), https://perma.cc/N57G-TVBE.

[23] ISS, Methodology and Research Process: Modern Slavery Solution (Mar. 2026), https://perma.cc/D7ZN-KPXH.

[24] ISS, Methodology and Research Process: Physical Risk Solution (Mar. 2026), https://perma.cc/LA9R-5MBV.

services, and thought leadership—just last year, ISS published thousands of articles and research offerings spanning various governance topics.

40.    *International Services*:    ISS also provides services directed to international audiences.  ISS provides proxy advisory services across markets in the Americas, Europe, the Middle East, Africa, and the Asia-Pacific covering approximately 35,000 companies across approximately 100 markets.  ISS' international clients often invest globally, just as ISS' U.S.-based clients do.  ISS also provides services to assist clients in meeting their international reporting obligations, including the European Banking Authority technical standards on Pillar 3 disclosures on ESG risks[25] and the European Union's Sustainable Finance Disclosure Regulation.[26]

## III.    S.B. 375 Will Harm ISS

41.    S.B. 375 will cause ISS to suffer irreparable harm, including loss of its free speech rights, loss of business, and unrecoverable compliance costs.

42.    I understand that S.B. 375 applies if ISS "makes a recommendation against company management" on a company or shareholder proposal, or "makes a default recommendation or policy involving votes against company management."  S.B. 375 § 4(a), (b). ISS' Benchmark and Specialty Policies each include particular issues on which ISS generally recommends voting against company management, such as voting against overboarded directors. Clients' Custom Policies often include general instructions for ISS to recommend against the company board's recommendation on certain issues.  One entity that has developed a Custom Policy that ISS administers, Bowyer Research, directs that ISS recommend "against reelection of

---

[25]  ISS, Methodology and Research Process: Climate EBA Pillar 3 ESG Solution (Mar. 2026), https://perma.cc/87KU-MQH8.

[26]  ISS, Methodology and Research Process: SFDR Principal Adverse Impact Solution (Mar. 2026), https://perma.cc/2ZZM-B95U.

the board" "if the company severely underperformed its peer group."[27]  When required to do so by a client's Custom Policy, or under the frameworks in ISS' Benchmark or Specialty Policies, ISS has and will continue to provide advice and recommendations that are contrary to the views of company management and company boards.  ISS believes that, depending on the client's chosen voting policy and the particular issue presented in a proxy vote, these considerations can be relevant and material.  By burdening only advice against management, S.B. 375 makes those recommendations significantly more expensive or cost-prohibitive compared to unburdened advice that agrees with the recommendation of company management.

43.    I understand that S.B. 375 would require ISS to perform a "written financial analysis" or otherwise issue a series of warnings that ISS does not believe and that misrepresent ISS' services.

44.    As a general matter, ISS does not perform the sort of analysis described in S.B. 375's "written financial analysis," such as "[a]nalyz[ing] the expected short-term and long-term financial benefits and costs to the company regarding the implementation of" a particular proposal and "conclud[ing] what vote or course of action is most likely to positively affect shareholder value." S.B. 375 § 3(k).  The voting decisions upon which ISS is called to make recommendations frequently involve qualitative issues that do not lend themselves to quantification.  Although ISS' proxy voting reports and recommendations often contain many pages of financial information and analysis, ISS does not purport to quantify or model the financial impact on company stock value of a particular vote recommendation.  Additionally, costs to a company are generally not publicly disclosed.  For example, if a director fails to win reelection, the company may have a replacement "waiting in the wings" who could be appointed quickly, or the company may need to engage a

---

[27] Bowyer Research, *Summary of Bowyer Research Proxy Voting Guidelines for States*, https://perma.cc/KM5Z-G2ZZ.

search firm to find a new director (the costs of which are not disclosed), or the company may simply reduce its board size by one director. ISS is not in a position to know what all of those costs may be. Likewise, if a shareholder proposal requests that the company prepare a report on a particular topic, ISS would not be in a position to know, if the company ultimately decides to prepare the report, how many company employees would be assigned to the task, how many hours would be spent preparing the report, or what those employees would be paid. Companies generally do not disclose this sort of information in favor of their own proposals, or in opposition to shareholder proposals.

45.    Attempting to produce S.B. 375's "written financial analysis" would force ISS to discuss and take positions on controversial issues that ISS would not otherwise do. ISS' research reports and voting recommendations are informational and take into account the varied interests of ISS' diverse clientele, meaning that ISS frequently offers different clients different voting recommendations on the same issue based on each client's chosen criteria. Any requirement that ISS separately opine on a particular proposal's "expected short-term and long-term financial benefits and costs," or to "conclude[] what vote or course of action is most likely to positively affect shareholder value," would necessitate ISS taking positions on issues about which its clients have varied views that are driven by their own risk tolerances and preferences. In many cases, ISS is not able to weigh and label which advice to different clients is "most likely to positively affect shareholder value," and ISS does not and would not otherwise perform such comparative analyses.

