# Foster Declaration Exhibit 1



ISS Proxy Analysis & Benchmark Policy Voting Recommendations

# Tesla, Inc.

## Key Takeaways



QualityScore



**Meeting Type:** Annual
**Meeting Date:** 6 November 2025
**Record Date:** 15 September 2025
**Meeting ID:** 1994609

**NASDAQ:** TSLA
**Index:** S&P 500
**Sector:** Automobile Manufacturers
**GICS:** 25102010

**Primary Contact**
U.S. Research
U.S. Research Help Center

## Agenda & Recommendations

**Policy: United States**
**Incorporated:** Texas, USA

| Item | Code | Proposal | Board Rec. | ISS Rec. |
|------|------|----------|------------|----------|
| **MANAGEMENT PROPOSALS** | | | | |
| 1a | M0201 | Elect Director Ira Ehrenpreis | FOR | AGAINST |
| 1b | M0201 | Elect Director Joe Gebbia | FOR | FOR |
| 1c | M0201 | Elect Director Kathleen Wilson-Thompson | FOR | FOR |
| 2 | M0550 | Advisory Vote to Ratify Named Executive Officers' Compensation | FOR | AGAINST |
| 3 | M0524 | Amend Omnibus Stock Plan | FOR | AGAINST |
| 4 | M0593 | Approve Issuance of Common Stock to Elon Musk Pursuant to CEO Performance Award | FOR | AGAINST |
| 5 | M0101 | Ratify PricewaterhouseCoopers LLP as Auditors | FOR | FOR |
| 6 | M0608 | Eliminate Supermajority Vote Requirement | NONE | FOR |

## Report Contents

| | | | |
|---|---|---|---|
| Financial Highlights | 4 | QualityScore | 11 |
| Ownership and Control Overview | 5 | Vote Results | 13 |
| Corporate Governance Profile | 5 | Meeting Agenda and Proposals | 14 |
| Board Profile | 7 | Additional Information | 58 |
| Compensation Profile | 9 | | |

© 2025 Institutional Shareholder Services Inc.  All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## SHAREHOLDER PROPOSALS

| | | | | |
|---|---|---|---|---|
| 7 | S0810 | Authorize Board to Invest Company Funds in xAI | NONE | AGAINST |
| 8 | S0510 | Assess Feasibility of Including Sustainability as a Performance Measure for Senior Executive Compensation | AGAINST | AGAINST |
| 9 | S0412 | Report on the Use of Child Labor in Connection with Electric Vehicles | AGAINST | AGAINST |
| 10 | S0126 | Amend the Bylaws To Repeal 3% Derivative Suit Ownership Threshold | AGAINST | AGAINST |
| 11 | S0232 | Amend Bylaws | AGAINST | AGAINST |
| 12 | S0201 | Declassify the Board of Directors | AGAINST | FOR |
| 13 | S0311 | Reduce Supermajority Vote Requirement | AGAINST | FOR |
| 14 | S0232 | Require Shareholder Approval of Bylaw Amendments Adopted by the Board of Directors | AGAINST | FOR |

Shading indicates that ISS recommendation differs from Board recommendation
▶ Items deserving attention due to contentious issues or controversy

## ISS-Company Dialogue

| Date | Initiated By | Notes |
|---|---|---|
| Oct. 6, 2025 | Issuer | Discussed the 2025 CEO Performance Award and other ballot items. |

**Note:** ISS engages in ongoing dialogue with issuers in order to ask for additional information or clarification, but not to engage on behalf of its clients. Any draft review which may occur as part of this process is done for purposes of data verification only. All ISS recommendations are based solely upon publicly disclosed information.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Material Company Updates

| Item | Summary |
|---|---|
| **Board Update** | On June 1, 2025, John R. (Jack) Hartung was appointed to the board. |
| **Bylaw Changes** | On May 15, 2025, following changes to Texas corporate laws, the board amended the bylaws to:<br><br>• provide for a jury trial waiver for "internal entity claims" as defined in the Texas Business Organizations Code; and<br>• add a 3 percent of shares outstanding ownership threshold requirement for any shareholder, or group, to institute or maintain a shareholder derivative lawsuit.<br><br>See Item 1, elect directors, for further commentary on the derivative suit bylaw. |
| **Tornetta Decision Appeal** | The Delaware Supreme Court held oral arguments on Oct. 15, 2025 on the company's appeal of the *Tornetta v. Musk* case, which relates to whether Musk can exercise his 2018 CEO Performance Award. |
| **Notable Vote Results** | At the last annual meeting, the following shareholder proposals received the support of a majority of votes cast: Adopt Simple Majority Vote and Declassify the Board of Directors. See *Board Responsiveness* section of ***Elect Directors*** below. |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Financial Highlights

**Company Description:** Tesla, Inc. designs, develops, manufactures, leases, and sells electric vehicles, and energy generation and storage systems in the United States, China, and internationally. The company operates in two segments, Automotive; and Energy Generation and Storage.

STOCK PRICE PERFORMANCE



TOTAL SHAREHOLDER RETURNS (ANNUALIZED)

|  | 1 Yr | 3 Yr | 5 Yr |
|---|---|---|---|
| Company TSR (%) | 62.52 | 4.66 | 70.67 |
| GICS 2510 TSR (%) | -27.05 | -16.42 | -0.66 |
| S&P500 TSR (%) | 25.02 | 8.94 | 14.53 |

Source: Compustat. As of last day of company FY end month: 12/31/2024

COMPANY SNAPSHOT (AS OF RECORD DATE)

| Market Cap (M) | 1,322,563.1 |
|---|---|
| Closing Price | 410.04 |
| Dividends Paid (LTM) | 0.00 |
| 52-Week High | 488.54 |
| 52-Week Low | 212.11 |
| Shares Outstanding (M)[1] | 3,325.15 |
| Average daily trading volume (prior mo)[2] | 84,154.71 |

Source: Compustat. As of September 15, 2025 (All currency in USD)
(1) DEF14A As of September 15, 2025
(2) Trading Volume in thousands of shares

FINANCIAL & OPERATIONAL PERFORMANCE

| | Historical Performance (FY ending) | | | | | Compared to Peers (Compustat FY*) – 2024 | | |
|---|---|---|---|---|---|---|---|---|
| **All currency in USD** | 12/2020 | 12/2021 | 12/2022 | 12/2023 | 12/2024 | | | |
| **Earnings** | | | | | | | | |
| Revenue (M) | 31,536 | 53,823 | 81,462 | 96,773 | 97,690 | | | |
| Net Income (M) | 721 | 5,519 | 12,556 | 14,997 | 7,091 | | | |
| EBITDA (M) | 4,506 | 9,407 | 17,579 | 13,558 | 13,128 | | | |
| EPS (USD) | 0.25 | 1.87 | 4.02 | 4.73 | 2.23 | | | |
| EPS Y/Y Growth (%) | 176 | 648 | 115 | 18 | -53 | | | |
| **Profitability** | | | | | | | | |
| Pretax Net Margin (%) | 4 | 12 | 17 | 10 | 9 | | | |
| EBITDA Margin (%) | 14 | 17 | 22 | 14 | 13 | | | |
| Return on Equity (%) | 3 | 18 | 28 | 24 | 10 | | | |
| Return on Assets (%) | 1 | 9 | 15 | 14 | 6 | | | |
| ROIC (%) | 2 | 14 | 25 | 21 | 8 | | | |
| **Leverage** | | | | | | | | |
| Debt/Assets | 26 | 14 | 7 | 9 | 11 | | | |
| Debt/Equity | 60 | 29 | 13 | 15 | 19 | | | |
| **Cash Flows** | | | | | | | | |
| Operating (M) | 5,943 | 11,497 | 14,724 | 13,256 | 14,923 | | | |
| Investing (M) | -3,132 | -7,868 | -11,973 | -15,584 | -18,787 | | | |
| Financing (M) | 9,973 | -5,203 | -3,527 | 2,589 | 3,853 | | | |
| Net Change (M) | 13,118 | -1,757 | -1,220 | 265 | -152 | | | |
| **Valuation & Performance** | | | | | | | | |
| Price/Earnings | 940.89 | 188.37 | 30.64 | 52.53 | 181.09 | | | |
| Annual TSR (%) | 743.44 | 49.76 | -65.03 | 101.72 | 62.52 | | | |

Source: Compustat. *Note: Compustat standardizes financial data and fiscal year designations to allow for meaningful comparison across companies. Compustat data may differ from companies' disclosed financials and does not incorporate non-trading equity units. Peers shown here represent closest industry peers drawn from those peers used in ISS' pay-for-performance analysis. See www.issgovernance.com/policy-gateway/company-financials-faq/ for more information.

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Ownership & Control Overview

| Stock Type | Votes per Share | Outstanding | |
|---|---|---|---|
| Common Stock | 1 | 3,325,150,886 | |
| **Top Holders - Ownership & Control** | | **% of Stock** | **% of Votes** |
| ▶MUSK ELON REEVE | | 12.4 | 12.4 |
| The Vanguard Group | | 6.9 | 6.9 |
| Blackrock, Inc. | | 5.6 | 5.6 |

Proxy Statement, © 2025 Factset Research Systems, Inc. All Rights Reserved. As of: 15 Sep 2025



Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

to Detailed Ownership Profile

ISS' definition of strategic shareholders may include, but is not limited to, shareholders with board representation, State-controlled entities, insiders/executives, and employee funds.

## Corporate Governance Profile

### BOARD SUMMARY

| | |
|---|---|
| Chair classification | Independent |
| Separate chair/CEO | Yes |
| Independent lead director | N/A |
| Voting standard | Majority |
| Plurality carveout for contested elections | Yes |
| Resignation policy | No |
| Total director ownership (000 shares) | 416,570 |
| Total director ownership (%) | 12.5 |
| Percentage of directors owning stock | 77.8% |
| Number of directors attending < 75% of meetings | 0 |
| Average director age | 56 years |
| Average director tenure | 10 years |
| Percentage of women on board | 22% |

### SHAREHOLDER RIGHTS SUMMARY

| | |
|---|---|
| Controlled company | No |
| Classified board | Yes |
| Multi-class common stock w/ unequal voting rights | No |
| Vote standard for mergers/acquisitions | 66.67% |
| Vote standard for charter amendment | 66.67% |
| Vote standard for bylaw amendment | 66.67% |
| Shareholder right to call special meetings | Yes, 50% |
| Material restrictions on right to call special meetings | No |
| Shareholder right to act by written consent | Unanimous |
| Cumulative voting | No |
| Board authorized to issue blank-check preferred stock | Yes |
| Poison pill | No |
| Proxy Access | Yes |
| -        Ownership requirement (%) | 3 |
| -        Time requirement (years) | 3 |
| -        Nomination limit (% of seats) | 20 |
| -        Nomination limit (# of nominees) | 2 |
| -        Aggregation cap (# of nominators) | 20 |

Publication Date: 17 October 2025

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## Board & Committee Composition

The information provided in the charts and tables below is based on ISS data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of ISS' report for that meeting. As such, these charts and tables might not reflect changes to the board composition and/or other covered elements subsequently disclosed by the issuer after ISS' publications or between general meetings.

Independence values refer to ISS Independence classifications ("Exec": Executive Director; "N-Ind.": Non-Independent Director; "Ind.": Independent Director).

