**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS**

|  |  |
|---|---|
| **INSTITUTIONAL SHAREHOLDER SERVICES INC.,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:26-cv-02254-HLT-RES** |
| **KRIS KOBACH, in his official capacity as the Kansas Attorney General,** | |
| **Defendant.** | |
| **GLASS, LEWIS & CO., LLC,** | |
| **Plaintiff,** | |
| **v.** | **Case No. 2:26-cv-02286-HLT-RES** |
| **KRIS KOBACH, in his official capacity as Attorney General of Kansas,** | |
| **Defendant.** | |

## MEMORANDUM AND ORDER

Plaintiffs Institutional Shareholder Services, Inc. ("ISS") and Glass, Lewis & Co., LLC ("Glass Lewis" or "GL") are proxy advisors that offer recommendations to institutional investors on shareholder votes. Plaintiffs filed separate lawsuits[1] and ask the Court to preliminarily enjoin Defendant Kris Kobach in his capacity as Attorney General of Kansas from enforcing the recently passed SB 375 against them because the law discriminates against viewpoint and violates their First Amendment rights. Defendant disagrees.

---

[1]   Although the cases are not formally consolidated, the Court requested that the parties coordinate briefing so the motions in both cases could be heard at the same hearing. This order will be filed in both cases.

The Court agrees with Plaintiffs. SB 375 discriminates on viewpoint because it imposes burdens when Plaintiffs' speech <u>disagrees</u> with the view of company management but imposes no burdens when Plaintiffs' speech <u>agrees</u> with the view of company management. Viewpoint discrimination is deeply antithetical to the First Amendment and, at a minimum, laws that discriminate based on viewpoint must pass strict scrutiny. Defendant does not argue that SB 375 can satisfy this demanding standard should it apply. Plaintiffs have therefore shown a likelihood of success on the merits of their First Amendment claim, and the other preliminary-injunction factors weigh in favor of an injunction. The Court grants the motions and enjoins Defendant from enforcing SB 375 against Plaintiffs.

## I.      BACKGROUND[2]

### A.      SB 375[3]

SB 375 is known as the Proxy Advisory Transparency Act. Under SB 375, a "proxy advisor" is "a person who, for compensation, provides a proxy advisory service to shareholders of a company or to other persons with authority to vote on behalf of the shareholders of a company." SB 375, § 3(g). "Proxy advisory service" is defined as certain "services that are provided in connection with or in relation to a company, or are provided to any person in this state." *Id.* § 3(h). This includes "[a]dvice or a recommendation on how to vote on a company proposal or proxy proposal." *Id.* Charitable organizations and banks that meet certain criteria are excluded from the definition of proxy advisory service. *Id.*

---

[2]     The following facts are alleged in the complaints and the exhibits submitted with the preliminary-injunction briefing. The Court has also considered the arguments, testimony, and additional exhibits presented at the June 18, 2026 preliminary-injunction hearing. Citation to documents in Case No. 2:26-cv-2254 are noted with the label "ISS." Citation to documents in Case No. 2:26-cv-2286 are noted with the label "GL."

[3]     Copies of SB 375 are found at ISS Doc. 16-2 and GL Doc. 15-4.

The operative portion of the bill starts in Section 4. If a proxy advisor makes a voting recommendation that aligns with the views of company management, SB 375 does not require any action. If a proxy advisor recommends a vote "against company management," whether specifically or as default policy, and that recommendation is not based on a "written financial analysis," the proxy advisor must:

> (1) Concurrently with providing the proxy advisory service, include a clear and conspicuous disclosure to each shareholder, or entity or other person acting on behalf of a shareholder, receiving the proxy advisory service that:
>
>> (A) Identifies the service being provided;
>>
>> (B) identifies the recommendation or policy at issue; and
>>
>> (C) states that the proxy advisor has made the recommendation or policy without basing such recommendation on a written financial analysis regarding the impact of such recommended action on company investors that:
>>
>>> (i) Analyzes the expected short-term and long-term financial benefits and costs to the company regarding the implementation of the company proposal or proxy proposal;
>>>
>>> (ii) concludes what vote or course of action is most likely to positively affect shareholder value; and
>>>
>>> (iii) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation;[4]
>
> (2) provide, concurrently with providing a proxy advisory service under section 3(h)(1)(A) or (1)(B), and amendments thereto, the disclosure under subsection (a)(1) to the board of directors of each company that is the subject of the proxy advisory service; and
>
> (3) while any proxy advisory services are being provided, publicly and conspicuously disclose on the home or front page of the proxy advisor's website a statement that the proxy advisor's proxy

---

[4] The language in Section 4(a)(1)(C)(i)-(iii) and Section 4(b)(1)(C)(i)-(iii) is how SB 375 specifically defines "written financial analysis" in the definition portion of the statute. ISS Doc. 16-2 at 3-4.

advisory services include one or more services that include recommendations or policies against company management on company proposals or proxy proposals that are not made based on a written financial analysis regarding the impact of such recommended action on company investors that:

> (A) Analyzes the expected short-term and long-term financial benefits and costs to the company regarding the implementation of the company proposal or proxy proposal;
>
> (B) concludes what vote or course of action is most likely to positively affect shareholder value; and
>
> (C) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation.