46.    I understand that if ISS produces a "written financial analysis" as defined by S.B. 375, ISS would be required to provide this analysis to ISS' clients, as well as "to the board of directors of each company that is the subject of the service." S.B. 375 § 4(b). Forcing ISS to

17

create and then publicly disseminate such content to third parties with no confidentiality obligation would worsen the harms I have described.

47.    I understand that if ISS does not perform S.B. 375's "written financial analysis," S.B. 375 would require ISS to issue a series of statements. I understand that S.B. 375 would require ISS to say that ISS' recommendation was made "without basing such recommendation on a written financial analysis regarding the impact of such recommended action on company investors," S.B. 375 § 4(a)(C), even though ISS believes that statement is incorrect because ISS makes its recommendations based on its clients' chosen criteria and, in many cases, after assessing financial information. I understand that S.B. 375 would also require ISS to say ISS did not "explain[] the methods and processes used to prepare the analysis," *id.*, even though ISS believes that statement to be false in light of the detailed proxy voting reports and recommendations ISS provides and given the detailed information about ISS' Benchmark and Specialty Policies on ISS' website along with several sets of exhaustive FAQs.[28] I further understand that S.B. 375 would require ISS to say that ISS did not "[a]nalyze[] the expected short-term and long-term financial benefits and costs to the company regarding the implementation of" a particular proposal or "conclude[] what vote or course of action is most likely to positively affect shareholder value," *id.*, statements that ISS believes misleadingly suggest both that such an analysis is possible and that ISS' analyses and advice are not rigorous. And by exempting pro-management recommendations from any requirement, S.B. 375 misleadingly suggests that management's recommendations are rigorous and backed by extensive modeling when, in ISS' experience, that

---

[28] For example, see ISS, U.S. Executive Compensation Policies, Frequently Asked Questions (updated Dec. 9, 2025), https://perma.cc/Y2FR-2D6S; ISS, U.S. Procedures and Policies (Non-Compensation), Frequently Asked Questions (updated Dec. 23, 2025), https://perma.cc/JUP8-D5DR.

may not be the case.  I understand that S.B. 375 would require ISS to provide these statements not only to ISS' clients, but also to company issuers and on ISS' website.

48.    ISS believes that S.B. 375's compelled statements misrepresent ISS' role in providing services and run counter to the demands of ISS' clients.  ISS' Benchmark and Specialty Policies are driven by, among other factors, client demand and input from subscribing clients and other market participants.  Each Custom Policy reflects the investor client's mandates and specific proxy voting considerations that set the basis for and direct ISS' vote recommendations.  S.B. 375's compelled statements are messages ISS would not otherwise create and would require ISS to disparage its advice, clients, and services.

49.    In addition, I understand that S.B. 375 may require ISS to reveal confidential information about the proprietary investment management strategies of its clients to company issuers, such as "[i]dentif[ying] the service" and "identif[ying] the recommendation or policy" that ISS provided to each of its clients.  S.B. 375 § 4(a)(1)(A)-(B), (2).  Although ISS provides company issuers an opportunity to obtain complimentary access to final, published proxy research reports under ISS' Benchmark Policy on their own company, this access does not "identify" the services or recommendations ISS provided to particular clients.  ISS also does not and would not otherwise provide access to company issuers for reports and recommendations under Custom or Specialty Policies.  Custom Policies are proprietary to and reflect competitively sensitive confidential investment strategies of ISS' clients and often contain client-specific proprietary and nonpublic information.  ISS' business depends on ISS' Custom Policy clients trusting ISS to maintain the confidentiality of their information.  If ISS were forced to disclose that information to company issuers or other investors, market participants, or other interested parties, ISS may lose business from its Custom Policy clients that do not wish for their private information, including

19

voting strategies, to be made public, or potentially risk disputes with those clients for breaching their confidentiality agreements.  Further, insofar as S.B. 375 could be construed to require ISS to provide its clients and third parties with ISS' recommendations under its Specialty Policies at no cost, the value of those products would be diluted, and some clients could stop paying for recommendations under ISS' Specialty Policies, further harming ISS' business.

50.    If ISS makes a recommendation against company management, compliance with S.B. 375 would call into question the quality of ISS' proxy voting services and products altogether, thereby threatening significant harm to ISS' business.