### Board

N-Ind.: 22%, 2
Ind.: 67%, 6
Exec.: 11%, 1

Meetings last FY:29

### as of November 6, 2025

**Audit**
Ind.: 100%, 4
Meetings last FY:9

**Comp**
Ind.: 100%, 3
Meetings last FY:9

**Nom**
Ind.: 100%, 4
Meetings last FY:7

■ **Exec**    ■ **N-Ind.**    ■ **Ind.**

### Independence History

| | 2021 | 2022 | 2023 | 2024 | After Meeting |
|---|---|---|---|---|---|
| Board | 75% | 71% | 63% | 63% | 67% |
| Audit Com | 100% | 100% | 100% | 100% | 100% |
| Comp Com | 100% | 100% | 100% | 100% | 100% |
| Nom Com | 100% | 100% | 100% | 100% | 100% |

### Gender Diversity Trend

78%
22%

| | 2021 | 2022 | 2023 | 2024 | After Meeting |
|---|---|---|---|---|---|
| male | 75% | 71% | 75% | 75% | 78% |
| female | 25% | 29% | 25% | 25% | 22% |

### Director Tenure



Publication Date: 17 October 2025

Page 6

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609

## Board Profile (after upcoming meeting)

| Item # | Executive Directors | Affiliation | Independence | | Leadership | Gender | Age | Tenure | Term Ends | Committee | | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | Co. | ISS | | | | | | Audit | Comp | Nom[1] | Gov[1] |
| | **Elon Musk** | Founder | Exec | Exec | CEO | M | 54 | 21 | 2026 | | | | |
| | **Non-Executive Directors** | | | | | | | | | | | | |
| | **Robyn Denholm** | | Ind. | Ind. | Chair | F | 62 | 11 | 2026 | C F | M | M | M |
| 1a | **Ira Ehrenpreis** | | Ind. | Ind. | | M | 56 | 18 | 2028 | | C | C | C |
| 1b | **Joseph (Joe) Gebbia** | | Ind. | Ind. | | M | 44 | 3* | 2028 | M | | | |
| | **John (Jack) Hartung** | | Ind. | Ind. | | M | 68 | 0 | 2027 | F | | | |
| | **James Murdoch** | | Ind. | Ind. | | M | 52 | 8 | 2027 | M | | M | M |
| | **Kimbal Musk** | Familial Relationship | Non-Ind. | Non-Ind. | | M | 52 | 21 | 2027 | | | | |
| | **Jeffrey (JB) Straubel** | Founder | Ind. | Non-Ind. | | M | 49 | 2 | 2026 | | | | |
| 1c | **Kathleen Wilson-Thompson** | | Ind. | Ind. | | F | 68 | 6 | 2028 | | M | M | M |
| | | | 78% Ind. | 67% Ind. | | 22% F | Ave: 56 | Ave: 10 | Ave: 2 | 100% Ind. | 100% Ind. | 100% Ind. | 100% Ind. |

Shaded cells in blue indicate that company and ISS independence classifications differ.
*Indicates director not previously submitted to shareholders for election.
Committee Membership: M = Member | C = Chair | **F = Member and Financial Expert**
1. The company has a combined Nominating and Governance committee.

### DIRECTOR NOTES

| Elon Musk | FOUNDER Elon Musk is a founder of the company. (Source(s): DEF14A, 9/17/25, p. 10.) |
|---|---|

Elon Musk

OTHER INFORMATION 1) Elon Musk is the brother of Kimbal Musk, a non-employee director of the company. (Source(s): DEF14A, 9/17/25, pp. 8, 36, 119, 129.) 2) The Boring Company (TBC) is a party to commercial agreements with the company. Under these agreements, the company incurred expenses of approximately $0.8 million through February 2025. Elon Musk is the founder of TBC. Space Exploration Technologies Corporation (SpaceX) is a party to certain commercial, licensing, and support agreements with the company. Under these agreements, SpaceX incurred expenses of approximately $0.1 million through February 2025. Elon Musk serves as CEO, chief technology officer, and chairman of SpaceX. x.AI Corp is a party to certain commercial, consulting, and support agreements with the company. Under these agreements, xAI incurred expenses of approximately $36.9 million through February 2025. Approximately $36.8 million through February 2025 was incurred by xAI for its purchase of the company's Megapack products. Elon Musk served as the CEO and treasurer of x.AI Corp. Following the March 2025 merger of X and x.AI Corp, he now serves as the CEO of X.AI Holdings Corp. As part of a multi-platform advertising campaign, the company directly or indirectly purchased advertising on X, which totaled approximately $0.01 million through February 2025. Elon Musk served as chief technology officer of X. Following the March 2025 merger of X and x.AI Corp, he now serves as the CEO of X.AI Holdings Corp. The company is a party to a service agreement with a security company, owned by Elon Musk and organized to provide security services concerning him, including in connection with his duties to, and work for, the company. The company incurred expenses of approximately $0.5 million through February 2025, representing a portion of the total cost of security services concerning Elon Musk. Since April 2016, SpaceX has invoiced the company for their use of an aircraft owned and operated by SpaceX at rates determined by the company and SpaceX, subject to rules of the Federal Aviation Administration governing such arrangements. The company incurred expenses of approximately $0.04 million through February 2025. (Source(s): DEF14A, 9/17/25, pp. 10, 158.; DEF14A, 9/17/25, p. 157.; DEF14A, 9/17/25, pp. 10, 157.) 3) Elon Musk and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

1a Ira Ehrenpreis

OTHER INFORMATION Ira Ehrenpreis and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

1b Joseph (Joe) Gebbia

OTHER INFORMATION Joseph Gebbia and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

John (Jack) Hartung

OTHER INFORMATION 1) John R. Hartung is the father-in-law of a senior program manager at the company. (Source(s): DEF14A, 9/17/25, p. 158.) 2) John Hartung and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

James Murdoch

OTHER INFORMATION James Murdoch and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119)

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Kimbal Musk | FAMILIAL RELATIONSHIP Kimbal Musk is the brother of Elon Musk, CEO of the company. (Source(s): DEF14A, 9/17/25, pp. 8, 36, 119, 129.) |
| --- | --- |
| | OTHER INFORMATION 1) For information about related-party transactions with companies affiliated with Elon Musk, see director note above. 2) Kimbal Musk and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119) |
| Jeffrey (JB) Straubel | FOUNDER Jeffrey Straubel is a co-founder of the company. (Source(s): DEF14A, 9/17/25, p. 17.) |
| | OTHER INFORMATION 1) Jeffrey Straubel served as chief technology officer of the company until July 2019. (Source(s): DEF14A, 9/17/25, p. 17.) 2) The company is party to an agreement with Redwood Materials Inc. to supply certain scrap materials. Under this agreement, Redwood incurred expenses of approximately $0.6 million through February 2025. Jeffrey Straubel is the founder and CEO of Redwood. (Source(s): DEF14A, 9/17/25, p. 157.) 3) Jeffrey Straubel and/or investment funds managed by, or otherwise affiliated with, him have made minority investments in certain companies or investment funds, (i) of which the company's other directors are founders, significant shareholders, directors, officers, managers, or affiliates and/or (ii) with which the company has had certain relationships. (Source: DEF14A, 9/17/25, p. 119) |

## COMMITMENTS AT PUBLIC COMPANIES

| Item # | Director Name | # of boards* | Company Name | Mandate Type | CEO | Board Chair | Audit | Comp | Nom |
| --- | --- | --- | --- | --- | --- | --- | --- | --- | --- |
| | Elon Musk | 1 | *Tesla, Inc.* | Executive Director | ✓ | | | | |
| | Robyn Denholm | 1 | *Tesla, Inc.* | Non-Executive Director | | ✓ | C F | M | M |
| 1a | Ira Ehrenpreis | 1 | *Tesla, Inc.* | Non-Executive Director | | | | C | C |
| 1b | Joseph (Joe) Gebbia | 2 | *Tesla, Inc.* | Non-Executive Director | | | M | | |
| | | | Airbnb, Inc. | Non-Executive Director | | | | | |
| | John (Jack) Hartung | 3 | *Tesla, Inc.* | Non-Executive Director | | | F | | |
| | | | The Honest Company, Inc. | Non-Executive Director | | | F | C | |
| | | | Portillo's, Inc. | Non-Executive Director | | | F | | |
| | | | Chipotle Mexican Grill, Inc. | Executive/Employee (non-director) | | | | | |
| | James Murdoch | 2 | *Tesla, Inc.* | Non-Executive Director | | | M | | M |
| | | | MCH Group AG | Non-Executive Director | | | | | |
| | Kimbal Musk | 1 | *Tesla, Inc.* | Non-Executive Director | | | | | |
| | Jeffrey (JB) Straubel | 2 | *Tesla, Inc.* | Non-Executive Director | | | | | |
| | | | QuantumScape Corporation | Non-Executive Director | | | | | |
| 1c | Kathleen Wilson-Thompson | 3 | *Tesla, Inc.* | Non-Executive Director | | | | M | M |
| | | | Wolverine World Wide, Inc. | Non-Executive Director | | | | C | M |
| | | | McKesson Corporation | Non-Executive Director | | | | M | M |

The information provided is based on ISS data records, which rely on disclosures in proxy materials and other public sources available as of the date set forth below (for the general meeting under review) and, with respect to information from prior years, information that was available ahead of each year's annual general meeting at the time of ISS' report for that meeting.
*The number of boards for each director is the total of executive director and/or non-executive director mandates.

## DIRECTOR PAY, ATTENDANCE AND EQUITY OWNERSHIP OVERVIEW MOST RECENT FY

| Item # | Director Name | Board Position | Attendance (in %) | Total Compensation | Ownership # | % stock | % votes |
| --- | --- | --- | --- | --- | --- | --- | --- |
| | **Elon Musk** | ED, CEO | ≥75% | ** | 413,362,808 | 12.4 | 12.4 |
| | **Robyn Denholm** | **NED, Chair, Audit (C), Comp (M), Nom (M)** | **≥75%** | **USD 0** | **85,000** | **<0.1** | **<0.1** |
| 1a | **Ira Ehrenpreis** | NED, Comp (C), Nom (C) | ≥75% | USD 0 | 855,394 | <0.1 | <0.1 |
| 1b | **Joseph (Joe) Gebbia** | NED, Audit (M) | ≥75% | USD 0 | 4,111 | <0.1 | <0.1 |
| | **John (Jack) Hartung** | NED, Audit (M) | N/A | N/A | 0 | 0 | 0 |
| | **James Murdoch** | NED, Audit (M), Nom (M) | ≥75% | USD 0 | 794,306 | <0.1 | <0.1 |
| | **Kimbal Musk** | NED | ≥75% | USD 0 | 1,463,220 | <0.1 | <0.1 |
| | **Jeffrey (JB) Straubel** | NED | ≥75% | USD 0 | 0 | 0 | 0 |
| 1c | **Kathleen Wilson-Thompson** | NED, Comp (M), Nom (M) | ≥75% | USD 0 | 5,400 | <0.1 | <0.1 |
| **Total** | | | | USD 0 | | | |

ED for Executive Directors, NED for Non-Executive Directors
Attendance rates take into account board and committee meetings.

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

**For executive director data, please refer to Executive Pay Overview.
Ownership values include shares held, stock awards that vest within 60 days of the disclosure date, and deferred stock units (DSUs). Stock options are excluded.

## Compensation Profile

### EXECUTIVE PAY OVERVIEW

| Executive | Title | Base Salary | Change in Pension, Deferred Comp, All Other Comp | Bonus & Non-equity Incentives | Restricted Stock | Option Grant | Total |
|---|---|---|---|---|---|---|---|
| **E. Musk** | Technoking of Tesla and Chief Executive Officer | 0 | 0 | 0 | 0 | 0 | 0 |
| **V. Taneja** | Chief Financial Officer | 304 | 3 | 0 | 26,137 | 171,897 | 198,340 |
| **X. Zhu** | SVP, APAC and Global Vehicle Manufacturing | 350 | 168 | 0 | 0 | 0 | 518 |
| **Median CEO Pay** | ISS Selected Peer Group | 1,312 | 555 | 2,215 | 11,061 | 0 | **16,537** |
| | Company Defined Peers | N/A | N/A | N/A | N/A | N/A | **N/A** |

Source: ISS. Pay in $thousands. Total pay is sum of all reported pay elements, using ISS' Black-Scholes estimate for option grant-date values. Median total pay will not equal sum of pay elements medians. Company Defined Peers are as disclosed. More information on ISS' peer group methodology is available at www.issgovernance.com/policy-gateway/us-compensation-policy-guidance/.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

## OPTION VALUATION ASSUMPTIONS

| For CEO's last FY Grant | Company | ISS |
|---|---|---|
| Volatility (%) | N/A | N/A |
| Dividend Yield (%) | N/A | N/A |
| Term (yrs) | N/A | N/A |
| Risk-free Rate (%) | N/A | N/A |
| Grant date fair value per option | N/A | N/A |
| Grant Date Fair Value ($ in 000) | N/A | N/A |

The CEO did not receive stock options in the most recent fiscal year.

## CEO PAY MULTIPLES

| Compared to | Multiple |
|---|---|
| 2nd highest active executive | 0.00 |
| Average active NEO | 0.00 |
| ISS peer median | 0.00 |
| Company peer median | N/A |
| Median employee/CEO Pay Ratio* (FY24, FY23) | 0.00, 0 |

*As disclosed by the company. The company disclosed the median compensation of all employees to be $57,243.