*Id.* § 4(a).

If a proxy advisor makes a recommendation "against company management" that <u>is</u> based on a written financial analysis, the proxy advisor must:

> (1) Concurrently with providing the proxy advisory service, include a clear and conspicuous disclosure to each shareholder, or entity or other person acting on behalf of a shareholder, receiving the proxy advisory service that:
>
> > (A) Identifies the proxy advisory service being provided;
> >
> > (B) identifies the recommendation or policy at issue;
> >
> > (C) states that the proxy advisor has made the recommendation or policy based on a written financial analysis that:
> >
> > > (i) Analyzes the expected short-term and long-term financial benefits and costs to the company regarding the implementation of the company proposal or proxy proposal;
> > >
> > > (ii) concludes what vote or course of action is most likely to positively affect shareholder value; and
> > >
> > > (iii) explains the methods and processes used to prepare the analysis, including the experience and geographic location of the personnel who formed the recommendation; and

(D) states that the analysis is available upon request;

(2) make such analysis available within a reasonable time to any client of the proxy advisory service upon request; and

(3) provide, concurrently with providing a proxy advisory service under section 3(h)(1)(A) or (1)(B), and amendments thereto, a copy of such analysis to the board of directors of each company that is the subject of the service.

*Id.* § 4(b).

A violation of the act is considered a "deceptive and unconscionable act" under the Kansas Consumer Protection Act ("KCPA"). *Id.* § 5(a). The attorney general may bring a civil action for any violation. *Id.* Penalties under the KCPA are up to $10,000. *See* K.S.A. § 50-636(a).

## B.    Proxy Advisor Services

### 1.    Shareholder Voting

Publicly traded companies hold annual shareholder meetings where shareholders vote on various proposals regarding the company business or operations. ISS Doc. 1 at ¶ 24; GL Doc. 2 at ¶ 37. These votes can be on a variety of matters. ISS Doc. 1 at ¶ 24; GL Doc. 2 at ¶ 39. The proposals range in complexity and subject matter. ISS Doc. 1 at ¶¶ 26-27; GL Doc. 2 at ¶ 40. Company management can also weigh in on proposals. GL Doc. 2 at ¶ 41. For some proposals, management's interests may diverge from shareholders' interests, such as executive compensation, long-term versus short-term growth, and accountability of management. *Id.* ¶ 42.

### 2.    Institutional Investors

Institutional investors are typically pension plans, asset managers, and mutual funds. ISS Doc. 1 at ¶ 28. Institutional investors are sophisticated entities and may manage billions or trillions of dollars. ISS Doc. 16-3 at ¶ 14. These entities can have significant stock holdings in several companies. ISS Doc. 1 at ¶ 28. As a result, they may have to cast thousands of votes at shareholder

meetings each year, most of which are concentrated in the period of March to June. *Id.*; ISS Doc. 16-3 at ¶ 14. To navigate these votes, institutional investors can hire proxy advisors to provide information, advice, and recommendations on how to cast their shareholder votes. ISS Doc. 1 at ¶ 1, 28.

### 3.    ISS

ISS is a proxy advisor. *Id.* ¶ 29. It is also a registered investment advisor. In 2025, ISS advised approximately 1,400 clients on voting decisions for approximately 52,000 shareholder meetings. *Id.* ISS does not serve retail investors. ISS Doc. 16-3 at ¶ 5. It is organized in Delaware and based in Maryland. ISS Doc. 1 at ¶ 35. It has one client in Kansas. *Id.* ¶ 36.

ISS provides its recommendations based on research and corporate governance data. *Id.* ¶ 33. Its recommendations are tailored based on the proxy voting policies selected by its clients. *Id.* There are three types of policies: (1) client-specific custom policies, (2) a benchmark policy, and (3) various specialty policies. *Id.* ¶ 37. Custom policies are designed to address a client's unique needs and preferences and reflect a client's specific approach to proxy voting based on the assets they manage. *Id.* ¶ 38. In 2024, 90% of the shares for which ISS provided recommendations were tied to custom policies. *Id.* ¶ 39. The benchmark policy is one that reflects ISS's general framework for providing proxy advice. *Id.* ¶ 40. It focuses on protecting shareholders from weak corporate governance practices. *Id.* ¶ 42. Specialty policies are thematic and can evaluate governance issues from various perspectives, including those that are faith-based, board-aligned, or focused on sustainability, social responsibility, or the climate. *Id.* ¶ 43. These policies are publicly available on ISS's website. *Id.*[5]