51.    ISS would likely suffer reputational harm or even lose clients if it tells its clients that there is a single correct "conclu[sion]" about "what vote or course of action is most likely to positively affect shareholder value," or that ISS made its recommendation without considering "the impact of such recommended action on company investors," or that ISS did not "explain[] the methods and processes used to prepare the analysis." S.B. 375 § 4.  As stated above, ISS offers a suite of corporate governance services that ISS clients have determined are useful, as evidenced by the fact that clients have continued to retain ISS year after year to provide these services.  If Kansas forces ISS to state that its services are actually against some clients' interests, there is a risk that would result in confusion and undermine ISS' ability to carry on this business.

52.    In addition to these business harms, S.B. 375 would also subject ISS to significant and unrecoverable economic costs, likely totaling in the millions of dollars or would otherwise be cost prohibitive.  For example, providing S.B. 375's "written financial analysis" for every vote recommendation inconsistent with company management would be impossible; at the very least, it would require substantial resources and staffing that are not currently available.  Additionally, I understand that S.B. 375 purports to require ISS to provide information to ISS clients and company

20

issuers all over the world. ISS does not currently have systems in place that would allow for these sorts and volume of disclosures. Actively supplying this volume of information to numerous entities would require significant ISS personnel and expenditures and would likely require the engagement of outside vendors.

53. S.B. 375 contains numerous provisions that are not clear in the context of ISS' business and that our company could not readily or definitively operationalize. For example:

a. It is not clear what it means for advice to be "against company management." S.B. 375 § 4. If the company board does not provide a voting recommendation at all, or if ISS recommends that the client abstain or withhold a vote, it is not clear if an ISS recommendation in those situations would be "against" management.

b. Other phrases in the law use terms without a recognized meaning in our business. For example, the law refers to a "default recommendation or policy," which the statute says is "a system, set of rules, principles or guidelines designed to assist with voting decisions." S.B. 375 § 3(f). If that is meant to refer to clients' Custom Policies and ISS' Benchmark and Specialty Policies, ISS does not consider those policies to be "default" policies. It is also unclear whether other ISS products, such as ISS Special Situations Research, may be included in this definition.

c. The law also does not provide guidance about what ISS must do if it tries to produce a "written financial analysis" but the issue does not lend itself to the sort of quantification demanded by S.B. 375. Among other things, it is unclear what the law considers "company investors," which is not a term that is commonly used in this business, and whether this term is the same thing as a "shareholder." The law also does not specify whether "shareholder value" refers

21

exclusively to stock price or accounts for qualitative factors, such as risk tolerance and management, or a shareholder's religious views.

   d.  S.B. 375 does not provide clarity on other compliance questions, including when the statute's reporting requirements attach and what would be a "clear and conspicuous" disclosure. S.B. 375 § 4. It is also unclear how ISS must provide the required disclosure to the company's board of directors, *id.* § 4(a)(2), (b)(3); how much information ISS must provide to be deemed to have "[i]dentifie[d] the service being provided" to each client and "identifie[d] the recommendation or policy at issue," *id.* § 4; what qualifies as a "reasonable time" within which to make a "written financial analysis" available to clients, *id.* § 4(b)(2), and whether and when this production requirement ends.

   e.  These compliance questions have high stakes because S.B. 375 makes violations enforceable through Kansas's Consumer Protection Act, which I understand allows the Attorney General to seek civil penalties up to $10,000 per violation.

  54.  Due to S.B. 375's lack of clarity, compelled statements, compliance costs, reputational harms, and penalties imposed for violations, it is likely that ISS would consider curtailing its recommendations or reducing or even eliminating certain services if the Attorney General is allowed to enforce this statute against ISS. The national and global reach of S.B. 375 means that it would be impossible to comply as a practical matter, and certainly not without compromising ISS' broad range of product offerings and curtailing their content. The demands that S.B. 375 would impose, and the threat of liability for noncompliance, would likely have a domino effect on ISS' other product offerings not covered by the law, as ISS would be forced to divert resources toward attempting to comply, or may lose business that subscribe to these other services.

55.    ISS would face immediate harm if S.B. 375 were to take effect on July 1, 2026. For example, for shareholder meetings held July 2025 through September 2025, ISS delivered more than 8,000 Benchmark reports, more than 22,000 Specialty reports, and more than 140,000 Custom research reports.  ISS anticipates providing similar numbers of reports for the July to September period in 2026.  ISS must review each Custom Policy client's holdings to determine whether the client has holdings in the company for which a vote is scheduled.  ISS' institutional client investors regularly purchase and sell stocks and could purchase stock in a company with an upcoming shareholder vote at any time and require a Custom Policy report on short notice, adding to the substantial number of reports referenced above.  Attempting to comply with S.B. 375 for upcoming meetings from July through September 2026—likely involving approximately 170,000 reports—would be substantially burdensome and likely be logistically impossible.

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Executed on May 7, 2026.

_____
Marc Goldstein