## CEO TALLY SHEET

| CEO | E. Musk |
|---|---|
| CEO tenure at FYE: | 16.2 years |
| Present value of all accumulated pension: | N/A |
| Value of CEO stock owned (excluding options): | $169,495,289,324 |
| **Potential Termination Payments** | |
| Involuntary termination without cause: | N/A |
| Termination after a change in control: | N/A |

Source: DEF14A

## 3-YEAR GRANTED VS. REALIZABLE CEO PAY

This chart is not displayed because the company discloses no granted pay to the CEO in the prior three fiscal years.

## CEO PAY VERSUS PERFORMANCE

| Year | SCT Total | Compensation Actually Paid | Value of $100 Investment (TSR) | | Revenue* |
|---|---|---|---|---|---|
| | | | Company | Peers | |
| 1 | $0 | $0 | $1,448 | $285 | $97,690,000,000 |
| 2 | $0 | $1,403,000 | $891 | $209 | $96,773,000,000 |
| 3 | $0 | ($9,703,000) | $442 | $151 | $81,462,000,000 |

**Important Metrics*:** Revenue, Adjusted EBITDA, Market Capitalization

Source: DEF14A. CEO Pay in $thousands. Year 1 = most recent fiscal year. SCT = Summary Compensation Table. TSR peers are as disclosed and may differ from pay peers. *The company disclosed these metrics as the most important for determining CEO pay.

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

# Quality Score



The ISS Cyber Risk Score is a concise, empirical, and proactive metric that seeks to convey how well a company manages and maintains its network security. It is a quantitative and data-driven rating that provides visibility into the level of cyber readiness and resilience an organization has implemented based on its ongoing actions to identify, manage, and mitigate cyber risk across its external technology networks, powered by a machine learning model trained to identify the potential for a breach event over the next 12 months. The Firmographic Max presented below the ISS Cyber Risk Score reflects the organization's maximum achievable Cyber Risk Score for their organization, considering inherent industry and organizational factors including sector classification and employee count. The ISS Cyber Risk Score is presented in this report for information only, and is not a factor in ISS's analysis or vote recommendations.

For more information on ISS Cyber Risk Score, visit http://www.issgovernance.com/esg/cyber-risk/. For questions, visit ISS Help Center.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Climate Awareness Scorecard



The ISS Climate Awareness Scorecard reflects publicly disclosed data and reporting on the company's climate change-related disclosures and performance. The Scorecard uses a range of climate-related factors to indicate a company's disclosure practices and performance record including its carbon risk classification. Companies are evaluated on overall disclosure (Governance, Strategy, Risk Management, Metrics & Targets) and performance factors (Norms Violations, GHG Emissions, Performance Ratings). For more information or questions regarding ISS Climate Awareness Scorecard, please contact: ISS Help Center.
*Reported **Estimated

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                              **Meeting Date: 6 November 2025**
POLICY: United States                                                                        Meeting ID: 1994609

## Vote Results

### ANNUAL MEETING 13 JUNE 2024

| Proposal | Board Rec | ISS Rec | Disclosed Result | Support Including Abstains (%)[1] | Support Excluding Abstains (%)[2] |
|---|---|---|---|---|---|
| 1a Elect Director James Murdoch | For | Against | Pass | 67.9 | 68.8 |
| 1b Elect Director Kimbal Musk | For | For | Pass | 78.5 | 79.5 |
| 2 Advisory Vote to Ratify Named Executive Officers' Compensation | For | Against | Pass | 79.4 | 80.3 |
| 3 Change State of Incorporation from Delaware to Texas | For | For | Pass | 62.7* | 62.7* |
| 4 Ratify Performance Based Stock Options to Elon Musk | For | Against | Pass | 76.2 | 76.9 |
| 5 Ratify PricewaterhouseCoopers LLP as Auditors | For | For | Pass | 96.2 | 97.5 |
| 6 Declassify the Board of Directors | Against | For | Pass | 53.3 | 54.1 |
| 7 Adopt Simple Majority Vote | Against | For | Pass | 53.1 | 53.9 |
| 8 Report on Harassment and Discrimination Prevention Efforts | Against | For | Fail | 30.9 | 31.5 |
| 9 Adopt a Non-Interference Policy Respecting Freedom of Association | Against | For | Fail | 20.0 | 20.6 |
| 10 Report on Effects and Risks Associated with Electromagnetic Radiation and Wireless Technologies | Against | Against | Fail | 3.6 | 3.8 |
| 11 Assess Feasibility of Including Sustainability as a Performance Measure for Senior Executive Compensation | Against | Against | Fail | 9.9 | 10.2 |
| 12 Commit to a Moratorium on Sourcing Minerals from Deep Sea Mining | Against | Against | Fail | 7.5 | 7.7 |

Shaded results reflect a majority of votes cast FOR shareholder proposal or AGAINST management proposal or director election
[1]Support Including Abstains is defined as %FOR/(For + Against + Abstain), as expressed as a percentage.
[2]Support Excluding Abstains is defined as %FOR/(For + Against), as expressed as a percentage, provided if different from For + Against + Abstain.
*Support as a percentage of outstanding shares.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Meeting Agenda & Proposals

| **Items 1a-1c. Elect Directors** | SPLIT |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST Nominating and Corporate Governance Committee Chair Ira Ehrenpreis is ██████████
████████████████████████████

████████████████████████████████████████████████
████████████████████████████████████████████████
████████████████████████████████████████████████

A vote FOR the other director nominees, Kathleen Wilson-Thompson and Joseph (Joe) Gebbia, is warranted.

**BACKGROUND INFORMATION**

Policies: Board Accountability | Board Responsiveness | Director Competence | Director Independence |
Election of Directors | ISS Categorization of Directors | Vote No campaigns

**Vote Requirement:** The company has adopted a majority vote standard (of shares cast) for the election of directors with a plurality carve-out for contested elections.

## Discussion

Please see the Board Profile section above for more information on director nominees.

**ELECTION SUMMARY**

The company proposes the following (re)elections:

| Type of election | Nominees |
|---|---|
| Incumbent board members to be reelected | Ira Ehrenpreis and Kathleen Wilson-Thompson |
| Nominee to be elected by shareholders for the first time | Joseph (Joe) Gebbia |
| **Terms of candidates** | **Nominees** |
| Three-year term | All nominees |

**INFORMATION ON NEW NOMINEES**

| | **Joseph (Joe) Gebbia** |
|---|---|
| # Shares held | 4,111 |
| Voting power | Less than 1% |
| CEO or Chair positions | N/A |

**ISS POLICY COMPLIANCE TABLE**

| | **Company-level** | **Nominee impact** |
|---|---|---|
| **Disclosure** | | |
| Names of new nominee(s) | Disclosed | |

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

| Biographies of new nominee(s) | Disclosed | |
|---|---|---|
| **Independence** | | |
| Board | 67% | |
| Audit committee | 100% | |
| Compensation committee | 100% | |
| Nominating committee | 100% | |
| **Composition** | | |
| Poor attendance | No concerns | |
| Overboarding | No concerns | |
| Executive on a key committee | No concerns | |
| Combined Chair/CEO | N/A | |
| Length of term | N/A | |

| | N/A in this market | | No concerns | | No impacted nominees | | Impacted nominees are on ballot |
|---|---|---|---|---|---|---|---|

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## PLEDGING OF SHARES

| | |
|---|---|
| Anti-pledging policy | Company permits |
| Anti-hedging policy | Company has robust policy |
| Pledging of at least 1,000 shares of company stock by NEOs or directors? | Yes |
| Aggregate shares pledged/value* | 237,461,941 shares valued at $95,896,630,253 |
| % of common shares outstanding or market value** | 7.38% |
| # of days to unwind pledged shares based on average daily trading volume*** | 2.82 days |
| Name and position | Elon Musk, CEO and director – 235,998,721 shares pledged<br><br>Kimbal Musk, director – 1,463,220 shares pledged |
| Pledged shares as % of total stock ownership**** | Elon Musk – 57.09%<br>Kimbal Musk – 100.00% |

*Based on fiscal year end stock price of $403.84*
**Based on common shares outstanding as of fiscal year end*
***Based on average daily trading volume over the past 30 days at 84,154,707 shares.*
****Based on ownership as captured in the Director Pay and Ownership table in the Board Profile above.*

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



## Item 2. Advisory Vote to Ratify Named Executive Officers' Compensation

## AGAINST

### VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted

### BACKGROUND INFORMATION

Policies: Advisory Votes on Executive Compensation

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Executive Compensation Analysis

### COMPONENTS OF PAY

| ($ in thousands) | CEO | | | | | CEO Peer Median | Other NEOs |
|---|---|---|---|---|---|---|---|
| | E. Musk | | E. Musk | E. Musk | | | |
| | 2024 | Change | 2023 | 2022 | | 2024 | 2024 |
| Base salary | 0 | | 0 | 0 | | 1,312 | 654 |
| Deferred comp & pension | 0 | | 0 | 0 | | 0 | 0 |
| All other comp | 0 | | 0 | 0 | | 517 | 171 |
| Bonus | 0 | | 0 | 0 | | 0 | 0 |
| Non-equity incentives | 0 | | 0 | 0 | | 2,109 | 0 |
| Restricted stock | 0 | | 0 | 0 | | 11,061 | 26,137 |
| Option grant | 0 | | 0 | 0 | | 0 | 171,897 |
| **Total** | **0** | | **0** | **0** | | **16,537** | **198,859** |
| % of Net Income | N/A | | | | | | 2.8% |
| % of Revenue | N/A | | | | | | 0.2% |

Publication Date: 17 October 2025

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**    **Meeting Date: 6 November 2025**
POLICY: United States    Meeting ID: 1994609

## Non-Performance-Based Pay Elements (CEO)

| | |
|---|---|
| *Key perquisites ($)* | N/A |
| *Tax gross-ups on key perks ($)* | None |
| *Value of accumulated NQDC\* ($)* | N/A |
| *Present value of all pensions ($)* | N/A |
| *Years of actual plan service* | N/A |
| *Additional years credited service* | N/A |

\*Non-qualified Deferred Compensation

## Disclosed Benchmarking Targets

| | |
|---|---|
| *Base salary* | None Disclosed |
| *Target short-term incentive* | None Disclosed |
| *Target long-term incentive (equity)* | None Disclosed |
| *Target total compensation* | None Disclosed |

## Severance/Change-in-Control Arrangements (CEO unless noted)

| | |
|---|---|
| *Contractual severance arrangement* | None |
| *Non-CIC estimated severance ($)* | N/A |

### *Change-in-Control Severance Arrangement*

| | |
|---|---|
| *Cash severance trigger\** | No Agreement |
| *Cash severance multiple* | N/A |
| *Cash severance basis* | N/A |
| *Treatment of equity* | The company has not entered into any agreements with NEOs that provide for certain treatment of normal equity grants in the event of severance or a change in control. However, the vesting of CEO Musk's 2025 CEO Interim Award will accelerate in the in the event of a change in control or death if he is still in eligible service at the time of either event. Additionally, CEO Musk's 2025 CEO Performance Award has certain severance and change in control provisions – see the discussion under Item 4. |
| *Excise tax gross-up\** | No |
| *Estimated CIC severance ($)* | Not disclosed |

\*All NEOs considered

## Compensation Committee Communication & Responsiveness

### *Disclosure of Metrics/Goals*

| | |
|---|---|
| *Annual incentives* | N/A – no annual incentive program |
| *Long-term incentives* | N/A – FY24 equity award made to one NEO is entirely time-based |

### *Pay Riskiness Discussion*

| | |
|---|---|
| *Process discussed?* | Yes |
| *Material risks found?* | No |

### *Risk Mitigators*

| | |
|---|---|
| *Robust equity clawback policy\** | Not considered robust |
| *CEO stock ownership guideline* | 6X |
| *Stock holding period requirements* | Stock options: 6 months<br>Restricted stock: 6 months |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**  
POLICY: United States

**Meeting Date: 6 November 2025**  
Meeting ID: 1994609

*Must cover all NEOs and apply to performance- *and* time-based equity incentives.

### *Pledging/Hedging of Shares*

| | |
|---|---|
| *Anti-hedging policy* | Company has a robust policy |
| *Anti-pledging policy* | The proxy statement does not disclose a robust policy |

### *Compensation Committee Responsiveness*

| | |
|---|---|
| *MSOP vote results (F/F+A)* | 2024: 80.3%; 2023: 90.9%; 2022: N/A |
| *Frequency approved by shareholders* | Annual with 56.6% support (most recent frequency vote: 2023) |
| *Frequency adopted by company* | Annual |

### *Repricing History*

| | |
|---|---|
| *Repriced/exchanged underwater options last FY?* | No |

## Pay for Performance Evaluation



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609



Data for ISS' pay-for-performance tests are sourced from proxy disclosures for pay and from Compustat for TSR and financial performance. For more information on ISS' quantitative pay-for-performance evaluation, visit https://www.issgovernance.com/policy-gateway/voting-policies/.