---

[5]    Custom policies are proprietary and are owned by the clients or third parties who developed them. ISS generally does not divulge the considerations for those recommendations. ISS Doc. 16-3 at ¶ 23. Reports issued under the benchmark policy are generally provided to the company at issue. *Id.* ¶ 34. But reports generated under custom or specialty policies are not. *Id.*

Once a client selects a policy, ISS analyzes each proposal on the ballot at an upcoming shareholder meeting through the lens of the applicable policy. *Id.* ¶¶ 46-47. ISS then provides clients with reports that summarize its research and provide voting recommendations. *Id.* ISS has no financial interest in the outcome of any shareholder vote. *Id.* ¶ 48. ISS has a public-facing brochure that states it "does not guarantee that its advice will produce any particular investment return or other results for clients." *Id.* ¶ 32.

ISS does not provide any voting recommendation to any investor who has not contracted with ISS for those services. ISS Doc. 16-3 at ¶ 16. Because of its wide variety of clients and policies, ISS may advise one client to vote for a proposal while advising another to vote against it, depending on the policies selected by the clients. ISS Doc. 1 at ¶ 48. The decision of how to vote is ultimately the responsibility of the client. ISS Doc. 16-3 at ¶ 10.

Generally, ISS does not provide a "written financial analysis" as defined in SB 375. *Id.* ¶ 44. The voting decisions typically involve qualitative issues that cannot be quantified. *Id.* Although reports contain financial information, ISS generally does not quantify the financial impact on company stock of a specific voting recommendation. *Id.*

If ISS attempts to perform the "written financial analysis" outlined in SB 375, it would be forced to take public positions on controversial issues, rank its various clients' preferences, and provide its work to others without compensation. ISS Doc. 1 at ¶ 64. If it doesn't conduct a "written financial analysis," it will be forced to say to its clients, company boards, and the public that it does not analyze the short-term and long-term financial benefits and costs to a company or conclude what action is most likely to positively affect shareholder value. *Id.* ISS views such statements as false and misleading because it does consider the impact of a recommendation on company investors because ISS's recommendations are based on each client's chosen criteria.

*Id.* ¶ 65. Additionally, stating that ISS does not consider short-term and long-term benefits and costs is misleading because such analysis is not always possible. *Id.* Many issues put to shareholder vote are not susceptible to financial quantification. *Id.* Requiring ISS to disseminate its reports to boards would also complicate its confidentiality obligations. ISS Doc. 16-3 at ¶ 46.

### 4.    Glass Lewis

Glass Lewis is a Delaware company based in California. GL Doc. 2 at ¶ 11. It offers proxy voting advice to institutional investors, including to at least seven clients in Kansas and regarding companies based in Kansas. *Id.* ¶¶ 11, 50, 52. It intends to continue doing so after July 1, 2026. *Id.* ¶ 55. Its clients include large public pension plans, mutual funds, and asset managers— primarily sophisticated institutional investors. *Id.* ¶ 49. Glass Lewis does not serve retail investors. *Id.* It is not a registered investment advisor, but it may become one in the future.

Glass Lewis offers its clients independent research, data analytics, and voting recommendations on company ballot items. *Id.* ¶¶ 43, 48. The core of Glass Lewis's business is "written reports and policies that reflect Glass Lewis'[s] views on how to best serve its clients and create and preserve long-term shareholder value." *Id.* ¶ 44. The recommendations provided by Glass Lewis frequently implicate matters of significant public concern. GL Doc. 15-2 at ¶ 14.

Glass Lewis's recommendations are based on its views about what is in the best interest of its clients based on corporate governance best practices. GL Doc. 2 at ¶ 57. Clients pay Glass Lewis prior to the delivery of its recommendations, and compensation does not depend on whether Glass Lewis recommends votes for or against a proposal. *Id.* ¶ 58. Its recommendations are intended to inform institutional investors; the recommendations do not advertise services. *Id.*

Glass Lewis's reports contain detailed explanations of the facts relied on and the policies applied, as well as the reasoning for the recommendations. *Id.* ¶ 59. They are often 50 pages or

more of financial analysis, including tables of quantitative and qualitative information. *Id.* ¶ 60. But many proposals up for vote are not susceptible to quantifiable analysis. GL Doc. 15-2 at ¶ 18. Nor do the reports model the financial impact of each voting recommendation on company stock. *Id.* ¶ 25. The voting recommendations provided by Glass Lewis are non-binding. *Id.* ¶ 20. Clients can vote in any manner they believe supports their fiduciary obligations. *Id.*