## Short-Term Cash Incentives

| CEO STI Opportunities | FY 2024 (E. Musk) | | FY 2023 (E. Musk) | |
|---|---|---|---|---|
| | **Target** | **Maximum** | **Target** | **Maximum** |
| *STI targets ($)* | N/A | N/A | N/A | N/A |
| *STI targets (calculated)* | N/A | N/A | N/A | N/A |
| *STI targets (as disclosed)* | ND | | | |
| *ISS peer median* | 153% of base salary | | | |
| *Company peer median* | N/A | | | |

| Actual Payouts ($) | FY 2024 (E. Musk) | | FY 2023 (E. Musk) | |
|---|---|---|---|---|
| | **Amount** | **% of base salary** | **Amount** | **% of base salary** |
| *Bonus* | 0 | N/A | 0 | N/A |
| *Non-equity incentive* | 0 | N/A | 0 | N/A |
| *Total Bonus + Non-equity* | 0 | N/A | 0 | N/A |

| | |
|---|---|
| *STI performance metrics/goals* | N/A: no annual incentive program in FY24 |

### *Other Short-Term Incentive Factors*

| | |
|---|---|
| *Performance results adjusted?* | N/A |
| *Discretionary component?* | N/A |
| *Discretionary bonus paid?\** | No |
| *Future performance metrics* | Not disclosed |

\*Based on the Bonus column in the SCT; per SEC rules, amounts disclosed in this column were not based on pre-set goals.

## Long-Term Incentives

| | |
|---|---|
| *CEO's last FY LTI target* | None disclosed |
| *NEOs' last FY award type(s)* | Time-based options, Time-based stock |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

| | |
|---|---|
| *Last FY performance metrics/goals* | N/A (CEO received no equity awards in FY24; other NEO's equity award was entirely time-based) |

*Long-Term Equity Grants*

| CEO Equity Awards | FY 2024 | | | | FY 2023 | | | |
|---|---|---|---|---|---|---|---|---|
| | Shares (#) | % shares* | Value ($)* | % value | Shares (#) | % shares* | Value ($)* | % value |
| *Time-based shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Time-based options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance shares* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Performance options* | 0 | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| *Total equity* | 0 | | 0 | | 0 | | 0 | |

| | |
|---|---|
| *Time-based equity vesting* | Taneja RSUs: Vest 1/16th every three months, beginning Dec. 5, 2024<br>Taneja Options: Vest 1/48th every month, beginning Dec. 5, 2024 |
| *Perf. measurement period* | N/A |
| *CEO one-time equity awards* | N/A |
| *CEO equity pay mix (by value)* | N/A – CEO received no equity awards in FY24 |

*Performance shares, if any, are counted and valued at target.

*Other Long-Term Incentive Factors*

| | |
|---|---|
| *Performance results adjusted?* | N/A |
| *Discretionary component?* | No |

## Executive Summary

## Analysis

### OVERVIEW

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 3. Amend Omnibus Stock Plan | AGAINST

VOTE RECOMMENDATION

██████████████████████████████████████████████████████████

███████, a vote AGAINST this proposal is warranted due to the following key factor(s):

- ██████████████████████████████████████████████
- ██████████████████████████████████████████████
- ██████████████████████████████

BACKGROUND INFORMATION

Policies: Amending Equity Plans

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes not counted)

## Proposal

| Plan Name | 2019 Equity Incentive Plan |
|---|---|
| Year of last share request | 2019 |
| New share request | 60,000,000 shares under General Share Reserve 207,960,630 shares under Special Share Reserve (ISS' cost analysis excludes these shares – see the Proposal & Assumptions section below) |
| Shares rolled over from prior plan(s) | None |
| Shares remaining under existing plan(s) | 47,444,367 shares |
| Evergreen provision | No |
| Shares outstanding* | 3,229,150,886 shares |
| Market value* | $989,702,455,050 |
| Material amendments | In addition to requests related to increasing share reserves, the plan is amended to authorize the board (i) to grant Musk awards from the Special Share Reserve with terms that may vary from the terms of the 2019 Plan (other than the share reserve and share recycling provisions), and (ii) to grant non-qualified stock options with an exercise price below fair market value on the date of grant. |

*As of Record Date using 200-day average closing price as of June 1, 2025; excludes 96 million shares underlying the 2025 CEO Interim Award (see section immediately below).

VOTE NO CAMPAIGNS

The following shareholders have launched "Vote No" campaigns urging shareholders to oppose this proposal:

(i)      The Comptroller of the City of New York
(ii)     SOC Investment Group

The filing from the Comptroller of the City of New York and the filing from the SOC Investment Group both cite the same factors for opposing this proposal. The shareholders assert that the need for a pool of shares for employees "was only necessitated by the Interim Award, which delivered to Mr. Musk the vast majority of remaining authorized shares, leaving the Company without the ability to use equity to attract, incentivize, and retain other employees." The shareholders also object to the amendment provision that allows for the issuance of in-the-money options, and they further argue that CEO Musk should buy more shares on the open market, rather than by equity award, if he wants to increase his voting power.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## PROPOSAL & ASSUMPTIONS

This proposal seeks shareholder approval of the Amended and Restated 2019 Equity Incentive Plan (the "2019 Plan") to (i) provide for a new 208 million share pool (the "Special Share Reserve") from which the board can grant future equity awards only to CEO Musk, and (ii) provide for a separate 60 million share pool increase (the "General Share Reserve") for awards to plan participants other than CEO Musk. The board states that this proposal will "help ensure that Tesla can honor its bargain with Mr. Musk under the 2018 CEO Award by providing increased flexibility through the authorization of shares for making future awards to Mr. Musk…." The board has committed that the CEO Interim Award already issued from the General Share Reserve as well as any CEO award to be made from the Special Share Reserve can provide the CEO "no material additional benefit" beyond the 2018 CEO Award that is the subject of ongoing litigation; in other words, any such award would be intended to make whole CEO Musk to the event that his 2018 CEO Award is reduced or forfeited as a result of the ongoing litigation. The proxy states that "in any case, the number of shares awarded to Musk through any combination of the 2018 CEO Performance Award, 2025 CEO Interim Award, and any Musk Award [from the Special Share Reserve] should not exceed 303,960,630 shares of common stock, which is the total amount of shares promised under the 2018 CEO Performance Award."



## Analysis

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

SUMMARY EVALUATION

**EPSC Model: S&P500**



*ISS Recommendation:* **AGAINST**

For the following analysis, ✓ has a positive impact, ✗ has a negative impact, and ↔ is neutral.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



## DISCUSSION

There are no overriding factors that have an impact on this proposal.

## SUPPLEMENTAL INFORMATION

### Shareholder Value Transfer (SVT)

| | |
|---|---|
| *Evergreen funding:* | No |
| *Fungible share counting (FV multiplier):* | None |
| *200-day average closing price as of June 1, 2025* | $306.49 |
| *4-digit GICS* | 2510 (Automobiles & Components) |

| SVT Calculation (2019 Equity Incentive Plan) | Company | ISS Valuation | SVT |
|---|---|---|---|
| *New shares requested (A)* | 60,000,000 | | |
| *Available shares remaining (B)* | 47,444,367 | | |
| *Unvested/Unexercised granted shares (C)* | 359,752,000 | | |
| *New + Available (A+B)* | 107,444,367 | | |
| *New + Available + Outstanding (A+B+C)* | 467,196,367 | | |

Source: A shares* - (DEF 14A filed 9/17/2025, p. 37); B shares* - (as of 8/19/2025; DEF 14A filed 9/17/2025, pp. 39-40, DEF 14A filed 9/17/2025, p. 37, B-5); C shares* consist of 342,300,000 stock options and 17,452,000 full-value awards (as of 8/19/2025; DEF 14A filed 9/17/2025, pp. 39-40).

*A shares exclude the shares reserved under the Special Share Reserve. B shares include the maximum possible 36 million recycled shares upon the assumed forfeiture of the 2025 CEO Interim Award. C shares capture the full CEO 2018 performance option award, and correspondingly exclude that the CEO Interim Award. Please see the Proposal & Assumptions section above.

### Company Burn Rate (Historical Grants)

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | | | |
|---|---|---|---|
| Index/GICS industry group: | S&P500/2510 (Automobiles & Components) | | |
| ISS benchmark: | ███ | | |

| Fiscal Year | 2024 | 2023 | 2022* |
|---|---|---|---|
| Options/SARs (O): | 14,979,000 | 9,521,000 | 105,440,210 |
| Full value awards (FV): | 12,045,000 | 11,743,000 | 8,714,000 |
| O + FV: | 27,024,000 | 21,264,000 | 114,154,210 |
| Wtd. common shares outstanding: | 3,197,000,000 | 3,174,000,000 | 3,130,000,000 |
| Unadjusted burn rate: | 0.85% | 0.67% | 3.65% |
| | *3-year average unadjusted burn rate:  1.72%* | | |
| Value-adjusted burn rate: | 0.70% | 0.60% | 2.80% |
| | *3-year average ISS value-adjusted burn rate:  1.36%* | | |

For more information on the Value-Adjusted Burn Rate methodology, please visit https://www.issgovernance.com/policy-gateway/voting-policies/. *Note: figures are adjusted to reflect a three-for-one stock split in 2022. The FY22 option figure includes 101.3 million shares earned by CEO Musk in that year pertaining to the 2018 CEO Performance Award.

## Share Dilution

| | | |
|---|---|---|
| Shares outstanding (1): 3,229,150,886 | Warrants & convertibles (2): 0 | |
| Shares reserved under plans (3): 467,196,367 | Fully diluted shares (1+2+3): 3,696,347,253 | |

| | Shares | Dilution (Basic)* | Dilution (Full)* |
|---|---|---|---|
| New shares requested: | 60,000,000 | 1.86% | 1.62% |
| Existing shares available for grant: | 47,444,367 | 1.47% | 1.28% |
| Granted unexercised/Unvested shares: | 359,752,000 | 11.14% | 9.73% |
| Total share allocation: | 467,196,367 | 14.47% | 12.64% |

*Assuming maximum dilution

## Additional Plan Features

| | |
|---|---|
| Award types authorized (minimum option exercise price): | ISOs (100%), NSOs (0%), SARs, restricted stock units, restricted stock, performance units, performance shares, unrestricted stock/common shares, and other stock awards |
| Award-type limits: | None |
| Eligible participants: | All employees, officers, non-employee directors, and consultants |
| Plan administrator: | Compensation Committee |
| Plan expiration date: | June 11, 2029 |
| Individual award limits: | None |
| Terms/vesting provisions: | Stock options have a maximum 10-year term. |
| Minimum vesting requirements: | Appreciation and full-value awards: None or not all award types |
| Loans to participants: | The plan does not allow the company to extend loans to participants. |
| Performance criteria disclosed: | No |
| Treatment in a CIC: | Unvested time-based equity awards would accelerate if not assumed; performance awards would be settled at target. |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**

POLICY: United States

**Meeting Date: 6 November 2025**

Meeting ID: 1994609

| Item 4. Approve Issuance of Common Stock to Elon Musk Pursuant to CEO Performance Award | AGAINST |
|---|---|

VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted. ████████████████████

████████████████████████████████████████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The board is seeking shareholder approval of the 2025 CEO Performance Award (the "2025 CEO Award") granted to CEO Elon Musk. The award, preliminarily valued by the company at $87.8 billion, is comprised of performance-based restricted stock which may vest in 12 tranches upon the achievement of 12 operational and 12 market capitalization ("market cap") goals over a 10-year period, and is also conditioned upon his continued service as CEO.

While the award has been approved by the board, CEO Musk will not receive the shares underlying the award until the later of either the "termination or expiration (and any extension thereof) under the HSR Act" or the approval of the award by shareholders. The company notes that shareholder approval is not necessary under Texas law, but it is required for equity compensation plans under Nasdaq rules.