The voting recommendations are tailored to the client's voting policy. GL Doc. 2 at ¶ 63; Doc. 15-2 at ¶¶ 26-27. Glass Lewis has a benchmark policy, which reflects Glass Lewis's research and analysis on how to create and preserve shareholder value. GL Doc. 2 at ¶ 64. But a majority of Glass Lewis's clients choose tailored policies based on specific investment preferences. *Id.* ¶ 65. Custom policies, which are drafted after extensive discussion with the client, are based on the client's unique investment approach, risk tolerance, views, and needs. *Id.* ¶¶ 65-66. Thematic policies are also available. *Id.* ¶ 68. Examples are Glass Lewis's Catholic Policy that is informed by guidelines set by the Conference of Catholic Bishops, or the Climate Policy that focuses on mitigating climate change. *Id.*

Glass Lewis's voting recommendations are opinions. *Id.* ¶ 45. Each report contains a disclaimer that the vote recommendation is a statement of opinion that is judgmental, rather than a statement of fact. *Id.* Glass Lewis regularly advises shareholders to vote against the recommendation of company management when doing so is in the shareholders' best interest. *Id.* ¶ 46. Glass Lewis may recommend votes for or against company management depending on how Glass Lewis views the proposal at issue. *Id.* ¶ 47.

Glass Lewis has no stake in the outcome of any shareholder vote. *Id.* ¶ 53. It does not seek to control or influence any company and does not solicit for or against ballot measures. *Id.* As far

9

as Glass Lewis is aware, none of its clients have ever claimed that the advice provided by Glass Lewis was deceptive. GL Doc. 15-2 at ¶ 11.

None of Glass Lewis's Kansas clients have requested a "written financial analysis" as defined by SB 375. GL Doc. 2 at ¶ 51. Glass Lewis believes the definition of "written financial analysis" in SB 375 is inconsistent with what institutional investors expect. GL Doc. 15-2 at ¶ 39. According to Glass Lewis, SB 375 will require it to either produce a "written financial analysis" that may go against the client's goals or else make self-disparaging remarks. GL Doc. 2 at ¶ 69.

> For example: a pension fund client may have a custom policy that directs Glass Lewis to vote against any board member who attended fewer than 75% of board meetings in the prior year. This policy reflects the client's own investment philosophy and fiduciary judgment that director attendance is a critical governance metric. When Glass Lewis implements that policy and recommends a vote against a director with poor attendance, the Act requires it to conduct a separate "written financial analysis" of the impact of voting against that director—analysis the client has already performed in developing its policy and already told Glass Lewis to implement. Worse, Glass Lewis must then tell the client whether it thinks the client's policy is right, even though Glass Lewis deliberately leaves that qualitative judgment to its clients. If Glass Lewis does not comply, it must make misleading statements that suggest it makes recommendations with no analysis at all.

*Id.* ¶ 70. Glass Lewis alleges SB 375 imposes obligations that serve no purpose other than require it to duplicate work the client has already done and produce analysis the client did not request. *Id.* ¶ 71. A "written financial analysis" under SB 375 also requires Glass Lewis to opine on whether the client's own policy is likely to decrease shareholder value, which could expose clients to claims for breach of fiduciary duty and could drive clients away from Glass Lewis. *Id.* ¶¶ 71, 77.

Glass Lewis alleges SB 375 will cause irreparable harm by requiring it to broadcast a misleading, state-mandated message under threat of financial penalty every time it makes a voting recommendation against company management. *Id.* ¶¶ 72-74. Glass Lewis believes that message

is also false because it does consider the impact of voting recommendations on its shareholders to the extent voting recommendations are based on the client's selected policy. *Id.* ¶ 75. It disagrees that there is an objectively correct single course of action on a single shareholder vote that would most likely positively impact shareholder value. GL Doc. 15-2 at ¶ 36. Additionally, Glass Lewis's recommendations to its clients are confidential. GL Doc. 2 at ¶ 80. SB 375 would require disclosure of competitively sensitive and confidential investment strategies of its clients. GL Doc. 15-2 at ¶ 9.[6]

## II.    STANDARD[7]

Plaintiffs seek a preliminary injunction enjoining Defendant from enforcing SB 375 against them. SB 375 takes effect on July 1, 2026. A party seeking a preliminary injunction must show (1) that there is a substantial likelihood of success on the merits of the underlying claim, (2) irreparable harm will occur unless the injunction is issued, (3) the threatened injury outweighs any potential harm that the injunction may cause to the opposing party, and (4) the injunction, if issued, will not adversely affect the public interest. *N.M. Dep't of Game & Fish v. U.S. Dep't of the Interior*, 854 F.3d 1236, 1246 (10th Cir. 2017). A preliminary injunction is "an extraordinary remedy." *Id.* at

---

[6]  The declaration at GL Doc. 15-2 restarts the paragraph numbering on page 10. This citation to paragraph 9 is on page 13.