Under Texas law, both Elon Musk and his brother Kimbal Musk are allowed to vote their shares owned, directly or indirectly, on this proposal as well as the A&R 2019 Equity Incentive Plan proposal further discussed under Item 3. While the proxy states that both recused themselves when "considering these matters as directors of Tesla," they are entitled to vote their shares owned on both proposals at the 2025 annual meeting. Combined, they have a beneficial ownership equating to 21.6 percent of common stock outstanding as of Sept. 15, 2025, according to the Ownership of Securities table in the proxy.

### VOTE NO CAMPAIGNS

This proposal is also the subject of two "Vote No" campaigns. One notice of exempt solicitation filed by The Comptroller of the City of New York, on behalf of the New York City Employees', Teachers', and Board of Education's retirement systems. One of the proponent's main concerns surrounds the goal rigor of the award, stating the performance targets are "in many cases vague, undemanding, and subject to significant discretion by what [they] believe is a non-independent board." They also cite the potential for significant dilution to shareholders caused by the award as well as the lack of "concrete commitments" from CEO Musk to keep his

Copyright © 2025 Institutional Shareholder Services Inc. All Rights Reserved. This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

attention on Tesla as concerns. The other notice of exempt solicitation was filed by SOC Investment Group and cites the same three main concerns regarding goal rigor, dilution, and Musk's commitment to Tesla.

BACKGROUND

Tesla was founded in 2003 as an independent auto-maker specializing in electric cars and completed its IPO in 2010. Since that time, the company has seen extraordinary growth under CEO Musk's leadership, growing to a market cap of $1.32 trillion (and even larger at $1.43 trillion as of Oct. 16, 2025) with global revenues of $97.7 billion. Tesla has since completed multiple acquisitions and expanded its business model to cover electric vehicles, lithium-ion battery energy storage, solar panels, artificial intelligence ("AI") technologies, and more.

Unlike most public company CEOs, Musk is the CEO of multiple other companies such as Space Exploration Technologies Corp., a privately owned space technology and transportation company, and X.AI Holdings Corp., a privately owned AI, social media, and technology company. Musk was also a founder of The Boring Company and Neuralink Corp. In fact, because he holds multiple leadership positions, the Special Committee Report recognizes that "Musk has more attractive options today than ever before, which may afford him greater influence over the fruits of his labor" and the "opportunity cost" for him to continue to devote time and focus to Tesla as part of the committee's rationale for granting him this award.

In 2018, the board proposed a separate large performance stock options grant (the "2018 CEO Award"), with an initial company valuation of $2.6 billion. The 2018 CEO Award was approved by shareholders at the company's March 2018 special meeting with 80.4 percent of votes cast in support of the proposal. Since that time, the performance requirements for all 12 tranches of the award were met, but Musk has not been permitted to exercise these options. After the 2018 special meeting, Richard Tornetta, a Tesla shareholder, filed a shareholder derivative complaint with the Delaware Chancery Court alleging that CEO Musk controlled the board and influenced the process, which resulted in an unfair award. The Delaware Chancery Court published its original opinion (the "First Tornetta Opinion") in January of 2024, which supported these claims and found that the award was not "entirely fair" to the company's shareholders and ordered the award be rescinded. Since the original opinion was published, the Delaware legislature has approved changes to the statutory framework regarding controlling stockholders that differs with much of the court's reasoning for its original ruling.

Following this decision by the Delaware court, the board held several meetings to address potential reincorporation outside of Delaware. These meetings led to the creation of a special committee (the "2024 committee"). The 2024 committee ultimately recommended the company reincorporate to Texas and ratify the 2018 Award by shareholder vote. These issues were both brought to and approved by shareholders as two separate proposals at the 2024 annual meeting with the reincorporation proposal receiving 86.6 percent support and the ratification proposal receiving 76.2 percent support.

Following shareholder re-ratification of the 2018 CEO Award at the 2024 annual meeting, the company as well as directors involved in the *Tornetta* lawsuit filed motions requesting that the Delaware Chancery Court revise the First Tornetta Opinion. In December of 2024, the Delaware court issued another opinion (the "Second Tornetta Opinion"), which, in conjunction with the First Tornetta Opinion, ruled that the ratification of the 2018 Award by the company's shareholders at the 2024 annual meeting does not reinstate the award. The Delaware court's opinion held that the "procedural safeguards that [the company] had implemented around the ratification were insufficient" to solve the issues within the initial approval process of the 2018 Award. The Second Tornetta Opinion also rejected the company's attempt to eliminate the need for rescinding the 2018 Award. The company has an appeal pending before the Delaware Supreme Court following the Second Tornetta Opinion, seeking reinstatement of the 2018 CEO Award. CEO Musk has been unable to exercise options from the 2018 CEO Award as a result of the ongoing litigation.

These opinions published by the Delaware court led the company to form a special committee of the board tasked with evaluating and determining whether it was in the best interests of the company to retain and incentivize CEO Musk as well as any new compensation that would potentially be awarded to him. The special committee

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                            Meeting Date: **6 November 2025**
POLICY: United States                                                                         Meeting ID: 1994609

ultimately recommended that CEO Musk be awarded the CEO Interim Award, discussed under Item 2 above, prior to the 2025 CEO Award.

### BOARD RATIONALE

**The board believes that the award is necessary to retain and incentivize CEO Musk.** The committee outlined three main reasons why shareholders should approve the 2025 performance award to Musk. While Musk currently owns 19.8 percent of Tesla's outstanding shares, the committee asserts that the pay-for-performance nature of the award design further aligns CEO Musk with shareholders as he will only earn compensation if the challenging milestones are met and will not receive any other pay outside of this award other than potentially the 2025 Interim CEO Award (only to the extent the 2018 CEO Award is reduced or forfeited). Secondly, the proxy disclosed that Musk has raised "the possibility of prioritizing other ventures if alignment could not be reached on a path forward with [the company]." The special committee determined that it was important to retain CEO Musk and "believes that Mr. Musk singularly possesses the leadership characteristics necessary to transform [the company] and realize its long-term mission at an unparalleled level." The committee also outlined that his continued service is essential for the company's successful transition from the EV and renewable energy industries to becoming a leading company in AI and robotics. Thirdly, the committee highlights the pay-for-performance nature of the award, which is intended to spur the achievement of strategic and financial goals under Tesla's updated strategic plans. The proxy indicates that if all market cap milestones are met, Tesla's market cap will be $8.5 trillion, which is "approximately equal to the combined market capitalizations of each of Meta, Microsoft, and Alphabet as of the date of this proxy statement." If none of the goals are met, then CEO Musk would not receive any shares.

**The board believes that conventional pay would not incentivize Musk.** The board states that Musk is "motivated by more than just conventional forms of compensation" and that traditional forms of compensation would be insufficient to incentivize him. Instead, they outlined how Musk is "driven by bold, high-stakes challenges that allow him to fundamentally reshape industries and society, while maximizing long-term shareholder value," which is why they designed this award to provide him with the opportunity to earn the astronomical grant value, but only if he achieves these far-reaching performance goals. The committee also "expressly declined" to use traditional benchmarking when determining the value and design of this award. The committee's reasoning behind this is that "no company in the world has similar goals to what is expected under the pay-for-performance structure of the 2025 CEO Performance Award" and that other companies also do not utilize compensation plans where pay for their CEO is based entirely on achievement of "such daunting and challenging goals." These differences all contribute to the company's opposition to implementing a more traditional CEO pay structure.

**The award is also intended to provide CEO Musk with greater voting power.** As disclosed in the Special Committee Report, the committee stated that "the 2025 CEO Performance Award was structured with the primary objective of delivering approximately 12 [percent] of additional voting power to Musk in exchange for Musk driving long-term stratospheric company stock price growth by meeting financial and product goals subject to an extended vesting period." Based on advice from external firms, the board determined that performance-conditioned restricted stock would be the best vehicle to accomplish both goals. This goal is also reflected by the voting agreement and extended vesting periods attached to each tranche, which are further discussed under the Award Terms section below.

### PRIOR AWARDS

**The 2012 award design has influenced the design of subsequent CEO awards.** In 2012, the board granted Musk a $78 million performance stock option award tied to market cap expansion targets and operational milestones. The 2012 award could be earned in 10 tranches over a 10-year term and the market cap goals required expansions in successive increments of $4 billion. The operational milestones consisted of delivering production versions of vehicles, meeting vehicle delivery targets, and achieving a gross margin greater than 30 percent for four consecutive quarters. To earn the full award (which ISS valued at more than $111 million), Tesla's market cap would have needed to grow from $3.2 billion to $43.2 billion. By 2017, this market cap expansion target was met, and all but one of the operational milestones had been achieved (the exception being the gross margin goal). Achievement of nearly all of the goals for this prior award influenced the design of awards to follow.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**The 2025 CEO Performance Award shares design elements with the 2018 Award.** In 2018, the board granted Musk a performance stock option award tied to market capitalization growth targets and operational milestones, originally valued by the company at $2.6 billion. The 2018 Award could be earned in 12 tranches over a 10-year term. The market cap goals required an initial milestone of $100 billion and then successive increases in increments of $50 billion. The operational milestones consisted of total revenue increases of $15-25 billion and adjusted EBITDA increases of $1.5-2 billion between tranche goals. In order to earn the full award (which ISS initially valued at $3.7 billion), the company's market cap would have needed to grow to $650 billion. By the 2021 annual meeting, the market cap growth goals had all been achieved and all of the operational milestones were later achieved by the 2023 annual meeting. Due to the success the company saw from the design of the 2018 and 2012 awards, the committee modeled the 2025 Award similarly, while also noting certain design changes that are intended to (i) achieve the goal of increasing the CEO's voting power and (ii) responding to shareholder input. For instance, the equity vehicle for this award will be restricted stock with an extended vesting period to retain Musk "in exchange for allowing him to exercise voting rights upon earning shares under a tranche without the burden of needing to create the liquidity in Tesla's stock." Additionally, the number of operational milestones was reduced, which was "responsive to input received from shareholders that there were too many opportunities for Musk to earn the entire 2018 CEO Performance Award." The company will utilize an "offset amount," which is further discussed below, to further drive stock appreciation growth and included CEO succession framework goals for the final two tranches to address shareholder feedback, as well.

**The CEO Interim Award may potentially be forfeited.** The CEO Interim Award was granted in August 2025 prior to the 2025 CEO Award and was valued by the company at $26.1 billion, compared to an ISS valuation of $27.3 billion. The award consists entirely of time-based restricted stock to immediately provide the voting influence that Musk desired. This equity vehicle was also intended to ensure retaining Musk through the two-year cliff vesting period. The award is also subject to a five-year holding period from the date of grant (Aug. 3, 2025). The company does not disclose that Musk may vote these shares prior to vesting as they do with the 2025 CEO Award further discussed below. The CEO Interim Award also requires Musk to pay a purchase price of $23.34 per share, equivalent to the exercise price of the 2018 Award options. The shares underlying the 2025 CEO Award equate to about one-third of the shares he is entitled to under the 2018 Award. The CEO Interim Award may potentially be forfeited in the future, however, dependent upon the outcome of the ongoing litigation of his 2018 CEO Award. If the Delaware courts ultimately allow Musk to exercise his 2018 options, he must forfeit the CEO Interim Award and cannot "double dip" in the value of both. Further information surrounding this award can be found under Item 2. While

### AWARD TERMS

**Multi-billion dollar award value requires the achievement of far-reaching market cap and operational milestones.** The size of this award is again unprecedented following the 2018 CEO Award, which was valued at $2.6 billion upon grant. The company estimates the grant value of this new award at $87.8 billion (ISS' valuation is $104.4 billion). The 2025 CEO Award consists of performance-conditioned restricted stock that can be earned in 12 tranches, with the value of each tranche representing approximately one percent of Tesla's outstanding shares. Each tranche is tied to the achievement of successive market cap growth targets as well as operational milestones comprised of product, adjusted EBITDA, and CEO succession framework goals (see below) that must be achieved within the 10-year performance period. The 2025 Award has a five-year post-exercise holding requirement. The award was also designed with an "offset amount" per share of $334.09, which was the stock price on the date of grant in order to encourage stock appreciation growth.