[7]  Defendant does not dispute Plaintiffs' standing. The Court agrees Plaintiffs have standing. *See Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560-61 (1992) (discussing Article III standing). Plaintiffs allege that they engage in activities targeted by SB 375 and that they would suffer constitutional and possibly economic harm if it went into effect. Plaintiffs intend to continue providing proxy advisory services after SB 375 goes into effect. Further, Defendant has threatened action against proxy advisors in the past and Plaintiffs allege he is likely to use SB 375 to act against Plaintiffs once it goes into effect on July 1, 2026. This sufficiently alleges an injury in fact. The other elements of standing are also met because the claimed harm is traceable to the enactment of SB 375, and an injunction would redress the claimed injury. The Court therefore finds Plaintiffs' have standing. Further, Glass Lewis also argues that the *Ex parte Young* exception to sovereign immunity applies. GL Doc. 15 at 8; *see also Prairie Band Potawatomi Nation v. Wagnon*, 476 F.3d 818, 828 (10th Cir. 2007) (explaining exception to state sovereign immunity for certain suits for injunctive relief against state officers with "some connection" to the enforcement of the law, including a duty or willingness to enforce the statute). The Court notes SB 375 authorizes the attorney general to bring a civil action for violation of SB 375, which would generally satisfy this standard. Defendant does not otherwise assert sovereign immunity.

1245-46 (internal quotation and citation omitted). Whether to issue an injunction is within the discretion of the court. *See Kansas v. United States*, 249 F.3d 1213, 1227 (10th Cir. 2001).

## III.    ANALYSIS

### A.    Likelihood of Success on the Merits

The Court turns to the injunction factors and starts with likelihood of success because "in First Amendment cases, the likelihood of success on the merits will often be the determinative factor." *Hobby Lobby Stores, Inc. v. Sebelius*, 723 F.3d 1114, 1145 (10th Cir. 2013). Plaintiffs contend that they are likely to succeed on the merits of their First Amendment claim because SB 375 discriminates based on viewpoint (facially and in purpose) and fails strict scrutiny.[8] Defendant responds that the law does not impose any viewpoint discrimination, so strict scrutiny does not apply. Defendant further argues that SB 375 passes constitutional muster because it only regulates commercial speech by requiring certain limited disclosures.

### 1.    Viewpoint Discrimination

The Supreme Court has long held that laws that regulate speech based on content are antithetical to the First Amendment and are presumptively unconstitutional. *Chiles v. Salazar*, 146 S. Ct. 1010, 1021 (2026). A particularly egregious form of content regulation is viewpoint discrimination. *Id.* A government regulation may not restrict constitutionally protected speech because of the viewpoint expressed unless the government can satisfy the demanding strict-scrutiny standard. *Id.*; *see also Reed v. Town of Gilbert, Ariz.*, 576 U.S. 155, 163 (2015).[9] A

---

[8]    Plaintiffs also argue SB 375 is unconstitutionally vague under the Fourteenth Amendment, and ISS argues it violates the dormant commerce clause. Because the Court finds Plaintiffs are likely to succeed on their First Amendment claims, it does not reach those arguments.

[9]    In *City of Austin, Texas v. Reagan National Advertising of Austin, LLC*, the Supreme Court addressed its holding in *Reed*. 596 U.S. 61, 69 (2022). The sign ordinance in *City of Austin* distinguished between on-premise and off-premise signs, i.e., signs that advertised businesses that were either on the same premise as the sign or signs for businesses at some other location. *Id.* at 65. The Supreme Court rejected a reading of *Reed* as stating "that a regulation cannot be content neutral if it requires reading the sign at issue." *Id.* at 69. The "off-premises distinction requires an examination of speech only in service of drawing neutral, location-based lines." *Id.* This is different

regulation targets the viewpoint expressed when it regulates based on the motivating ideology, opinion, or perspective of the speaker. *Id.* at 168-69; *see also Chiles*, 146 S. Ct. at 1021 ("When the government seeks not just to restrict speech based on its subject matter, but also seeks to dictate what particular opinion or perspective individuals may express on that subject, the violation of the First Amendment is all the more blatant." (internal quotation and citation omitted)).

Plaintiffs argue SB 375 discriminates against viewpoint on its face because SB 375 is triggered only if a proxy advisor "makes a recommendation against company management." *See* SB 375, § 4(a)-(b) (emphasis added). Defendant disagrees and argues that SB 375 is viewpoint neutral because it regulates votes against company management but not the reasons why the vote is against company management. ISS Doc. 33 at 12-13.[10] For example, Defendant contends the law applies whether a vote against management is based on either "pro-ESG" factors or "anti-ESG" factors and therefore is not viewpoint based. *Id.* at 14.[11]

The Court agrees with Plaintiffs that SB 375 is viewpoint-based on its face because the law draws a distinction based on the message conveyed. If a proxy advisor recommends voting with company management, SB 375 does not require any action by the proxy advisor and the speech is unencumbered regardless of the methodology (or lack thereof) or reasons underlying the recommendation. But, if the proxy advisor recommends voting against company management, SB

---

from regulations based on "topic discussed or the idea or message expressed." *Id.* at 73-74 (internal quotation and citation omitted). And "[u]nlike the sign code at issue in *Reed*," the sign "provisions at issue [in *City of Austin*] do not single out any topic or subject matter for differential treatment." *Id.* at 71 (emphasis added). As discussed, this is different from SB 375, which does single out a viewpoint—voting recommendations against company management—for differential treatment.