**The 2025 Award also provides for a voting agreement with Musk.** Once the market cap and operational milestones for a tranche have been achieved, those associated shares will become "earned shares" and Musk will have the right to determine the vote of the shares in that given tranche. Prior to shares becoming earned shares, Musk will provide the Corporate Secretary of Tesla an irrevocable proxy allowing the unearned shares to vote proportionately to the shareholder votes cast for or against and provide written consents proportionately to shareholder consents for or not provided, as applicable, at any annual or special meeting of shareholders.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| | |
|---|---|
| *Grant Value* | Number of shares: 423,743,904 restricted shares (12% of the Company's outstanding shares as of Aug. 29, 2025)<br><br>Tesla valuation: $87.8 billion<br><br>ISS valuation ██████████<br><br>Offset amount per share: $334.09 (fair market value on grant date Sept. 3, 2025)<br><br>Each of the 12 tranches represents 1% of the total adjusted outstanding shares |

| 2025 CEO Performance Award | Company | ISS |
|---|---|---|
| Volatility (%) | 57.3% | ██████ |
| Dividend Yield (%) | 0.00% | ██████ |
| Vesting period/term (yrs) | 10 years | ██████ |
| Risk-free Rate (%) | 4.18% | ██████ |
| Grant Date Price per Share | $334.09 | ██████ |
| *Offset Amount per Share* | $334.09 | ██████ |
| Grant Date Fair Value ($ in billions) | $87.8 | ██████ |

**Valuation Assumptions**

The company used a Monte Carlo simulation model on the date of grant to determine the valuation of the 2025 Award (see footnote (5) on page 86 of the 2025 proxy statement).

████████████████████████████████████████

| | |
|---|---|
| *Offset Amount* | As the committee did not want this award to provide larger compensation than the case would be with a net-settled stock option exercise, an "offset amount" was implemented as part of the award. This offset amount will reduce the number of earned shares that can become vested shares by the value of those shares on the grant date ($334.09 per share). As a result, the share price on the vesting date must exceed that of the grant date share price for Musk to see any economic value. The use of an offset amount is intended to reinforce the requirement of unprecedented growth in price appreciation for Musk. |
| *Award Milestones* | Market Capitalization Milestones<br><br>• The award vests based on 12 market capitalization milestones:<br><br>   ○ First tranche milestone is $2 trillion<br><br>   ○ Each of the next nine tranches thereafter requires an additional $500 billion in market capitalization to vest, up to $6.5 trillion<br><br>   ○ The final two tranches each require an additional $1 trillion in market capitalization to vest, up to $8.5 trillion for the last tranche |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

o  Sustained trailing average market cap for each tranche is required over (i) a 6-calendar-month period and (ii) a 30-calendar-day period in order to be considered earned

Operational Milestones

- 12 operational milestones, comprised of four product goals and eight adjusted EBITDA milestones, of which one must be paired with each of the market capitalization milestones for all tranches to vest.

| Product Goals | Adjusted EBITDA (in billions) |
|---|---|
| 20 million Tesla vehicles delivered | $50 |
| 10 million active FSD subscriptions | $80 |
| 1 million Bots delivered | $130 |
| 1 million Robotaxis in commercial operation | $210 |
| | $300 |
| | $400* |
| | $400* |
| | $400* |

*Adjusted EBITDA milestones six through eight will require adjusted EBITDA to be $400 billion over three non-overlapping periods, each made up of four consecutive quarters.

CEO Succession Framework:

- The final two tranches (11 and 12) are also subject to CEO Musk developing a CEO succession framework, which will be approved by the administrator in good faith.

| | |
|---|---|
| *Vesting and Performance Period* | Each of the 12 tranches becomes "earned shares" when both a market capitalization milestone and an operational milestone are met during the 10-year performance period. Generally, any tranches that become earned shares prior to the 5th anniversary of the grant date will vest on the 7.5th anniversary. Generally, any tranches that become earned shares following the 5th anniversary of the grant date will vest on the 10th anniversary. |
| *Holding Period* | Five years after shares become earned shares |
| *Employment Requirement for Continued Vesting* | Vesting eligibility is contingent upon Musk (i) remaining as CEO, or (ii) serving as an executive officer responsible for Tesla's product development or operations that have been approved by disinterested members of the board. |
| *Employment Termination* | Acceleration of vesting of earned shares upon termination of employment without cause, death, or disability. |
| *Change in Control* | Any earned shares will vest upon a change in control. The administrator will assess whether shares have become earned shares solely based on the market capitalization milestones. |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 5. Ratify PricewaterhouseCoopers LLP as Auditors | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal to ratify the auditor is warranted.

**BACKGROUND INFORMATION**

Policies: Auditor Ratification

**Vote Requirement:** Majority of votes cast (abstentions count against)

## Discussion

### AUDIT FIRM INFORMATION

The board recommends that PricewaterhouseCoopers LLP be reappointed as the company's independent audit firm.

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Audit firm since (as disclosed) | 2005 |
| Audit opinion for the last fiscal year | Unqualified |
| Term to serve if reappointed | 1 year |

### FEES PAID DURING THE LAST FISCAL YEAR

| Audit firm name | PricewaterhouseCoopers LLP |
|---|---|
| Fees currency | USD |
| **Total fees paid to the audit firm** | **17,923,000** |
| Audit fees | 15,634,000 |
| Audit-related fees | 54,000 |
| Tax fees | 2,154,000 |
| Other fees | 81,000 |
| **Total non-audit fees\*** | **2,235,000** |
| **Total non-audit fees as a percentage of total fees** | **12.5%** |

*Total non-audit fees include other fees, tax advice fees, and certain transaction-related fees. Non-audit fees will also include any tax-related fees not identified as tax compliance or tax preparation.

The auditor's report contained in the annual report is unqualified, meaning that in the opinion of the auditor, the company's financial statements are fairly presented in accordance with generally accepted accounting principles.

## Analysis

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609

| Item 6. Eliminate Supermajority Vote Requirement | FOR |
|---|---|

VOTE RECOMMENDATION

A vote FOR this proposal is warranted, ███████████████████████████████
████████████

BACKGROUND INFORMATION

Policies: Supermajority Vote Requirements

**Vote Requirement:** Two-thirds of outstanding shares (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The board seeks shareholder approval to amend the company's certificate of formation and bylaws to eliminate various supermajority voting requirements and replace them with majority requirements.

Currently, approval from two-thirds of the outstanding voting power is required to amend various provisions of the certificate of formation (including those related to board classification) and the bylaws. If approved, amendments to these governing documents would require approval from a majority of shares outstanding.

The board is not providing shareholders with a recommendation of how to vote on this proposal; the board recommendation is "NONE". At the 2022 annual meeting, when a similar binding proposal was last on ballot, the board recommended that shareholders vote "FOR" that proposal.

### BACKGROUND AND RATIONALE

Previous binding proposals to remove supermajority requirements have been on ballots at each of the 2019, 2021, and 2022 annual meetings, though none were approved by the requisite supermajority of shareholders. The board indicated in the proxies for the 2023 and 2024 annual meetings that "once we have achieved a total shareholder participation rate of at least 65% at a shareholder meeting, the Board will again propose amendments to Tesla's governing documents to eliminate supermajority voting requirements." Because this participation rate was met at the 2024 meeting, the board is again submitting this proposal topic to a binding shareholder vote.

### EXEMPT SOLICITATIONS

On Sept. 9, 2025, John Chevedden filed an exempt solicitation in which he urges shareholders to vote in favor of this proposal along with the non-binding proposal in Item 13, and to vote against director Ira Ehrenpreis in Item 1a as chair of the governance committee. The filer contends that the two-thirds vote required to approve this proposal is a substantial hurdle to meet and that the proposal in Item 13 only requires a majority of votes cast to be approved, indicating that it is important for at least one of them to be approved. In recommending against the governance committee chair, the filer highlights concerns over the lack of a binding vote on board declassification at this meeting (see Item 1 for further discussion).

## Analysis

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609



| Item 7. Authorize Board to Invest Company Funds in xAI | AGAINST |
| --- | --- |

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted. ████████████████████
████████████████████████████████████████████████████████
████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

Tesla's CEO, Elon Musk, also serves as the CEO of X.AI Holdings Corp., which is the owner of X, the social media platform, and x.AI, an artificial intelligence company.

### PROPOSAL

Stephen Hawk intends to present the following proposal for consideration:

> WHEREAS, Tesla, Inc. is transforming into a leading artificial intelligence (AI), robotics, and energy company, with its mission to advance technology for human benefit and advance sustainable energy;

> WHEREAS, xAI, a company focused on building AI to accelerate human scientific discovery, has developed Grok, an AI assistant already integrated into Tesla vehicles to enhance user experience, vehicle functionality, and autonomous driving capabilities;

> WHEREAS, the synergies between Tesla and xAI are evident, as both companies share a commitment to advancing technology for human benefit, with xAI's AI expertise complementing Tesla's advancements in autonomous driving, robotics (e.g., Tesla Bot), and energy optimization;

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                                        **Meeting Date: 6 November 2025**
POLICY: United States                                                                                             Meeting ID: 1994609

WHEREAS, Tesla's strategic investments in AI are critical to maintaining its competitive edge in the rapidly evolving AI and robotics industries, and a direct investment in xAI would strengthen Tesla's access to cutting-edge AI technologies, talent, and intellectual property;

WHEREAS, xAI's mission aligns with Tesla's, creating opportunities for collaborative innovation in areas such as vehicle AI, energy grid optimization, and humanoid robotics, which could enhance Tesla's product offerings and market leadership;

WHEREAS, an investment in xAI would provide Tesla with a stake in a major AI player, potentially yielding significant financial returns while fostering technological advancements that benefit Tesla's customers and shareholders;

WHEREAS, the Board of Directors has a fiduciary duty to evaluate strategic investments that align with Tesla's long-term growth and innovation goals;

NOW, THEREFORE, BE IT RESOLVED, that the shareholders of Tesla, Inc. request that the Board of Directors authorize an investment in xAI, in an amount and form deemed appropriate by the Board, to capitalize on the synergies between the two companies and strengthen Tesla's position as a leader in AI, robotics, and energy.

### PROPONENT STATEMENT

The proponent contends that there are evident synergies between Tesla and xAI. Tesla is transforming into a leading artificial intelligence (AI) company, and xAI is focused on building AI and its AI assistant is already integrated into Tesla vehicles. The proponent believes that a direct investment from Tesla into xAI would "strengthen Tesla's access to cutting-edge AI technologies, talent, and intellectual property." This proposal does not specify a size or structure of any investment in xAI, providing the board with flexibility.

### BOARD COMMENTARY

The board is not making any recommendation on this proposal, and it will take into consideration the results. The board highlights that this is an advisory proposal that is not binding on the company or the board. Since an investment in xAI would likely be considered a related party transaction, the board will "ultimately determine and implement financial strategies related to artificial intelligence (including any potential investment in xAI) in a manner that is consistent with its fiduciary duties".

### Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| Item 8. Assess Feasibility of Including Sustainability as a Performance Measure for Senior Executive Compensation | AGAINST |
| --- | --- |

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted, ███████████████████████████████████
███████████████████████████████████████████████████████████████

**BACKGROUND INFORMATION**

Policies: Environmental, Social, and Governance (ESG) Compensation-Related Proposals

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

Tulipshare Capital LLC has submitted a precatory proposal requesting that Tesla adopt targets and report on the quantitative metrics for assessing the feasibility of integrating sustainability metrics in the company's compensation plan for senior executives.

The resolved clause of the resolution specifically requests:

> **Resolved:** Shareholders request that, within one year, the Board Compensation Committee adopt targets and publicly report quantitative data appropriate to assessing the feasibility of integrating sustainability metrics, including those regarding diversity and independence among senior executives, into performance measures or vesting conditions that may apply to senior executives under compensation plans or arrangements.

### PROPONENT'S STATEMENT

In its supporting statement, the proponent argues that the integration of sustainability metrics into executive compensation can enhance transparency, promote corporate citizenship, and avoid legal and reputational harm. The filer notes that, increasingly, shareholders have rejected generous executive pay packages and that companies are embracing different ways to integrate ESG factors into executive pay programs. It adds that a majority of the largest companies in Europe and North America consider ESG performance in at least one incentive program. The proponent asserts that "Tesla does not integrate environmental or human capital management-related metrics in executive pay, despite 53.6% and 90.4% of S&P 500 companies doing so, respectively." It goes on to note that as a result of a lawsuit filed at the company, Tesla's directors were asked to return $735 million to the company to settle claims that they overpaid themselves. Additionally, the proponent points out that Elon Musk's pay package has raised the ceiling of CEO pay and led to "widening the gap between workers' and executives' pay packages." The proponent recommends that the report requested in the proposal include:

- "A robust, comprehensive human rights due diligence process with specific performance metrics aligned with UN Guiding Principles on Business and Human Rights assessing Tesla's success in preventing and mitigating human rights risks across its value chain.
- A performance-based component in the executive compensation structure directly tied to achieving established human rights and sustainability performance metrics, thus incentivizing the Board to embed such considerations into Tesla's core operations."