[10]  At oral argument, Defendant presented a slightly different argument why SB 375 was not viewpoint based. The argument goes that ISS and Glass Lewis themselves have no viewpoint outside the policies, which are directed by clients, and thus the voting recommendations are the client's viewpoint, not Plaintiffs' viewpoint. But the voting recommendations are still just that: recommendations by Plaintiffs on how their clients should vote. The fact that the underlying analysis is directed by the client-selected policies does not make the speech in Plaintiffs' reports any less that of Plaintiffs.

[11]  ESG factors refers to environmental, social, or governance factors.

375 requires the proxy advisor to either (1) disclose a report that satisfies the statute's definition of "written financial analysis" to the client and the company, or (2) declare to the client, company, and the internet at large that it made voting recommendations not based on a "written financial analysis." SB 375 therefore regulates speech based on whether the expressed opinion is for or against company management. *See Chiles*, 146 S. Ct. at 1021. The fact that SB 375 doesn't drill down even further on <u>why</u> a particular voting recommendation goes against company management does not make the statute any less viewpoint-based on its face.

A recent Supreme Court case found viewpoint discrimination in similar circumstances. In *Chiles*, the Supreme Court considered a law that regulated speech by therapists. *Id.* at 1024. The law allowed a therapist to engage in practices that provided acceptance or support of a patient wanting to explore their identity or undergo gender transition. *Id.* at 1018. But it did not permit the therapist to counsel a patient who wanted to change behaviors or gender expressions or eliminate sexual attraction toward the same sex. *Id. Chile*s found the law went "a step further" from regulating just the content of the therapist's speech to "prescribing what views she may and may not express." *Id.* at 1024.

In *Chiles*, the underlying reason <u>why</u> a therapist might want to counsel a patient on eliminating certain behaviors was not at issue. The law was viewpoint based simply because it allowed one type of talk therapy (supporting exploration of gender identity and sexual orientation) but not the opposite (discouraging exploration of gender identity and sexual orientation). The same is true here. Plaintiffs may recommend votes that align with company management without repercussion, but they cannot recommend votes against company management without triggering SB 375. *See also Animal Legal Def. Fund v. Kelly*, 9 F.4th 1219, 1233 (10th Cir. 2021) ("There can be no question that subsection (b) is viewpoint discriminatory in operation. . . . A person who

lies to acquire or exercise control over an animal facility intending to <u>expose wrongdoing</u> violates subsection (b). But a person who tells the same lie to gain the same control intending to <u>laud</u> the facility or for neutral reasons does not." (emphasis added)); *Chaker v. Crogan*, 428 F.3d 1215, 1227-28 (9th Cir. 2005) ("Only knowingly false speech <u>critical</u> of peace officer conduct is subject to prosecution under section 148.6. Knowingly false speech <u>supportive</u> of peace officer conduct is not similarly subject to prosecution. . . . [W]e conclude that the statute impermissibly regulates speech on the basis of a speaker's viewpoint." (emphasis added)).

Because SB 375 discriminates based on viewpoint, strict scrutiny applies. *Chiles*, 146 S. Ct. at 1021. Defendant does not argue that SB 375 can withstand strict scrutiny. Defendant explained at the hearing that Defendant values First Amendment rights and would not argue that SB 375 satisfies strict scrutiny should the Court agree with Plaintiffs that SB 375 discriminates based on viewpoint. Defendant's position is wise and well taken because it would be a tall order to overcome this demanding standard. *See Sorrell v. IMS Health Inc.*, 564 U.S. 552, 571 (2011) ("In the ordinary case it is all but dispositive to conclude that a law is content based and, in practice, viewpoint discriminatory.").

In sum, the Court finds that Plaintiffs are likely to succeed on the merits of their First Amendment claim because SB 375 discriminates against viewpoint on its face and Defendant doesn't overcome strict scrutiny.

### 2.      Severance and Commercial Speech

The viewpoint-based nature of SB 375 decides the First Amendment question and ends the likelihood-of-success analysis. But Defendant briefly mentions the issue of severance and suggested that the viewpoint-based provisions in SB 375 could be severed. There are many problems with this argument. The first problem is that severance is an issue more appropriately

15

addressed in the merits phase of a case and is premature at this stage. *See Space Expl. Techs. Corp. v. Nat'l Lab. Rels. Bd.*, 151 F.4th 761, 773 (5th Cir. 2025). The second problem is that Defendant did not meaningfully argue severance in the briefing. Only the last paragraph of his brief generically suggests it as an option without proposing what language would be cut and how the severed statute would function. The third problem is that the viewpoint-based language is the triggering language in the statute. It is unclear how the law could operate without that language. The fourth problem is that SB 375 still compels speech even when the viewpoint-based language is excised from it.