### BOARD'S STATEMENT

In its opposition statement, the board states that the prescriptive request of the proposal is unnecessary given the company's existing disclosures and commitment to sustainability. It asserts that the company's mission is to accelerate the world's transition to sustainable energy and that ethical treatment of all people and respect for human rights are core to its mission. It states that the company's Global Human Rights Policy discloses "[its]

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

commitment to uphold, respect and embed human rights and the values they represent throughout [its] business."
It says the policy also states that Tesla is committed to implementing the United Nations Guiding Principles on
Business and Human Rights and that it "conduct[s] human rights due diligence to identify risks and work[s] to
mitigate them." The board states that the company sources responsibly according to the Organization for
Economic Cooperation and Development (OECD) Due Diligence Guidance for Responsible Mineral Supply Chains
and Responsible Business Conduct and the United Nations Guiding Principles on Business and Human Rights. It
asserts that Tesla sets forth clear expectations for its suppliers, including through its Responsible Sourcing Policy
and Supplier Code of Conduct. The board argues that the prescriptive actions requested by the proposal would
"unduly constrain" Tesla's board and management's ability to determine an appropriately tailored approach to its
sustainability efforts. It notes that Tesla's annual Impact Report provides additional information on how human
rights values are respected in its operations. Lastly, the board notes that it is cognizant of the scrutiny surrounding
its compensation practices but adds that shareholders continue to support them as designed.

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For more information on linking compensation and sustainability, see ISS' Environmental and Social Background
Report.  For an update on the most recent shareholder activism around environmental and social issues, see ISS'
Top Governance and Stewardship Trends for 2025.

This is the second consecutive year that Tesla has received this proposal. Last year the proposal received 10.2
percent shareholder support (calculated as votes FOR as a percentage of votes cast FOR or AGAINST).

Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein
may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report,
please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 9. Report on the Use of Child Labor in Connection with Electric Vehicles

## AGAINST

### VOTE RECOMMENDATION

A vote AGAINST this proposal is warranted, ███████████████████████████████████████

████████████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The National Center for Public Policy Research (the "NCPPR") has submitted a proposal requesting that the company publish a report that discloses the extent to which its electric vehicle supply chain may involve child labor.

The resolution specifically requests:

> **RESOLVED:** Shareholders request that, beginning in 2026, Tesla report to shareholders (at reasonable cost and omitting proprietary information) on the extent to which its business plans with respect to electric vehicles and their charging stations involve, rely on, or depend on child labor outside the United States. The report would optimally be fully transparent with regard to sources relied on and their credibility and expressly identifies any instances in which Tesla has failed to determine whether child labor is implicated and the causes of those failures.

### PROPONENT'S STATEMENT

In its supporting statement, the proponent voices its concerns regarding the potential and actual use of child labor in Tesla's supply chain, particularly in cobalt mining, a component for electric vehicle batteries. The proponent says that most of the global cobalt supply originates from the Democratic Republic of the Congo (DRC) and alleges that children often work in hazardous conditions in these mines. It asserts that Tesla is aware that child labor may be present in its supply lines, highlighting that the company noted in 2022 the potential dangers involved in sourcing cobalt from the DRC. The proponent says that while Tesla stated in its 2024 Impact Report that the company invested more human and legal resources than ever before to address forced and child labor, it has not disclosed specific metrics on these efforts. It notes that although a lawsuit against Tesla and other companies by former child miners was dismissed on procedural grounds, questions remain about Tesla's potential involvement in international child labor. The proponent asserts that shareholders are entitled to understand the extent of any direct or indirect reliance on child labor outside the United States.

### BOARD'S STATEMENT

In its opposing statement, the board says the proposal is unnecessary, as the company already has robust policies and processes to prevent child labor. It notes that the prohibition of child labor is reinforced across Tesla's Code of Business Ethics, Supplier Code of Conduct, and Global Human Rights Policy. Tesla reports that it engages regularly with external groups for feedback on its human rights approach and requires all suppliers to follow its Supplier Code of Conduct, prohibiting child labor in all stages of manufacturing. It adds that multiple risk assessment and mitigation measures are in place to minimize child labor risks across the supply chain.

The company also highlights its sourcing strategy. In 2024, all direct cobalt suppliers underwent an audit, with ten assessed against a Tesla-preferred international standard covering environmental and social risks. It states this audit was in addition to a series of audits and assessments over the past three years, including a human rights assessment. Tesla notes that it also conducts its own audits of mine sites and refiners and reviews third-party audit results, such as those from the Responsible Minerals Initiative. For materials not directly sourced, it says it applies

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

the same mapping and due diligence requirements. The board concludes the proposal is unnecessary because Tesla already has strong human rights policies and regularly reports on efforts to prevent and address child labor.

BACKGROUND AND RECENT SHAREHOLDER ACTIVISM

For background information on business and human rights see ISS' Environmental and Social Background Report. For an update on the most recent shareholder activism around environmental and social issues, see ISS' Top Governance and Stewardship Trends for 2025.

This is the second time the company has received a proposal on this topic. In 2022, it received a proposal asking it to issue a report on the use of child labor in connection with its battery supply chain, which garnered 10.5 percent shareholder support.

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609

| **Item 10. Amend the Bylaws To Repeal 3% Derivative Suit Ownership Threshold** | **AGAINST** |
|---|---|

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted. ███████████████████████
████████████████████████████████████████████████████
████████████████████████████████████████████████████

**Vote Requirement:** Two-thirds of outstanding shares (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The Comptroller of the State of New York, as lead filer, intends to present the following binding bylaw proposal for consideration:

> **Resolved:** Tesla's bylaws are hereby amended as follows:
>
> (1)  The title of Article XI is amended as follows: the phrase "OWNERSHIP THRESHOLD FOR DERIVATIVE PROCEEDINGS" is deleted;
>
> (2)  "Section 11.3 — OWNERSHIP THRESHOLD FOR DERIVATIVE PROCEEDINGS" is repealed and deleted in its entirety; and
>
> (3)  ARTICLE X — AMENDMENTS is amended to add the following language to the end of the last sentence: "; and *provided further*, that the board of directors shall not have the power to adopt or amend the bylaws to provide for an ownership threshold for shareholders to institute derivative proceedings."

### PROPONENT STATEMENT

The proponent reminds shareholders that when the company proposed to reincorporate from Delaware to Texas, the board stated that shareholder rights under Delaware and Texas law were substantially equivalent, and that there was no reason to believe that Texas law would lessen shareholders' litigation rights relative to Delaware.

On May 14, 2025, Texas amended its corporate laws to permit Texas corporations to set up to a 3 percent ownership threshold before a shareholder can enforce their rights in a derivative suit. The proponent believes that derivative suits are a last resort for shareholders to enforce their rights, where shareholders can sue directors and officers who have violated their fiduciary duties on behalf of the company. For Tesla, a 3 percent holding would amount to tens of billions of dollars, which is something that few shareholders could satisfy on their own, Elon Musk excluded.

The proponent highlights that the Tesla board amended the bylaws the next day to implement the 3 percent threshold, which it contends insulates directors/officers from accountability to shareholders, and characterizes it as a "bait-and-switch" given the board's past statements at the time of the reincorporation.

The proponent believes that amending the Tesla bylaws to remove this provision will "restore both faith in the Board's accountability and shareholders' ability to raise legitimate legal concerns about corporate governance" and that Tesla's adoption of it in the first place is egregious.

### BOARD STATEMENT

In recommending that shareholders vote against this proposal, the board dedicates considerable real estate to correct what it characterizes as the proponent's misleading and incorrect statements (see page 102 of the proxy for full accounting). The board highlights that the Texas law at issue was not introduced until 10 months after the 2024 proxy was filed and that when Tesla moved to Texas, the Texas legislature was not even in session. Further,

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

the board states that any shareholder can initiate a derivative claim if it gathers support from 3 percent of the shareholder base, and that this bylaw allows the company to remain accountable to shareholders while focusing corporate resources on claims that matter to a meaningful portion of the shareholder base. The board also takes issue with the last part of the proponent's request, which would preclude the board from adopting any sort of ownership requirement for derivative proceedings, limiting future flexibility.

The board further highlights the considerable expense the company has incurred related to derivative suits brought by shareholders. Specifically, in 2018, a holder of just nine Tesla shares brought a derivative suit challenging Musk's compensation, which has for over seven years resulted in expense and diversion of resources. Last year, shareholders voted again on that compensation package in question and the holders of 72 percent of disinterested shares supported the ratification of the package, demonstrating "our shareholder base's overwhelming rejection of the litigation challenging our CEO's compensation."

In addition, the board highlights various ways in which it believes it has been responsive and accountable to shareholders, and that shareholders have a variety of means with which to hold the board accountable.

Further, in the Q&A portion of the proxy, the company adds that if Item 6 is adopted, the management proposal to remove various supermajority requirements, then Article X of the bylaws would be deleted in its entirety. As this proposal relates to amending Article X of the bylaws, it would also be impossible for the company to implement both Item 6 and this Item 10 (i.e. deleting and then amending Article X). As such, the board "will need to consider how to take appropriate actions to reflect any conflicting bylaws amendments to the extent adopted by our shareholders."

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

Meeting Date: **6 November 2025**
Meeting ID: 1994609

## Item 11. Amend Bylaws

### AGAINST

**VOTE RECOMMENDATION**

A vote AGAINST this proposal is warranted. ████████████████████████
████████████████████████████████████████████████████████████████

**Vote Requirement:** Two-thirds of outstanding shares (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

The Treasurer for the State of Illinois and Trustee of the Bright Directions College Savings Trust, as lead filer, intends to present the following binding proposal for consideration:

> RESOLVED, pursuant to Article X of the Amended and Restated Bylaws of Tesla, Inc., shareholders of Tesla, Inc. ("Tesla") hereby amend the Bylaws to add the following to the end of Article X:

> "; *and provided further, however,* that any amendment of these bylaws by the board of directors to make the "affirmative election" referenced in section 21.373(b) of the TBOC to be governed by section 21.373 of the TBOC shall be invalid if it is not ratified within one year of such amendment by the affirmative vote of the holders of at least 66 2/3% of the total voting power of outstanding voting securities, voting together as a single class."

### PROPONENT STATEMENT

The proponent highlights that Section 21.373 of the Texas Business Organizations Code permits corporations whose principal office is in Texas to amend their governing documents to elect to be governed by the section, which imposes more stringent requirements for submitting shareholder proposals relative to the default rules under SEC Rule 14a-8. Whereas Rule 14a-8 requires ownership of between $2,000 and $25,000 of stock, Section 21.373 requires $1,000,000 of stock or 3 percent of voting shares. In addition, Section 21.373 requires that any shareholder proponent solicit the holders of at least 67 percent of shares entitled to vote.

The proponent believes that shareholder proposals are a crucial mechanism for providing feedback, and curtailing this ability, if adopted, would not serve the company's or shareholders' financial interests. The proponent also cites some of Tesla's recent financial and governance challenges, and concerns over Elon Musk's outside commitments and the board's oversight.

Therefore, the proponent believes that shareholders should have the opportunity to ratify any bylaw amendment that would limit their rights.

### BOARD STATEMENT

The board asserts that the proponent has not cited any actions taken by it to curtail shareholder proposals or limit shareholder communication, stating that it has not adopted the bylaw in question permitted by Section 21.373, making this proposal premature. Further, the board highlights Tesla's commitment to shareholder engagement and that it remains responsive on issues that matter to a meaningful portion of the shareholder base.

Moreover, if Item 6 is adopted, the management proposal to remove various supermajority requirements, then Article X of the bylaws would be deleted in its entirety. As this proposal relates to amending Article X of the bylaws, it would not only be unnecessary, but it would also be impossible for the company to implement both Item 6 and this Item 11 (i.e. deleting and then amending Article X).

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

Finally, the board highlights that there are multiple proposals related to Section 21.373 on this ballot, Item 11 and 14, each of which recommend a different approach. The board believes it should have discretion and flexibility in taking action on such a novel and evolving issue.

### EXEMPT SOLICITATION

On Oct. 16, 2025, the Illinois State Treasurer's Office filed an exempt solicitation in which it urges shareholders to vote in favor of this proposal. The filing includes responses to some of the points made by the board in its opposition statement.