This last problem is significant. Defendant suggests at the hearing that the against-company-management language could be severed so that SB 375 would apply to all proxy advisor recommendations. But SB 375 would still compel speech. And compelled speech is still evaluated under strict scrutiny except in some exceptional and narrowly drawn categories. Commercial speech that requires speakers to disclose only factual, noncontroversial information is one such category. *See Chiles*, 146 S. Ct. at 1022. Defendant argues that, once severed, the speech regulated by SB 375 is commercial speech that satisfies the standard in *Zauderer v. Office of Disciplinary Counsel*, 471 U.S. 626 (1985), and is therefore constitutional.[12]

But SB 375 does not regulate commercial speech. "Commercial speech is that which does no more than propose a commercial transaction." *United States v. Wenger*, 427 F.3d 840, 846 (10th Cir. 2005) (internal quotation and citation omitted). Advertising is the most obvious example. *Id.*

---

[12] The Supreme Court has recognized limited circumstances where "content-based restrictions [] can apply to professional speech without triggering strict scrutiny." *Chiles*, 146 S. Ct. at 1022. One such circumstance relevant here is "laws that require speakers to disclose only factual, noncontroversial information in 'commercial speech.'" *Id.* (citing *Zauderer*, 471 U.S. at 650-53). Such disclosure requirements cannot be "unjustified or unduly burdensome" such that they would chill protected commercial speech. *Zauderer*, 471 U.S. at 651. And the disclosure requirements must be "reasonably related to the State's interest in preventing deception of consumers." *Id.* Although Defendant also alternatively addresses the standard in *Central Hudson Gas & Electric Corp. v. Public Service Commission of New York*, 447 U.S. 557 (1980), which can also apply to commercial speech, he argues that *Zauderer* is the correct standard if SB 375 regulates commercial speech. ISS Doc. 33 at 26.

A combination of factors distinguishes commercial speech from non-commercial speech. *Id*. at 847. Speech is more likely to be characterized as commercial speech if "(1) it is concededly an advertisement, (2) it refers to a specific product, or (3) it is motivated by an economic interest in selling the product." *Id.* (citing *Bolger v. Youngs Drug Prods. Corp.*, 463 U.S. 60, 66-67 (1983)).

Plaintiffs' voting recommendations are not commercial speech. The voting recommendations are not advertisements. Although commercial speech may not be "cabined to advertisements" as Defendant argues, ISS Doc. 33 at 16, advertisements are the quintessential commercial speech. *Wenger*, 427 F.3d at 846. The recommendations are not referencing a product. The recommendations are not offering a product for sale. The recommendations are the product. Also, although ISS and Glass Lewis offer their services for compensation, that transaction has already occurred before the voting recommendations are made. And the compensation is not for the specific vote, but for the service of providing voting recommendations. *See Institutional S'holder Servs., Inc. v. Sec. & Exch. Comm'n*, 142 F.4th 757, 767 (D.C. Cir. 2025) ("Between a proxy adviser and its client, it might be reasonable to say that the client 'solicits' the adviser's recommendation but that interpretation does not suggest that, in providing that recommendation, the adviser has 'solicited' the client's vote."). The fact that Plaintiffs are compensated for providing voting recommendations does not transform the voting recommendations into commercial speech. *See Serafine v. Branaman*, 810 F.3d 354, 365 (5th Cir. 2016) ("Commercial speech is speech that proposes a commercial transaction, not speech for profit. Therefore, merely receiving compensation for psychological services cannot be commercial speech." (internal quotation and citation omitted)).

Defendant argues this case is controlled by *United States v. Wenger*, which he contends establishes that the speech at issue is commercial speech. *Wenger* involved speech on a radio

program and in a newsletter giving reasons to buy PanWorld stock. 427 F.3d at 844. At issue was whether the speaker, Wenger, complied with disclosure laws because he had accepted payment of millions of shares of PanWorld stock in exchange for recommending to his listeners that they purchase the stock. *Id.* at 844-45. After the government criminally charged Wenger with securities fraud, he argued that strict scrutiny applied to the underlying disclosure law. *Id.* at 848. The Tenth Circuit disagreed, distinguishing disinterested investment advice (which was entitled to full First Amendment protection) from commercial speech in the form of compensated promotion of stocks: "While disinterested investment advice will still qualify for full First Amendment protection, paid publicists' speech is grounded in commercial transactions of the kind that the state has traditionally regulated." *Id.*

Defendant argues that "ISS and Glass Lewis, like the publisher in *Wenger*, are in the business of selling a message about publicly traded securities for a fee." ISS Doc. 33 at 17. But this overlooks important differences between the speech in *Wenger* and the speech here. In *Wenger*, the speech was clearly akin to an advertisement. Wenger was paid to recommend a product (PanWorld stock) to his listeners. His speech proposed a commercial transaction, i.e. that his listeners go buy PanWorld stock.