## Analysis



| Item 12. Declassify the Board of Directors | FOR |
| --- | --- |

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮

**BACKGROUND INFORMATION**

Policies: Classification/Declassification of the Board

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

James McRitchie intends to present the following proposal for consideration:

> RESOLVED: Tesla Inc. ("Company" or "Tesla") shareholders, including James McRitchie of CorpGov.net, ask that our Company take all steps necessary to reorganize the Board of Directors into one class with each director subject to election each year for a one-year term so that all directors are elected annually. The proposal can be implemented in one-year, a best practice, or can be phased in.

### PROPONENT STATEMENT

The proponent highlights that 90 percent of S&P 500 boards are declassified, that annual director elections are widely viewed as best practice, and annual elections make directors more accountable. The proponent also indicates that this proposal topic has historically received majority support at other companies, and that a similar proposal last year at Tesla also received majority support. Moreover, the proponent highlights some of the company's governance deficiencies, including certain supermajority voting requirements.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**                                                                                    **Meeting Date: 6 November 2025**
POLICY: United States                                                                                    Meeting ID: 1994609

## BOARD STATEMENT

As discussed elsewhere, because the "shareholder participation rate" was over 65 percent at the last annual meeting, the board has submitted a proposal for shareholder consideration to remove various supermajority requirements (Item 6). If that proposal is approved, it would "unlock a gateway for our Board and shareholders to adopt further shareholder-driven governance actions, including, without limitation, the declassification of the Board, as may be appropriate in accordance with law."

In addition, the board does not believe this is the right time to move toward a declassification, believing it is more appropriate to first enable shareholders to vote on a removal of supermajority requirements, and " whether the gateway for adopting further shareholder-driven governance actions (such as Board declassification, as may be appropriate in accordance with law) should be unlocked." However, the board also highlights the risks to stability and Tesla's long-term strategy that a declassification could cause.

## Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

| **Item 13. Reduce Supermajority Vote Requirement** | FOR |
|---|---|

**VOTE RECOMMENDATION**

A vote FOR this proposal is warranted ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮
▮▮▮▮▮▮▮

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

John Chevedden intends to present the following proposal for consideration:

> Shareholders request that our board take each step necessary so that each voting requirement in our charter and bylaws (that is explicit or implicit due to default to state law) that calls for a greater than simple majority vote be replaced by a requirement for a majority of the votes cast for and against applicable proposals, or a simple majority in compliance with applicable laws. If necessary this means the closest standard to a majority of the votes cast for and against such proposals consistent with applicable laws. This includes making the necessary changes in plain English.

### PROPONENT STATEMENT

The proponent states that supermajority requirements have been found to be an entrenching mechanism and can be used to block proposals that can improve shareholder rights. The proponent highlights that this proposal topic won majority support at the 2024 and 2020 annual meetings. Further, the proponent contends that it would be useful for the board to "prepare a detailed report, omitting proprietary data, on the Board of Directors' expenses to proxy solicitors and other vendors to obtain the challenging supermajority approval requirement from all shares outstanding on this proposal topic when less such *[sic]* supermajority of Tesla shares typically cast ballots."

### BOARD STATEMENT

In recommending that shareholders vote against this proposal, the board highlights that Tesla is already asking shareholders to vote on amendments to remove supermajority requirements under Item 6, making this shareholder proposal unnecessary if it is approved. The board believes that the requested report is also unnecessary when considering that Tesla achieved a total shareholder participation rate of 72 percent at the 2024 annual meeting. Further, the board highlights that it has repeatedly sought to remove supermajority requirements at each of the 2019, 2021, and 2022 annual meetings, though they did not receive the requisite two-thirds vote required for approval. Finally, the board states that at this meeting it is delivering on its prior commitment to propose a binding vote to remove the supermajority requirements because the shareholder participation rate was in excess of 65 percent at the 2024 meeting.

### EXEMPT SOLICITATION

On Sept. 24, 2025, John Chevedden, the proponent, filed an exempt solicitation in which he urges shareholders to vote in favor of this proposal along with the binding proposal in Item 6, and to vote against director Ira Ehrenpreis in Item 1a as chair of the governance committee. The filer contends that the two-thirds vote required to approve Item 6, the binding proposal, is a substantial hurdle to meet and that this shareholder proposal only requires a majority of votes cast to be approved, indicating that it is important for at least one of them to be approved. In recommending against the governance committee chair, the filer highlights concerns over the lack of a binding vote on a board declassification at this meeting (see Item 1 for further discussion).

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

Analysis



Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

## Item 14. Require Shareholder Approval of Bylaw Amendments Adopted by the Board of Directors

**FOR**

### VOTE RECOMMENDATION

A vote FOR this proposal is warranted ██████████████████████████████████
████████████████████████████████████████████████████████████████████████

**Vote Requirement:** Majority of votes cast (abstentions count against; broker non-votes have no effect)

## Discussion

### PROPOSAL

Newground Social Investment, on behalf of certain co-filers, intends to present the following proposal for consideration:

> **RESOLVED:**  Shareholders request that the Board seek shareholder approval before adopting any bylaw amendment that sets ownership thresholds or solicitation requirements for shareholder proposals above those specified in Rule 14a 8 of the Securities Exchange Act of 1934.

### PROPONENT STATEMENT

In 2025, Texas enacted SB 1057, which allows Texas-registered corporations, or those listed on the Texas stock exchange, to impose significantly higher thresholds to file a shareholder proposal than those set by the SEC under Rule 14a-8. As permitted by the new law, as a pre-condition, Tesla could require a shareholder, or a group, to hold at least 3 percent of shares outstanding or at least $1 million in voting shares, and require them to solicit support from 67 percent of shareholders if they were to try to submit a shareholder proposal. (Note that SB 1057 provides for Section 21.373, which is the topic of Item 11 at this meeting)

The proponent is concerned that Tesla could impose these restrictions without a shareholder vote (bylaw amendments do not necessarily require shareholder approval), allowing management to override SEC rules and long-established shareholder rights without consent. The proponent asserts that the $1 million ownership threshold is unreasonable in light of most shareholders' modest holdings, and that shareholder proposals have proven to be a low-cost, high-value tool for companies to better understand and manage material risks.

### BOARD STATEMENT

In recommending that shareholders vote against this proposal, the board highlights much of the same arguments that are stated in Item 11, including:

- that limiting the board's ability to respond to novel and evolving issues would not be in the best interests of shareholders;
- the presence of multiple shareholder proposals on this topic, which outline different approaches, further highlights the importance of board flexibility; and
- that the board has consistently demonstrated its commitment to shareholders' ability to communicate with Tesla or with each other.

## Analysis

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**  
POLICY: United States

**Meeting Date: 6 November 2025**  
Meeting ID: 1994609

## Detailed Ownership Profile

back to Ownership and Control Overview

Percentages rounded down to 1 decimal. "▶" identifies shareholders considered strategic under ISS' definition.

| Type | Votes per Share | Outstanding |
|---|---|---|
| Common Stock | 1 | 3,325,150,886 |

| Ownership - Common Stock | Number of Shares | % of Class |
|---|---|---|
| ▶MUSK ELON REEVE | 413,362,808 | 12.4 |
| The Vanguard Group | 229,805,491 | 6.9 |
| Blackrock, Inc. | 188,797,465 | 5.6 |
| SSgA Funds Management, Inc. | 113,418,687 | 3.4 |
| Geode Capital Management LLC | 64,767,993 | 1.9 |
| Capital Research & Management Co. (World Investors) | 41,632,930 | 1.2 |
| Norges Bank Investment Management | 37,272,002 | 1.1 |
| JPMorgan Investment Management, Inc. | 32,123,572 | 0.9 |
| Northern Trust Investments, Inc.(Investment Management) | 23,084,319 | 0.6 |
| Fidelity Management & Research Co. LLC | 22,043,484 | 0.6 |
| T. Rowe Price Associates, Inc. (IM) | 20,228,729 | 0.6 |
| Amundi Asset Management US, Inc. | 19,558,787 | 0.5 |
| Charles Schwab Investment Management, Inc. | 18,576,698 | 0.5 |
| Goldman Sachs & Co. LLC (Private Banking) | 17,819,904 | 0.5 |
| Morgan Stanley & Co. LLC | 13,634,156 | 0.4 |
| Barclays Bank Plc (Private Banking) | 13,230,784 | 0.4 |
| BAMCO, Inc. | 13,018,798 | 0.3 |
| Loomis, Sayles & Co. LP | 12,914,797 | 0.3 |
| ▶Vaibhav Taneja | 120,856 | <0.1 |
| ▶Tom Zhu | 47,600 | <0.1 |

Source(s): Proxy Statement, © 2025 Factset Research Systems, Inc. All Rights Reserved. As of: 15 Sep 2025

## Additional Information

| | |
|---|---|
| Meeting Location | Tesla's Gigafactory Texas, 1 Tesla Road, Austin, Texas 78725 |
| | Virtual Meeting: http://www.virtualshareholdermeeting.com/TSLA2025 |
| Meeting Time | 15:00 |
| Shareholder Proposal Deadline | May 20, 2026 |
| Solicitor | INNISFREE M&A Incorporated |
| Security IDs | 88160R101(CUSIP) |

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.

**Tesla, Inc. (TSLA)**
POLICY: United States

**Meeting Date: 6 November 2025**
Meeting ID: 1994609

ISS' experienced research team provides comprehensive proxy analysis and complete vote recommendations for over 50,000 meetings annually in over 100 markets worldwide. With over 300 research professionals, ISS aims to cover every holding within a client's portfolio in both developed and emerging markets.

Our research analysts are located in offices worldwide, offering local insight and global breadth. Research office locations include Berlin, Brussels, London, Manila, Mumbai, Norman, Paris, Rockville, Stockholm, Sydney, Tokyo, Toronto, and Washington, D.C.

ISS has long been committed to engagement and transparency. For information on the policies applied in this research report, please see our Policy Gateway. Please use the ISS Help Center for questions on research reports, policy, and for requests for engagements.



Copyright © 2025 Institutional Shareholder Services Inc. and/or its subsidiaries ("ISS STOXX"). All rights reserved.

This report and all of the information contained in it, including without limitation all text, data, graphs and charts, is the property of ISS STOXX and/or its licensors and is provided for informational purposes only. The information may not be modified, reverse-engineered, reproduced or disseminated, in whole or in part, without prior written permission from ISS STOXX.

This report and the recommendations, ratings and/or other analytical content in the report has not been submitted to, nor received approval from, the United States Securities and Exchange Commission or any other regulatory body.

The user of this report assumes all risks of any use that it may make or permit to be made of the information. While ISS STOXX exercised due care in compiling this report, ISS STOXX makes no express or implied warranties or representations with respect to the information in, or any results to be obtained by the use of, the report. In particular, the recommendations, ratings and/or other analytical content in the report are not intended to constitute an offer, solicitation or advice to buy or sell securities nor are they intended to solicit votes or proxies. ISS STOXX shall not be liable for any losses or damages arising from or in connection with the information contained herein or the use of, reliance on, or inability to use any such information.

Please note the issuer(s) mentioned within this report and/or material may have a commercial relationship with ISS Corporate Solutions, Inc. ("ISS-Corporate"), a wholly owned subsidiary of Institutional Shareholder Services Inc., or ISS-Corporate may have provided advisory or analytical services to the issuer(s) in connection with the information described in this report. No employee of ISS-Corporate played a role in the preparation of this report. If you are an institutional client of ISS STOXX, you may inquire about any issuer's use of products and services from ISS-Corporate via ProxyExchange or by emailing disclosure@issgovernance.com.

Additionally, the issuer(s) mentioned within this report and/or material may be a client of ISS STOXX, or the parent of, or affiliated with, a client of ISS STOXX. One or more of the proponents of a shareholder proposal at an upcoming meeting may be a client of ISS STOXX, or the parent of, or affiliated with, a client of ISS STOXX. None of the sponsors of any shareholder proposal(s) played a role in preparing this report.

ISS STOXX is majority owned by Deutsche Börse AG ("DB"), an international exchange organization. Both ISS STOXX and DB have established standards and procedures to protect the integrity and independence of the research, recommendations, ratings and other analytical offerings ("Research Offerings") produced by ISS STOXX.

Further information about conflict mitigation can be found here.

Copyright © 2025 Institutional Shareholder Services Inc.  All Rights Reserved.  This proxy analysis and the information herein may not be reproduced or disseminated in whole or in part. For information on the policies applied in this research report, please see our Policy Gateway.