But here the speech at issue does not propose any commercial transaction. SB 375 does not regulate Plaintiffs' offering of services to clients. It regulates the product Plaintiffs ultimately provide. The fact that both situations (here and in *Wenger*) involve, to some extent, securities and speech does not make them comparable.[13] Nor is speech about securities automatically entitled to lesser protection. *See Nat'l Ass'n of Manufacturers v. S.E.C.*, 800 F.3d 518, 555 (D.C. Cir. 2015)

---

[13]   The purchase of securities themselves also seems quite distinct from the votes cast by shareholders on corporate governance matters after they have purchased securities.

(rejecting argument that a lower standard of scrutiny applies to securities regulations). Thus, even if Defendant could escape the conclusive impact of viewpoint discrimination in SB 375 by excising the triggering language, he has no escape path through commercial speech.

In sum, the Court finds that SB 375 is viewpoint-based. Defendant offers no defense that it can withstand strict scrutiny. Severance is not at issue and, even if it was, no lesser standard applies because the speech at issue is not commercial speech. Plaintiffs are therefore likely to succeed on their First Amendment claim.

## B.    Remaining Injunction Factors

Although "the likelihood of success on the merits will often be the determinative factor" in First Amendment cases, the Court addresses the remaining injunction factors for completeness. *See Hobby Lobby Stores, Inc.*, 723 F.3d at 1145.

### 1.    Irreparable Harm

The second preliminary-injunction factor is whether irreparable harm will occur unless the injunction is issued. "When an alleged constitutional right is involved, most courts hold that no further showing of irreparable injury is necessary." *Fish v. Kobach*, 840 F.3d 710, 752 (10th Cir. 2016) (internal quotation and citation omitted). Curtailment of First Amendment rights generally suffices to show irreparable injury. *See A.C.L.U. v. Johnson*, 194 F.3d 1149, 1163 (10th Cir. 1999). Because the Court has found SB 375 is unlikely to survive a First Amendment challenge, Plaintiffs have established they will suffer irreparable harm in the absence of an injunction.

### 2.    Balance of the Equities

The third preliminary-injunction factor is whether the threatened injury outweighs the potential harm of the injunction to the opposing party. This factor weighs in favor of an injunction because "the threatened injury to Plaintiffs' constitutionally protected speech outweighs whatever

damage the preliminary injunction may cause [Defendant's] inability to enforce what appears to be an unconstitutional statute." *Id*.

### 3. Public Interest

The fourth preliminary-injunction factor considers whether an injunction will adversely impact the public interest. "[I]t is always in the public interest to prevent the violation of a party's constitutional rights." *Hobby Lobby Stores, Inc.*, 723 F.3d at 1147.

The remaining injunction factors thus all weigh in favor of an injunction.

### C. Bond

Rule 65(c) states that a "court may issue a preliminary injunction . . . only if the movant gives security in an amount that the court considers proper to pay the costs and damages sustained by any party found to have been wrongfully enjoined or restrained." Fed. R. Civ. P. 65(c). Courts have "wide discretion" to determine an appropriate bond under Rule 65(c). *RoDa Drilling Co. v. Siegal*, 552 F.3d 1203, 1215 (10th Cir. 2009). A district court may "in the exercise of discretion, determine a bond is unnecessary to secure a preliminary injunction if there is an absence of proof showing a likelihood of harm." *Coquina Oil Corp. v. Transwestern Pipeline Co.*, 825 F.2d 1461, 1462 (10th Cir. 1987) (internal quotation and citation omitted).

Here, Defendant has not argued for a bond in the briefing.[14] He has not shown any likelihood of economic harm stemming from the injunction. Other courts have expressed hesitation in requiring a bond where a defendant is a state officer sued in an official capacity. *See Fresh Vision OP, Inc. v. Skoglund*, 2024 WL 3534739, at *10 (D. Kan. 2024) ("And, given that all

---

[14] At the hearing, Plaintiffs suggested no bond or a nominal bond of $100. Defendant suggested a bond of $10,000 each because that is the penalty amount under SB 375. Neither of these amounts equate with economic harm stemming from an injunction.

defendants have been sued in their official capacity as members of a state commission, the court requires no security here.").

The Court determines, in its discretion, that a bond is not needed under the facts of the case.

## IV.    CONCLUSION

THE COURT THEREFORE ORDERS that ISS's Motion for Preliminary Injunction (ISS Doc. 16) and Glass Lewis's Motion for Preliminary Injunction (GL Doc. 15) are GRANTED.

THE COURT FURTHER ORDERS that Defendant is enjoined from enforcing SB 375 against ISS and Glass Lewis.

IT IS SO ORDERED.

Dated: June 24, 2026                        /s/ *Holly L. Teeter*
                                            HOLLY L. TEETER
                                            UNITED STATES DISTRICT JUDGE